Craig C. Marchiando (SBN 283829)
Leonard A. Bennett, *pro hac vice forthcoming*
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel: (757) 930-3660
Fax: (757) 257-3450
craig@clalegal.com
lenbennett@clalegal.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHER DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **KIMETRA BRICE, EARL BROWNE, and JILL NOVOROT,** | : | Case No. _____ |
| | : | |
| **Plaintiffs,** | : | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| | : | |
| **v.** | : | |
| | : | |
| **KENNETH REES, GPL SERVICING, LTD., PLAIN GREEN, LLC, GREAT PLAINS LENDING, LLC, VICTORY PARK CAPITAL ADVISORS, LLC, VICTORY PARK MANAGEMENT, LLC, SCOTT ZEMNICK, JEFFREY SCHNEIDER, THOMAS WELCH, HAYNES INVESTMENTS, LLC, and L. STEPHEN HAYNES,** | : | |
| | : | |
| **Defendants.** | : | |

Plaintiffs, Kimetra Brice, Earl Browne, and Jill Novorot (collectively "Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by Counsel, and for their Class Action Complaint against Defendants Kenneth Rees, GPL Servicing, Ltd., Plain Green, LLC, Great Plains Lending, LLC, Victory Park Capital Advisors, LLC, Victory Park Management, LLC, Scott Zemnick, Jeffrey Schneider, Thomas Welch, Haynes Investments, LLC ("Haynes Investments"), and L. Stephen Haynes (collectively "Defendants"), they allege as follows:

# I.   PRELIMINARY STATEMENT.

1.     Most states have enacted usury laws that limit the amount of interest that a company may charge on a loan. To evade these laws, payday lenders originated their loan products in the name of national banks, who were exempt from state interest-rate caps under the National Bank Act. *See* 12 U.S.C. § 85. Under these arrangements, the bank served as a conduit for the loans in exchange for a fee, but the payday lender funded, serviced, and collected the loans—a tactic known as "rent-a-bank." When federal regulators began cracking down on these rent-a-bank arrangements, the payday lenders developed a solution—they adapted the structure to use Native American tribal entities as the conduit to ostensibly cloak the loans in tribal sovereign immunity.[1] Hence, the new structure has been dubbed "rent-a-tribe" lending.

2.     This case involves a rent-a-tribe enterprise that was established with the intent of evading state usury laws. Prior to establishing the rent-a-tribe enterprise at issue, Defendant Kenneth Rees ("Rees") and his company, Think Finance, LLC,[2] made millions of dollars through a rent-a-bank relationship with First Bank of Delaware. After federal regulators shut down the rent-a-bank arrangement, Think Finance, under the direction of Rees, established a rent-a-tribe lending scheme with the Chippewa Cree Tribe and Otoe-Missouria Tribe. Under the rent-a-tribe model, loans were made in the name of Defendants Plain Green, LLC and Great Plains Lending, LLC—two entities formed under tribal law to serve as the fronts to disguise Defendants' roles and to ostensibly shield the scheme by exploiting tribal sovereign immunity. In return for the use of their

---

[1] *See, e.g.,* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 785 (2012) (providing background on payday loans and describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance").

[2] Various lawsuits and government enforcement actions have uncovered the enterprise's misconduct. *Pennsylvania v. Think Fin., Inc.*, No. 14-CV-7139 (E.D. Pa.). Faced with mounting pressure from the lawsuits and regulatory actions, Think Finance and its subsidiaries, Think Finance SPV, LLC; TC Decision Sciences, LLC; and Tailwind Marketing, LLC filed for bankruptcy on October 27, 2017, to avoid responsibility for the illegal scheme. *Think Finance, LLC v. Victory Park Capital Advisors, LLC*, Case No. 17-03106 (Bankr. Tex.).

CLASS ACTION COMPLAINT

name, the tribal companies received a nominal flat-fee of the revenue from the loans,[3] but they otherwise had no control over the income, expenses, or day-to-day operations of the businesses.

3.      Each of the Defendants played an integral role in the scheme. Rees was one of the architects of a rent-a-tribe lending enterprise—one of the few in his role yet to be criminally prosecuted for his misconduct.[4] Rees is the former president and chief executive officer of Think Finance, the company that provided the infrastructure to run the lending operation, including the software, risk management, application processing, underwriting assistance, collections, and customer service for the loans. In short, although Plain Green and Great Plains held themselves out as the actual lenders of these internet payday loans, Think Finance controlled the origination and servicing of the loans under the guise of Plain Green and Great Plains.[5]

---

[3] Although Plain Green received 4.5% of the revenue on paper, these funds were diverted to tribal leaders such as Neal Paul Rosette and Billi Anne Morsette, the former "chief executive officers" of Plain Green who were sent to prison for accepting bribes in exchange for facilitating the award of tribal contracts and for helping another tribal member siphon over $55,000 in tribal monies, which were laundered through the predecessor company of Plain Green. The United States Attorney's Office, District of Montana, *Plain Green Officials Sent to Prison* (March 8, 2016), https://www.justice.gov/usao-mt/pr/plain-green-officials-sent-prison. As part of this investigation, the Montana Attorney General's office uncovered that Rosette, Morsette, and James Eastlick, Jr., each received $400,000 from a consulting company, Ideal Consulting, LLC, involved in the Plain Green operation. *Id.* In other words, the Chippewa Cree Tribe actually received far less than the 4.5% allocated to it under the agreement.

[4] *See* Press Release, The United States Attorney's Office, Southern District of New York, Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; Press Release, The United States Attorney's Office, Eastern District of Pennsylvania, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

[5] Plaintiffs anticipate that Plain Green and Great Plains will claim to be "arm(s) of the tribe" and thus protected by tribal immunity. Although the doctrine of tribal sovereign immunity protects the tribe itself, it does not automatically extend to economic subdivisions of a tribe, and the Court must determine whether these entities are "analogous to a governmental agency, which should benefit from sovereign immunity" or whether they are more like a "commercial business enterprise, instituted for the purpose of generating profits for [their] private owners." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010) (citing *Gavle v. Little Six, Inc.,* 555 N.W.2d 284, 293 (Minn.1996)). In addition to the allegations alleged in this Complaint concerning the creation, purpose, and structure of Plain Green and Great Plains, these entities are not entitled to sovereign immunity because nearly all of the profits of the scheme went to non-tribal participants and the companies were established for the sole purpose of evading state usury laws. Extending the protections of tribal immunity to Plain Green and Great Plains would not serve the policies underlying tribal sovereign immunity.

3

4.      Defendant GPL Servicing, Ltd. ("GPLS") played an integral role in the rent-a-tribe enterprise as the special purpose company created to raise and provide the capital to fund the hundreds of millions of dollars of illegal loans made to consumers. According to Think Finance itself, GPLS was created "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See* Complaint ¶ 24, *Think Finance, LLC, v. Victory Park Capital Advisors, LLC*, Case No. 17-03106 (Bankr. Tex.) (explaining the creation of GPLS). Defendant Victory Park Capital Advisors, LLC, a private equity firm, owned most of the shares of GPLS, but "Victory Park required that Think Finance purchase a portion of the equity in GPLS, which it did through Think SPV." *Id.* at ¶ 26. The enterprise also raised money from third party investors. *Id.* at ¶ 27. The enterprise used the money invested in GPLS to make the illegal loans to consumers, and in turn, investors in GPLS received an 18-20% *fixed-rate* return on their investment—which was *guaranteed* by Think Finance. Because it bore all the risk and handled the operations, the remaining profits (which were substantial) were distributed to Think Finance.

5.      Defendant Haynes Investments, LLC provided substantial capital used to make high-interest loans to consumers and participated in the affairs of the enterprise as explained below. L. Stephen Haynes is the owner and managing partner of Haynes Investments. Scott Zemnick, Jeffrey Schneider, and Thomas Welch are partners at Victory Park. Each of these individuals participated in their respective firms' decision to invest and reinvest in the enterprise. Each of these individuals also actively participated in the affairs of the enterprise and helped design the financial and operational structure of the rent-a-tribe scheme. As a result of their participation in the enterprise and direct involvement of the underlying illegal conduct, the individuals are jointly and severally liable for the claims of Plaintiffs and the class members.

6.      Because of their comfort with the rent-a-tribe structure, Defendants' scheme made loans in California with annual percentage rates in excess of 400%—more than 40 *times* the 10% interest-rate cap in Article XV of California's Constitution. CAL. CONST. Art. XV § 1. If a lender makes a loan in violation of Art. XV § 1, then "[n]o person, company, association, or corporation

shall directly or indirectly take or receive in money, goods, or things" and the loan is void. CAL. CIV. CODE § 1916-2.

7.      Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Defendants received millions of dollars derived from the collection of unlawful debt, and Defendants used and reinvested this income to grow the rent-a-tribe enterprise. Further, Defendants acquired and maintained interests in the rent-a-tribe enterprise, actively participated in the scheme, and conspired with Think Finance and others to repeatedly violate state lending statutes resulting in the collection of an unlawful debt from Plaintiffs and the class members. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962(a)-(d).

8.      Plaintiffs also assert a class claim for violations of California's usury laws and unjust enrichment. Because the loans exceed California's 10% annual percentage rate ("APR") cap, Defendants were prohibited from taking or receiving money in excess of 10% on the loans. Cal. Civ. Code § 1916-2. Accordingly, Plaintiffs seek to disgorge all amounts paid by California consumers, plus treble the amount of such usurious interest that was paid in the two years preceding the filing of this action. Cal. Civ. Code § 1916-3.

## JURISDICTION

9.      This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiffs Kimetra Brice and Earl Browne are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in California.

## PARTIES

11.      Plaintiff Kimetra Brice ("Brice") is a natural person and resident of the Richmond, California.

12.     Plaintiff Earl Browne ("Browne") is a natural person and resident of the Fairfield, California.

13.     Plaintiff Jill Darlene Novorot ("Novorot") is a natural person and resident of the Mission Viejo, California.

14.     Defendant Kenneth Rees ("Rees") is a natural person and resident of the state of Texas. At all times relevant, Rees was the president and chief executive officer of Think Finance, LLC and its subsidiaries, which Rees set up to make and collect on the usurious loans. Rees is also the founder, chief executive officer, and sole registered member of Tailwind Marketing, LLC ("Tailwind Marketing") and TC Decision Sciences, LLC ("TC Decisions").

15.     Defendant GPL Servicing ("GPLS") is a foreign corporation incorporated under the laws of the Cayman Islands.

16.     Defendant Plain Green, LLC ("Plain Green") is a limited liability company doing business as an internet lending website under the domain name www.plaingreenloans.com. Plain Green claims to be a "tribal lending entity wholly owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana, a sovereign nation located within the United States."[6] In return for a small fraction of the revenue, the Chippewa Cree Tribe allowed the lending scheme to use its name and falsely claim that it is operated by the Chippewa Cree Tribe. At all times relevant hereto, the Chippewa Cree Tribe did not participate in the day-to-day operations of Plain Green and did not fund the loans or handle the servicing or collection of the loans.

17.     Defendant Great Plains Lending, LLC ("Great Plains") is a limited liability company doing business as an internet lending website under the domain name www.greatplainslending.com. Great Plains claims to be a "tribal lending entity wholly owned by the Otoe-Missouria Tribe of Indians, a sovereign nation located within the United States."[7] In return for a small fraction of the revenue, the Otoe-Missouria Tribe allowed the lending scheme to use its name and falsely claim that it was "wholly owned" and operated by the Otoe-Missouria Tribe. At all times relevant hereto,

---

[6] Plain Green, *Home*, https://www.plaingreenloans.com/Default.aspx (last visited Feb. 22, 2018).

[7] Great Plains, *Home*, https://www.greatplainslending.com/ (last visited Feb. 22, 2018).

the Otoe-Missouria Tribe did not participate in the day-to-day operations of Great Plains and did not fund the loans or handle the servicing or collection of the loans.

18.     Defendant Haynes Investments, LLC ("Haynes Investments") is a limited liability company with a principal place of business in Dallas, Texas. Haynes Investment is a private equity company focused on investments related to Native American tribes. Haynes Investments claims that its "Native American investments have successfully monetized the tribal advantages of sovereignty to enhance yield while substantially reducing risk."[8] As explained below, Haynes Investment provided the initial capital to fund the operations of Plain Green.

19.     Defendant L. Stephen Haynes ("Mr. Haynes") is the managing partner and owner of Haynes Investments. Mr. Haynes's biography indicates that he "is one of the leading business executives in Native American project finance."[9] Mr. Haynes personally participated in the rent-a-tribe enterprise and signed each of the agreements used to fund the illegal loans.

20.     Defendant Victory Park Capital Advisors, LLC ("Victory Park") is a private equity firm headquartered in Chicago. As explained below, Victory Park invested no less than $250-$300 million in Plain Green and Great Plains.

21.     Defendant Victory Park Management, LLC ("VP Management") is a wholly owned subsidiary of Victory Park.

22.     Defendant Scott Zemnick is a partner at Victory Park and the firm's general counsel. Zemnick joined Victory Park in 2008 and "oversees the firm's legal operations and the structuring, negotiation, execution and protection of the firm's investment portfolio."[10] As the general counsel, Zemnick personally participated in the enterprise and had direct personal involvement in the unlawful conduct alleged herein.

---

[8]  Haynes Investment, *American Indian*, http://www.haynesinvestments.net/native-american/ (last visited on Dec. 15, 2017).

[9] Haynes Investment, *About Us*, http://www.haynesinvestments.net/native-american/ (last visited on Dec. 15, 2017).

[10]  Victory Park Capital, *Team – Legal, Investor Relations and Operations, Scott Zemnick*, https://www.victoryparkcapital.com/legaloperations.html (last visited on Dec. 19, 2017).

23.     Defendant Jeffrey Schneider ("Schneider") is a partner at Victory Park and the firm's chief financial officer. Schneider joined Victory Park in 2010 and "oversees the accounting, tax, finance, treasury and fund operations of the firm and assists in the structuring of VPC's investments."[11] As the chief financial officer, Schneider personally participated in the enterprise and had direct personal involvement in the unlawful conduct alleged herein.

24.     Defendant Thomas Welch ("Welch") is a partner and investment professional at Victory Park. According to his biography, Welch is "primarily responsible for sourcing, analyzing, executing, and management of direct private debt and equity investments in middle market companies within the specialty finance and financial technology sectors."[12] As explained below, Welch personally participated in the enterprise and had direct personal involvement in the unlawful conduct alleged herein.

## FACTUAL BACKGROUND

### A.     Statutory and Regulatory Background.

25.     "Usury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations."[13] Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

26.     California, which was founded in 1850, has regulated maximum interest rates since 1872. *See id.* at 1385.

---

[11] Victory Park Capital, *Team – Legal, Investor Relations and Operations, Jeffrey Schneider*, https://www.victoryparkcapital.com/legaloperations.html (last visited on Dec. 19, 2017).

[12] Victory Park Capital, *Team – Legal, Investor Relations and Operations, Thomas Welch*, https://www.victoryparkcapital.com/legaloperations.html (last visited on Dec. 19, 2017).

[13] Usury laws are not unique to California or the United State of America. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

27.     Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

28.     Thus, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. ea Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing CAL. CONST. ART. XV § 1).

29.     "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.* (citing Cal. Civ. Code § 1916–2).

30.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *See id.* at 1166 (quoting *Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

31.     Thus, California law allows borrowers to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3; *Dev. Acquisition Group*, 776 F. Supp. 2d at 1165; Rickett, *supra*, at 1391.

**B.     Overview of tribal lending.**

32.     In a "payday" loan, a consumer who can't afford to wait until payday receives a cash advance and, in exchange, the lender subtracts a larger amount from the consumer's paycheck. Consumers renew the loans when they are unable to pay them off, creating a cycle of mounting debt.

33.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra*, 69 Wash. & Lee L. Rev. at 759 (quoting Karen E. Francis, Note,

*Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

34.    It is no secret that "internet payday lenders have a weak history of complying with state laws." *Id*. at 764.

35.    Prior to the rent-a-tribe business model, some payday lenders, including Think Finance, entered into partnerships with national banks to avoid compliance with state laws.[14]

36.    Payday lenders used the banks as the conduit for the loans because the National Bank Act (and the federal preemption doctrine) allowed banks to charge "interest at the rate allowed by the laws of the State, Territory, or District where the bank" was located, 12 U.S.C. § 85, and some states do not have any interest rate caps. *Wolfe v. Ebert*, 37 B.R. 934, 936, n. 3 (D.S.C. 1983) (explaining that South Carolina repealed its usury laws in 1980).

37.    Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 CATH. U. L. REV. 381, 399 n.16 (2012).

38.    In response to the crackdown on rent-a-bank arrangement, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id*.; *see also* Martin & Schwartz, *supra*, 69 WASH. & LEE L. REV. at 759.

39.    "In these partnerships, online payday lenders register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign immunity. Using this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation

---

[14] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

only, not the laws of the state in which the reservation is located or the state in which the borrower resides." *Id*.

**C.     Defendants establish a rent-a-tribe enterprise with the Chippewa Cree Tribe after regulators shut down their rent-a-bank arrangement.**

40.     Prior to the creation of the lending scheme at issue, Think Finance used a rent-a-bank lending model. (*See* Ex. 1).

41.     Under this arrangement, loans were originated in the name of First Bank of Delaware, but it served as nothing more than a nominal lender on behalf of Think Cash, Inc. ("Think Cash"), Think Finance's predecessor. (Ex. 1 at TF-PA-504641).

42.     In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans.  (Ex. 1 at TF-PA-504640).

43.     By contrast, through its wholly owned subsidiary TC Administrative, Think Cash received the "excess" of the cash flow after accounting for losses, management fees, and fixed rate interest payments to investors, *i.e.*, the third parties who invested money to allow Think Cash to grow the scheme. (Ex. 1 at TF-PA-504640).

44.     The Federal Deposit Insurance Corporation took steps to shut down Think Finance's arrangement with First Bank of Delaware through a cease and desist order directing it to terminate its relationship with "all third-party lending programs."[15]

45.     In response, Rees developed a solution for Think Finance—he decided to use the rent-a-tribe model as the new method to continue the scheme.[16]

---

[15] *See, e.g.*, *In the Matter of First National Bank*, Case No. FDIC-07-256b, Order to Cease and Desist, Order for Restitution, and Order to Pay (Oct. 9, 2008), *available at* https://www.fdic.gov/bank/individual/enforcement/2008-10-03.pdf.

[16] *See, e.g.*, Ben Walsh, *Outlawed By The States, Payday Lenders Take Refuge on Reservations,* Huffington Post (June 29, 2015, updated Sept. 8, 2015), http://www.huffingtonpost.com/2015/06/29/online-payday-lenders-reservations_n_7625006.html ("But by 2010, various federal regulators had all but shut down the [rent-a-bank] arrangement. Rees needed a new way to keep his business alive. The solution he found was relatively straightforward: He'd work with Native American tribes . . . .").

11

46.     Indeed, Rees frankly informed the media that Think Finance abandoned doing direct lending itself because "byzantine state laws" cut into the profits.[17]

47.     According to Rees, Native American tribes did not "have to look to each state's lending laws," and, thus, Think Finance solicited the Chippewa Cree Tribe to participate in the venture.

48.     Shortly thereafter, the key companies involved in the enterprise—Think Finance, Haynes Investments, and Victory Park (through GPLS)—entered into a term sheet with the Chippewa Cree Tribe dated March 11, 2011. (Ex. 2).

49.     Pursuant to the term sheet, Think Finance agreed to provide the infrastructure to run the lending operations, including the software, "risk management, application processing, underwriting assistance, payment processing, and ongoing service support" for consumer loans in the name of the Chippewa Cree Tribe. (Ex. 2 at 1).

50.     On the other hand, Haynes Investments agreed to "provide funding to the Tribe to enable it to make each of the Loans," and to fund Plain Green's bank account with "sufficient monies to fund one business day of Loans based upon the average Loan volumes for the preceding month." (Ex. 2 at 1-2.)

51.     Consistent with the term sheet, Haynes Investments provided the funds to Think Finance, which could only be used to fund loans originated in the name of Plain Green. (Ex. 2).

52.     After the loans were originated in the name of Plain Green, 99% of the loans were "purchased" within two days by GPLS—an employee-less company who created by Victory Park "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See Think Finance, LLC, v. Victory Park Capital Advisors, LLC*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 24) (explaining Victory Park's creation of GPLS).

---

[17] Carter Dougherty, *Payday Lenders and Indians Evading Laws Draws Scrutiny* (June 4, 2012), http://stoppredatorygambling.org/wp-content/uploads/2012/12/2012-Payday-Lenders-and-Indian-Tribes-Evading-Laws-Draw-Scrutiny.pdf.

53.     As part of this process, GPLS refunded 99% of the funds provided by Haynes Investments, who also received: (1) 5% interest on the money loaned to the Tribe, and (2) 1% of the revenue collected on the loans as a "referral" fee.

54.     By contrast, GPLS paid "the Tribe 4.5% of cash revenue received" on the loans received by GPLS, as well as reimbursement for costs and expenses. (Ex. 1 at 2).

55.     After accounting for all expenses, GPLS paid a 20% fixed rate of return to Victory Park and the remaining revenue was distributed to TC Administrative Service, a wholly owned subsidiary of Think Finance.

**D.     The initial structure of the rent-a-tribe venture involving Great Plains.**

56.     On or around January 12, 2011, Think Finance pitched a similar rent-a-tribe arrangement to the Otoe-Missouria Tribe. (Ex. 3).

57.     As part of the presentation, Think Finance provided the Otoe-Missouria Tribe with an overview of its financial products, (Ex. 3 at TF-PA1677), the underwriting chain of command for the loans (Ex. 3 at TF-PA1680), the marketing strategy for the loans (Ex. 3 at TF-PA1680), the lending structure, and key contractual agreements, including a loan purchase agreement where GPLS would purchase loans originated by Great Plains within two days (Ex. 3 at TF-PA1681-1682).

58.     Great Plains did not exist prior to this meeting, and, as part of Think Finance's presentation, the next steps were "[c]reate tribal entity—Great Plains Lending, LLC," "setup tribal bank account at FBD," "review/approve consumer legal documents," and "[r]eview/sign contractual agreements." (Ex. 3 at TF-PA1686).

59.     Indeed, Think Finance had already registered the domain name for the Great Plains website, developed the text and graphics for the website, and raised the funds to make the loans—the final step was securing the tribe to serve as the front for the loans. (Ex. 3 at TF-PA1678).

60.     On February 24, 2011, the Otoe-Missouria accepted Think Finance's proposal, and Think Finance transferred the web address, www.greatplainslending.com, to Great Plains.

61.     On this same day, Kenneth Rees instructed Think Finance's key employees to "start your engines!!" (Ex. 4, at TF-VA001630).

62.     Great Plains' structure virtually copied the structure of Plain Green except that Great Plains received 6% of the revenues. (Ex. 3 at TF-VA1682).

**E.      Rees signed the key documents to establish and operate the rent-a-tribe enterprise.**

63.     TC Administrative, Tailwind, and TC Decision Sciences—all subsidiaries of Think Finance—served a dual purpose of returning as much money as possible to Think Finance, while at the same time concealing Think Finance's role in the scheme.

64.     For example, TC Administrative participated in the lending scheme as the designated administrative service provider and, more importantly, as the pass-through entity that received Think Finance's share of the profits of the scheme. (Ex. 3 at TF-VA1682).

65.     TC Administrative Services received the "net income" from the enterprises after accounting for the fixed return of 18-20% allocated to Victory Park for providing the capital to fund the loans through GPLS. (Ex. 3 at TF-VA1682).

66.     The relationship between TC Administrative and GPLS was formalized through an "Administrative Agency Agreement," signed by Rees as the chief executive officer of TC Administrative. (Ex. 5 at TF-VA000200-231).

67.     The Administrative Agency Agreement explains that Great Plains will "originate certain loans" to borrowers and "GPLS will purchase certain" loans from Great Plains. (Ex. 5 at TF-VA000200).

68.     GPLS hired TC Administrative, an employee-less company, as "a provider of certain management and administrative agent services," including: (1) establishing an account system and maintaining account ledgers for GPLS; (2) performing daily loan settlement reporting and accounting; (3) disbursing funds for the purchase of the loans by GPLS; (4) depositing funds

14

reflecting all principal, interest, fees and other amounts collected from borrowers into GPLS' collection account; and (5) paying the fixed return to GPLS's investors. (Ex. 5 at TF-VA000206-7 at § 2.2(a)-(p)).

69.     Rees also signed the "Licensing and Support Agreement" between Great Plains and TC Decision Sciences, another subsidiary of Think Finance. (Ex. 6, at TF-VA589).

70.     Pursuant to this agreement, TC Decision Sciences participated in the enterprises as the website operator and software administrator for Plain Green and Great Plains. (*See, e.g.*, Ex. 6; Ex. 3 at TF-VA1682).

71.     In return, TC Decision Sciences received $50 for each loan funded, as well as $150 an hour for work and services it provided. (Ex. 6, at TF-VA590).

72.     TC Decision Sciences also handled servicing responsibilities for Plain Green and Great Plains pursuant to servicing agreements, which were also signed by Rees. (*See, e.g.*, Ex. 7 at TF-VA610-616).

73.     TC Decision Sciences servicing responsibilities included "customer support and collection services" under the guise of Great Plains. (Ex. 7 at TF-VA616). In exchange, TC Decision Sciences received $5 per month for each active account.

74.     Pursuant to a marketing agreements—also signed by Rees—Tailwind handled the online and other advertisements for Plain Green and Great Plains. (*See, e.g.*, Ex. 8 at TF-VA594 ("Tailwind shall perform services reasonably required to market Loans within the parameters established by [Great Plains], via one or more websites, search engine optimization, call centers or other marketing channels….")).

75.     Tailwind also handled the lead generation used to identify and solicit potential consumers,[18] and Tailwind received $100 for every borrower provided to Plain Green and Great Plains. (Ex. 8, at TF-VA608).

---

[18] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. Pew Charitable Trust, *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/~/media/assets/2014/10/payday-lending-report/fraud_and_abuse_-online_harmful_practices_in_internet_payday_lending.pdf.

76.     Like the Chippewa Cree Tribe, the Otoe Missouria Tribe did not provide any of its money to make the loans.

77.     Instead, GPLS deposited the initial $1 million used to fund the illegal loans made in the name of Great Plains. (Ex. 9, Flow of Funds Overview, ¶ 1).

78.     After the loans were originated in the name of Great Plains—a process that had no tribal involvement—Great Plains "sold the loans at book value to GPLS," and the "proceeds from selling the participating interests" were then used by Great Plains "to originate additional loans." (Ex. 9 ¶ 3).

79.     A third-party bank then "processed customer payments on loans via ACH each day" and deposited those payments "into a Collection Account" belonging to GPLS. (Ex. 9 ¶ 4).

80.     At the end of each month, GPLS performed a "reconciliation of all cash revenue," and the revenue was remitted according to the contracts whereby 6% of the cash revenue collected was remitted to Great Plains.

81.     Great Plains' 6% percent, however, was illusory as it was reduced by payments to Tailwind and TC Decision Sciences. (Ex. 9 at ¶¶ 8-9).

**F.      Haynes Investments and Mr. Haynes's role in the enterprise.**

82.     As explained above, Haynes Investments provided the initial capital used to fund the Plain Green loans.

83.     Consistent with the term sheet, Haynes Investments provided the funds to Think Finance, which could only be used to fund loans originated in the name of Plain Green. (Ex. 2).

84.     As a result, Haynes Investments received monthly payments from Think Finance.

85.     Due to the success of the operation and the returns earned by Haynes Investments, increased its investment on several occasions.

86.     Upon information and belief, Haynes Investment increased its investment in Plain Green on multiple occasions from April 2011 through February 2015, resulting in substantial returns to Haynes Investments and Mr. Haynes.

87.     Haynes did not merely invest in the rent-a-tribe enterprise. Rather, Haynes used his connections to assist the enterprise's efforts to collect unlawful debt.

88.     Among other things, Haynes played an integral role in helping the enterprise obtain a bank willing to process payments through the Automated Clearing House Network (the "ACH Network"), an electronic payment processing system regulated by the National Automated Clearing House Association ("NACHA").

89.     Unlike other financial networks, the ACH Network allows financial institutions to send or take money directly out of a bank account without the requirement of a direct relationship between the financial institution and the borrower.

90.     Without access to the ACH Network, a payday lender would not be able to electronically process payments in batches or without participation of the consumer—necessary functions of companies who specialize in providing small dollar loans over the Internet. Elizabeth G. Balassone & Lauren L. Wroblewski, 17 No. 2 Fintech L. Rep. 1 (Mar. 2014) (explaining that "online lenders predominantly rely on electronic withdrawals and deposits to the consumer's bank account," which are carried out through bank connected to the ACH Network).

91.     Because of the vital role played by the ACH Network, "[s]tate and federal regulators, as well as the Department of Justice, have seized on the ACH Network as a way to stop online lending by out-of-state lenders." *Id*.

92.     For example, in August 2013, the New York Department of Financial Services issued a cease and desist to 117 banks placing "'the onus on the banks originating the debits'" to "ensure the legality of the underlying transactions submitted" through the ACH Network. *Id*. (quoting Letter from Benjamin M. Lawsky, New York Department of Financial Services "Re: Illegal Online Payday Loans Offered and Sold to New York Customers", available at http://www.dfs.ny.gov/about/press2013/pr130806-link1.pdf).

93.     Similarly, the Department of Justice launched "Operation Choke Point," an initiative aimed at financial institutions working with online lenders.

94. In doing so, the Executive Director of the Financial Fraud Task Force explained that the government had "prioritized the role of financial institutions in mass marketing fraud schemes—including deceptive payday loans[.]" Michael J. Bresnick, Executive Director, Financial Fraud Enforcement Task Force, Address at the Exchequer Club of Washington, D.C. (Mar. 20, 2013), http://www.justice.gov/iso/opa/doj/speeches/2013/opa-speech-130320.html.

95. Plain Green and Great Plains' were targeted by state and federal regulators and, as a result, banks ceased processing the debits and credits on their loans.

96. Upon information and belief, Mr. Haynes played a critical role in finding a new bank to partner with Plain Green and Great Plains.

97. Upon information and belief, based on his rapport with the Tribes through prior transactions, Mr. Haynes also acted as the liaison between Think Finance and the Tribes.

**G.    Victory Park's creation and control of GPLS.**

98. Victory Park, through its ownership interest in and control over GPLS, provided substantial capital to fund the loans to consumers and worked together with the other entities described herein to systemically perpetrate fraud and to scam consumers.

99. GPLS was a company created by Think Finance and Victory Park "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See Think Finance, LLC, v. Victory Park Capital Advisors, LLC*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 24) (explaining Victory Park's creation of GPLS).

100. As explained above, GPLS purchased 99% of the interests in the loans originated by Plain Green and Great Plains within two days of the origination.

101. According to Think Finance's  verified complaint against Victory Park, "Victory Park was the primary investor in a loan participation venture, GPLS," but "Victory Park required that Think Finance purchase a portion of the equity in GPLS, which it did through Think SPV." *Think Finance*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 26).

102. Victory Park also raised money from third party investors to further grow the scheme. As part of this effort, Victory Park issued classes "shares to investors," in GPLS including

funds named "Series I-A and I-B, Series II and Series III." *Think Finance*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. ¶ 27).

103.    Victory Park and Think Finance collected the revenue generated from the consumer loans and after payment of all operating expenses, the loan program would distribute the fixed rate return to investors in GPLS and distribute the remaining revenue to Think Finance.

104.    Victory Park managed the distribution of interest payments to those investors and Victory Park received a 1% management fee off the top of those interest distributions.

105.    The shares, however, did not come with any management rights or entitle shareholders to exercise any voting rights relating to the management of GPLS. *Think Finance*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. ¶ 28).

106.    Instead, Victory Park also created "Management Shares," which were 100% owned and controlled by Victory Park, albeit through VP Management.

107.    Victory Park also substantially invested and reinvested its own funds into GPLS, including a $100 million dollar investment on or around July 2010.[19]

108.    Victory Park continued to invest and reinvest amounts in GPLS, including a $50 million dollar investment in late 2012, and additional nine figure investments between 2013-2016.

109.    As a result Victory Park continue to receive large payouts on their investment, including: (1) $75 million on March 31, 2017, (ii) $14 million on May 1, 2017, (iii) $42 million on May 10, 2017, and (iv) $6.2 million on May 31, 2017.

110.    Victory Park not only invested hundreds of millions of dollars in Plain Green and Great Plains, but Victory Park also participated in the affairs of the rent-a-tribe enterprise.

111.    On March 18, 2011, GPLS entered into a Participation Agreement with Plain Green, which was signed by Scott Zemnick as General Counsel for Victory park. (Ex. 10, Mar. 18, 2011 Participation Agreement).

---

[19] This investment was used to purchase loans originated by the rent-a-bank arrangement between Think Finance/FBD, which were transferred to GPLS after the creation of the rent-a-tribe scheme.

112.     Consistent with the Term Sheet, the Participation Agreement provided GPLS with the "right, but not the obligation," to purchase 99% of the participation interests in the loans originated in the name of Plain Green.

113.     In addition to the Participation Agreement, Victory Park also entered into an Administrative Agency Agreement with TC Administrative in which Victory Park appointed TC Administrative as its agent for the purpose of managing the enterprise's cash accounts. (Ex. 5).

114.     Under the Administrative Agency Agreement, Victory Park agreed to pay TC Administrative all residual revenues after payment of the tribe's "service fee" and Victory Park's 20% return, which was further guaranteed by "Guaranty and Security Agreement" between Victory Park and Think Finance. (Ex. 11, Mar. 18, 2011 Guaranty and Security Agreement).

115.     Because of the structure of the Participation Agreement, Victory Park controlled whether and to what extent loans originated in the name of Plain Green and Great Plains.

116.     When Victory Park stopped purchasing the participation interests, Plain Green and Great Plains stopped originating loans.

117.     For example, after the New York Department of Financial Services issued the cease and desist to Great Plains, Victory Park cut off funding to both Plain Green and Great Plains, which caused them to stop making new loans. *Pennsylvania by Shapiro v. Think Fin., Inc.*, No. 14-CV-7139, 2018 WL 637656, at *3 (E.D. Pa. Jan. 31, 2018) (describing an e-mail from Think Finance's CFO explaining that GPLS would stop purchasing loans due to the loss in *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F.Supp.2d 353 (S.D.N.Y. 2013), and GPLS's failure to purchase would cause "the tribal portfolios" to "go into wind down.").

118.     Victory Park not only invested in the rent-a-tribe ventures and controlled the amount of money available to the enterprise, but it also identified and solicited potential investors in the scheme.

119.     For example, Victory Park was successful in recruiting a number of large investors in the scheme, including at least one foreign institutional investor who decided to make the

investment after Victory Park and Think Finance's executives traveled overseas to pitch the rent-a-tribe venture.

**H.    Zemnick, Schneider, and Welch's personal involvement in the affairs of the enterprise.**

120.    During all relevant times, Zemnick, Schneider, and Welch were partners at Victory Park and participated in the affairs of the rent-a-tribe enterprise.

121.    At all times relevant hereto, Zemnick, Schneider, and Welch directly and actively managed Victory Park's activities with Plain Green, Great Plains, and Think Finance.

122.    Zemnick, Schneider, and Welch handled the day-to-day operation of Victory Park with respect to its relationship with Plain Green, Great Plains, and Think Finance.

123.    For example, Zemnick oversaw and personally directed the legal operations of Victory Park and participated in the structuring, negotiation, and execution of critical documents needed to establish and operate the enterprise.

124.    Among other things, Zemnick personally participated in the structuring, negotiation, and execution of the Term Sheet, the Participation Agreement, the Administrative Agency Agreement, the Guaranty and Security Agreement, and all subsequent amendments of those agreements.

125.    Each one of these documents were signed by Zemnick on behalf of Victory Park, as well as multiple amendments to each of the documents.

126.    Moreover, all notices required to be given under the agreements were to be delivered to Zemnick.

127.    By contrast, Schneider and Welch actively managed Victory Park's investment in GPLS, including receipt and review of weekly reports from Think Finance regarding the performance of Plain Green and Great Plains.

128.    Schneider and Welch also directed the major business decisions of Victory Park and GPLS with respect to the rent-a-tribe venture, including decisions on when to cease funding for the loans.

129.    Zemnick, Schneider, and Welch knew the subject loans were a scam and illegal under state laws, but they nonetheless pursued the rent-a-tribe venture anyway, and continued to fund the loans even after Great Plains' loss in *Otoe-Missouria Tribe*, 974 F.Supp.2d at 356 ("There is simply no basis… that the Tribes are treated differently from any other individuals or entities that enter New York to lend to a New York resident.").

130.    As a result, Zemnick, Schneider, and Welch are jointly and severally liable for the claims herein.

**I.    Defendants' loans charged interest in violation of California's usury laws and RICO.**

131.    Defendants, together with Think Finance and its subsidiaries, marketed, initiated, and collected usurious loans in California.

132.    Under the terms of the standard loan agreements, the interest rates charged were significantly greater than 10% APR—often between 118% and 448%, if not higher.

133.    Plaintiffs obtained loans from Plain Green and Great Plains—each of those loans had interest rates far in excess of 10% APR.

134.    For example, Brice's interest rate was 287.86% (Ex. 12 at 2)

135.    Similarly, one of the Great Plains loans made to Novorot had an interest rate of 258.61% (Ex. 13 at 2).

136.    Absent several exceptions—none of which apply in this case—California's Constitution prohibits any person from making loans to consumers in excess of 10% APR. Cal. Const. Art. XV § 1.

137.    If a lender makes a loan in violation of Art. XV § 1, then "[n]o person, company, association, or corporation shall directly or indirectly take or receive in money, goods, or things" and the loan is void. Cal. Civ. Code § 1916-2.

138.    Plaintiff Brice paid no less than $2,634.40 on her loans with Great Plains, including $1,940.75 within the past year—most of which was credited to interest and fees.

139.  Plaintiff Browne paid no less than $10,250.20 on his loans with Plain Green and Great Plains, including $2,377.05 within the past year—most of which was credited to interest and fees.

140.  Plaintiff Novorot paid no less than $6,179 on her loans with Great Plains, including $3,518.64 within the past year—most of which was credited to interest and fees.

141.  Because the interest rates on Plaintiffs' loans exceeded 10%, it was unlawful for any person, including Defendants, to collect or receive any interest, fees or charges on the loans.

142.  Upon information and belief, Defendants collected more than $100 million dollars from California consumer pursuant to these illegal loans within the past four years.[20]

143.  Pursuant to Cal. Civ. Code § 1916-3, Plaintiffs and the class members are entitled to recoup the any excess interest paid on these loans, as well as treble damages for any interest paid within the prior year.

144.  Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

145.  RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

146.  Defendants charged an interest rate far in excess of the enforceable rate established by Cal. Const. Art. XV § 1, and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

147.  As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

---

[20] Plaintiff provides this estimate based interrogatory responses from Think Finance indicating that $69.4 million was collected from Virginia consumers—a state with 21% of the population of California.

**COUNT ONE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)**
**(CLASS CLAIM AGAINST GPLS, VICTORY PARK, SCOTT ZEMNICK, JEFFREY SCHNEIDER, THOMAS WELCH, HAYNES INVESTMENTS, MR. HAYNES)**

148.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

149.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim against Defendants,[21] for themselves and on behalf of a class initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains.

150.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated and/or any payment was made on or after February 22, 2014.[22]

151.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Numerosity will be easily satisfied in this case based on the number of loans at issue in California. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and/or Think Finance, and the class members may be notified of the pendency of this action by published and/or mailed notice.

152.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions

---

[21] For the purpose of simplicity, Plaintiffs use the term "Defendants" in this Count to refer to all Defendants except Rees, Plain Green, and Great Plains. Plaintiffs do not assert a § 1962(a) violation as to Rees, Plain Green or Great Plains.

[22] Plaintiffs allege a subclass because they anticipate Defendants will argue that RICO's four-year statute of limitations applies to any loans originated or payments made prior to February 23, 2014. However, "the Supreme Court has established that the discovery-of-injury accrual rule applies to civil RICO actions." *Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.*, 493 F. App'x 390, 393 (4th Cir. 2012) (citing *Rotella v. Wood*, 528 U.S. 549, 556 (2000). Because consumers could not have known or reasonably discovered their injuries caused by *Defendants' conduct*, the proper class should include all consumers who entered into a loan agreement with Plain Green or Great Plains.

include: (1) whether Think Finance, Plain Green, Great Plains, the Chippewa Cree Tribe, the Otoe-Missouria Tribe, GPLS, Haynes Investments, and Victory Park constitute an "enterprise" under RICO; (2) whether Defendants received income derived from the unlawful collection of debt; (3) whether Defendants used or invested the part of that income to acquire an interest in, to establish, or to operate the enterprise; and (4) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

153.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

154.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

155.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the

litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

156.     **Injunctive Relief Appropriate for the Class.   Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction prohibiting Defendants from continued collection of these illegal loans; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

157.     All of the loans made to California residents included an interest rate far in excess of twice the enforceable rate in California and, thus, the loans constitute "unlawful debt" under RICO. 18 U.S.C. § 1961(6).

158.     As alleged above, Defendants violated § 1962(a) of RICO through the receipt of income derived, directly and indirectly, through collection of unlawful debt; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

159.     Defendants participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

160.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

161.     Accordingly, the Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

1

2

3

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)**
**(CLASS CLAIM AGAINST GPLS, VICTORY PARK, SCOTT ZEMNICK, JEFFREY**
**SCHNEIDER, THOMAS WELCH, HAYNES INVESTMENTS, MR. HAYNES)**

4        162.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at

5    length herein.

6        163.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this

7    claim against Defendants,[23] for themselves and on behalf of a class initially defined as:

8

9
> All consumers residing in California when they entered into a loan agreement with
> Plain Green or Great Plains where the loan was originated or any payment was made.

10        164.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this

11    claim for themselves and on behalf of a subclass initially defined as:

12

13
> All consumers residing in California when they entered into a loan agreement with
> Plain Green or Great Plains where the loan was originated and/or any payment was
> made on or after February 22, 2014.

14        165.    **Numerosity. Fed. R. Civ P 23(a)(1).** Numerosity will be easily satisfied in this case

15    based on the number of loans at issue in California. Additionally, the names and addresses of the

16    class members are identifiable through the internal business records maintained by Defendants

17    and/or Think Finance, and the class members may be notified of the pendency of this action by

18    published and/or mailed notice.

19        166.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**

20    Common questions of law and fact exist as to all members of the putative class, and there are no

21    factual or legal issues that differ between the putative class members. These common questions

22    predominate over the questions affecting only individual class members. The common questions

23    include: (1) whether Think Finance, Plain Green, Great Plains, the Chippewa Cree Tribe, the Otoe-

24    Missouria Tribe, GPLS, Haynes Investments, and Victory Park constitute an "enterprise" under

25

26    _____

27    [23] For the purpose of simplicity, Plaintiffs use the term "Defendants" in this Count to refer to all
Defendants except Rees, Plain Green, and Great Plains. Plaintiffs do not assert a § 1962(a) violation
as to Rees, Plain Green or Great Plains.

28

RICO; (2) whether Defendants acquired and maintained an interest in the enterprise; and (3) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

167.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

168.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

169.    **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction prohibiting Defendants from continued collection of these illegal loans; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

170.    As alleged above, Defendants § 1962(b) of RICO by acquiring and maintaining interests in and control of the enterprise involved in the unlawful collection of debt.

171.    Defendants participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

172.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

173.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

174.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

175.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated or any payment was made.

176.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated and/or any payment was made on or after February 22, 2014.

177.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Numerosity will be easily satisfied in this case based on the number of loans at issue in California. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and/or Think Finance, and the class members may be notified of the pendency of this action by published and/or mailed notice.

178.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Think Finance, Plain Green, Great Plains, the Chippewa Cree Tribe, the Otoe-Missouria Tribe, Haynes Investments, and Victory Park constitute an "enterprise" under RICO; (2) whether Defendants conducted the affairs or participated in the enterprise's affairs; (3) whether the

loans violated Art. XV § 1 of California's Constitution because their interest levels were too high; and (4) what is the proper recovery for Plaintiffs and the class members against each Defendant.

179.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

180.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

181.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

182.    **Injunctive Relief Appropriate for the Class.   Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the

class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction prohibiting Defendants from continued collection of these illegal loans; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

183.    All of the loans made to California residents included an interest rate far in excess of twice the enforceable rate in California.

184.    As alleged above, Defendants associated with the enterprise and participated in the affairs of the enterprise, which existed for the purpose of collection of unlawful debt.

185.    Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Plaintiffs to repay amounts on unlawful loans.

186.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

<u>COUNT FOUR:</u>
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

187.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

188.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated or any payment was made.

189.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated or any payment was made on or after February 22, 2014.

190.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by

31

Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

191.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

192.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

193.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

194.    **Injunctive Relief Appropriate for the Class.   Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction prohibiting Defendants from continued collection of these illegal loans; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

195.    As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to violate §§ 1962(a)-(c), including but not limited to: (1) the Term Sheet between the Haynes Investments, Chippewa Cree Tribe, Think Finance, and Victory Park (through GPLS),

(2) a similar term sheet between Otoe-Missouria Tribe, Think Finance, and Victory Park (through GPLS), and (3) the Participation, Administrative Agency, and Guaranty and Security Agreements.

196.   As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT FIVE:**
**VIOLATIONS OF CALIFORNIA USURY LAWS**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

197.   Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

198.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

**California Usury Class**: All California residents who made a payment on any loan with Plain Green or Great Plains on or before February 22, 2015.

**California Treble Damages Subclass**: All California residents who made a payment on any loan with Plain Green or Great Plains on or after February 22, 2016.

Plaintiffs are members of this class and subclass.

199.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

200.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to California consumers violated Art. XV § 1 of California's Constitution because their interest levels were too high; (2) whether Plaintiffs may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against each Defendant.

201.  **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

202.  **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

203.  **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

204.  All of the loans made to California consumers in the name of Plain Green and Great Plains used an interest rate greater than 12%.

205.  As explained above, Defendants received the proceeds, directly and indirectly, of the loans originated in the names of Plain Green and Great Plains.

206.    Accordingly, Plaintiffs and the class members are entitled to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3.

**COUNT SIX:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

207.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

208.    Pursuant to Rule 23 of the Federal Rules of Civil Procedures, Plaintiffs bring this claim for themselves and on behalf of a class—the "California Unjust Enrichment Class"—initially defined as follows:

> **California Unjust Enrichment Class**: All California residents who executed a loan with Plain Green or Great Plains where the consumer repaid more than the original principal of the loan.

> Plaintiffs are members of the unjust enrichment class.

209.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

210.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

35

211.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

212.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

213.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

214.   All of the loans to California consumers in the name of Plain Green and Great Plains were void.

215.   Plaintiffs and the class members conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefits; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

216.   Accordingly, on behalf of themselves and all other California consumers similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Plain Green and Great Plains.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request the Court enter judgment for themselves and the class they seek to represent against Defendants, including for:

A.   Certification of this matter to proceed as a class action;

B.   Declaratory and injunctive relief as pled herein;

C.   Compensatory relief in an amount as pled herein;

D.   Treble damages pursuant to 18 U.S.C. § 1964(c) and Cal. Civ. Code § 1916-3;

E.   Attorney's fees, litigation expenses, and costs of suit; and

F.   Any further relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**PLAINTIFFS**

By:_____/s/ *Craig C. Marchiando*_____
Craig C. Marchiando, Esq., (SBN 283829)
Leonard A. Bennett, Esq., (pro hac vice to be filed)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com

Kristi C. Kelly, Esq., (pro hac vice to be filed)
Andrew J. Guzzo, Esq., (pro hac vice to be filed)
**KELLY & CRANDALL, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572

1    (703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
2    Email: aguzzo@kellyandcrandall.com

3    Anna C. Haac (pro hac vice to be filed)
Andrew J. Silver (pro hac vice to be filed)
4    **TYCKO & ZAVAREEI LLP**
5    1828 L Street, N.W., Suite 1000
Washington, DC 20036
6    Phone: 202-973-0900
Fax: 202-973-0950
7    Email: ahaac@tzlegal.com
Email: asilver@tzlegal.com
8

9    *Counsel for Plaintiffs*

CLASS ACTION COMPLAINT