1   Michael J. Shepard (SBN 91281)
    HOGAN LOVELLS US LLP
2   3 Embarcadero Center, Suite 1500
    San Francisco, California 94111
3   Tel: (415) 374-2300
    Fax: (415) 374-2499
4   michael.shepard@hoganlovells.com

5   Virginia A. Gibson (*pro hac vice* motion pending)
    Kendyl E. Keesey (*pro hac vice* motion pending)
6   HOGAN LOVELLS US LLP
    1735 Market Street
7   Philadelphia, PA 19103-2799
    Tel: (267) 675-4600
8   Fax: (267) 675-4601
    virginia.gibson@hoganlovells.com
9   kendyl.keesey@hoganlovells.com

10  Colleen E. Roh Sinzdak (*pro hac vice* motion pending)
    Kyle Druding (*pro hac vice* motion forthcoming)
11  HOGAN LOVELLS US LLP
    555 13th St. NW
12  Washington DC, 20004
    Tel: (202) 637-5600
13  Fax: (202) 637-5910
    colleen.sinzdak@hoganlovells.com
14  kyle.druding@hoganlovells.com

15  Attorneys for Defendant PLAIN GREEN, LLC

16              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
17                 **SAN FRANCISCO DIVISION**

18  KIMETRA BRICE, EARL BROWNE,            Case No.  3:18-cv-01200-WHO
    and JILL NOVOROT, individually and on
19  behalf of all others similarly situated,    The Honorable William H. Orrick

20                             *Plaintiffs*,     **DEFENDANT PLAIN GREEN,**
                                                 **LLC'S NOTICE OF MOTION AND**
21              v.                               **MOTION TO DISMISS THE**
                                                 **COMPLAINT OR, IN THE**
22  KENNETH REES; GPL SERVICING, LTD.;    **ALTERNATIVE, TO COMPEL**
    PLAIN GREEN, LLC; GREAT PLAINS         **ARBITRATION; MEMORANDUM**
23  LENDING, LLC; VICTORY PARK             **OF POINTS AND AUTHORITIES**
    CAPITAL ADVISORS, LLC; VICTORY         **IN SUPPORT THEREOF**
24  PARK MANAGEMENT, LLC; SCOTT
    ZEMNICK; JEFFREY SCHNEIDER;            Date:   November 14, 2018
25  THOMAS WELCH; HAYNES                   Time:  2:00 p.m.
    INVESTMENTS, LLC; and L. STEPHEN       Location: Courtroom 2, 17th Floor
26  HAYNES
                              *Defendants*.
27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION AND MOTION**

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 14, 2018, at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2 of the United States District Court for the Northern District of California located on the Seventeenth Floor at 450 Golden Gate Avenue, San Francisco, California, Defendant Plain Green, LLC will, and hereby does, move the Court for an order to dismiss the Complaint or, in the alternative, to compel arbitration.

Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, which provides that a complaint that lacks jurisdiction or fails to state a claim be dismissed, Plain Green respectfully requests that this Court dismiss Plaintiffs' Complaint without leave to amend.  In the alternative, Plain Green respectfully requests that this Court compel arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 1–16, which holds parties to their agreements to arbitrate in strict adherence to those agreements' terms.

This Motion is based on this Notice of Motion and Motion, Memorandum of Points and Authorities in support thereof, the Declarations of Vice-Chairman Theodore Whitford and Mr. Steve Parker, all exhibits thereto, all documents in the Court's file, and such other argument as may be presented to the Court.  A proposed order granting Plain Green's motion is also attached.

Dated: October 10, 2018

**HOGAN LOVELLS US LLP**

By:  */s/ Michael J. Shepard*

Michael J. Shepard
**HOGAN LOVELLS US LLP**
3 Embarcadero
San Francisco, CA 94111
Tel: (415) 374-2300
Fax: (415) 374-2499
michael.shepard@hoganlovells.com

*Attorneys for Plain Green, LLC*

1

## <u>TABLE OF CONTENTS</u>

2

**Page(s)**

3

STATEMENT OF THE ISSUES TO BE DECIDED .....................................................................1

4

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

5

INTRODUCTION .........................................................................................................................1

6

BACKGROUND ...........................................................................................................................2

7

A.   PLAIN GREEN ..............................................................................................................2

8

B.   PROCEDURAL HISTORY ............................................................................................6

9

ARGUMENT .................................................................................................................................7

10

I.   PLAIN GREEN IS IMMUNE FROM SUIT...................................................................7

11

A.   AN ARM OF THE CHIPPEWA CREE TRIBE IS ENTITLED TO IMMUNITY
FROM SUIT.....................................................................................................................7

12

B.   PLAIN GREEN IS AN ECONOMIC ARM OF THE CHIPPEWA CREE TRIBE .................8

13

C.   PLAINTIFFS' ARGUMENTS AGAINST IMMUNITY FAIL.............................................13

14

II.   THE PARTIES' AGREEMENT REQUIRES ARBITRATION...........................................17

15

A.   THE PARTIES ENTERED A VALID AND ENFORCEABLE ARBITRATION
AGREEMENT ................................................................................................................17

16

B.   THERE IS NO VALID REASON TO DECLINE TO ENFORCE THE
ARBITRATION AGREEMENT. ...................................................................................19

17

III.   PLAINTIFFS' CLAIMS IGNORE THE GOVERNING LAW............................................21

18

IV.   PLAINTIFFS CANNOT PLEAD A RICO CLAIM ...............................................................24

19

CONCLUSION ............................................................................................................................25

20

21

22

23

24

25

26

27

28

Hogan Lovells US
LLP
Attorneys At Law

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Am. Express Co. v. Italian Colors Rest.*,

5
    570 U.S. 228 (2013) ..................................................................................................... 19

6
*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ..................................................................................................... 17

7

8
*Bank of Hemet v. United States*,
    643 F.2d 661 (9th Cir. 1981) ....................................................................................... 13

9
*Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino and Resort*,

10
    629 F.3d 1173 (10th Cir. 2010) ............................................................................. *passim*

11
*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015) ..................................................................................... 19

12

13
*Buchanan v. Sokaogon Chippewa Tribe*,
    40 F. Supp. 2d 1043 (E.D. Wis. 1999) .......................................................................... 8

14
*Cain v. Salish Kootenai Coll.*,

15
    No. cv-12-181-M-BMM, 2018 WL 2272792 (D. Mont. May 17, 2018) ........................ 9

16
*Comanche Indian Tribe of Okla. v. 49, L.L.C.*,
    391 F.3d 1129 (10th Cir. 2004) ................................................................................... 17

17

18
*Commonwealth of Pennsylvania v. Think Finance et. al.*,
    No. 2:18-mc-00169-JCJ (E.D. Pa. September 26, 2018) ....................................... *passim*

19
*Consumer Fin. Prot. Bureau v. CashCall, Inc.*,

20
    No. CV157522JFWRAOX, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) .................... 23

21
*Cook v. AVI Casino Enterprises, Inc.*,
    548 F.3d 718 (9th Cir. 2008) ..................................................................................... 7, 8

22

23
*Demontiney v. U.S. ex rel. Dep't of Interior, Bureau of Indian Affairs*,
    255 F.3d 801 (9th Cir. 2001) ..................................................................................... 3, 8

24
*Dillon v. BMO Harris Bank, N.A.*,

25
    856 F.3d 330 (4th Cir. 2017) ................................................................................... 6, 20

26
*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003) ..................................................................................................... 14

27

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

*Felts v. Paycheck Today*,
   No. CV 2008-13084, slip op. (D. N.M. Sept. 20, 2018) ...................................................14, 16

*First Options of Chic., Inc. v. Kaplan*,
   514 U.S. 938 (1995).....................................................................................................1, 13, 19

*Gingras v. Rosette*,
   No. 5:15-CV-101, 2016 WL 2932163 (D. Vt. May 18, 2016)......................................6, 9, 13

*Green Tree Fin. Corp.-Alabama v. Randolph*,
   531 U.S. 79 (2000)................................................................................................................. 17

*Gristede's Foods, Inc. v. Unkechauge Nation*,
   No. 06-CV-1260 (CBA), 2006 WL 8439534 (E.D.N.Y. Dec. 22, 2006) ................................ 8

*Hayes v. Delbert Services. Corp.*,
   811 F.3d 666 (4th Cir. 2016) ................................................................................................ 20

*Henderson v. Super. Ct.*,
   142 Cal. Rptr. 478 (Ct. App. 1978) ..................................................................................... 23

*Howard v. Plain Green, LLC*,
   No. 2:17CV302, 2017 WL 3669565 (E.D. Va. Aug. 7, 2017)....................................... *passim*

*Howard ex rel. U.S. v. Shoshone-Paiute Tribes of the Duck Valley Indian Reservation*,
   608 F. App'x 468 (9th Cir. 2015) ........................................................................................ 25

*In re Think Finance, LLC*,
   No. 17-33964-hdh11 (Bankr. N.D. Tex. Oct. 2, 2018) .................................................. *passim*

*Inyo Cty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*,
   538 U.S. 701 (2003)............................................................................................................. 25

*Iowa Tribe of Kan. & Neb. v. Salazar*,
   607 F.3d 1225 (10th Cir. 2010) ........................................................................................... 13

*James Joseph Morrison Consultants, Inc. v. Sault Ste. Marie Tribe of Chippewa Indians*,
   No. 2:97-CV-315, 1998 WL 1031492 (W.D. Mich. Aug. 6, 1998) ........................................ 8

*Keene Corp. v. United States*,
   508 U.S. 200 (1993).............................................................................................................. 14

*KPMG LLP v. Cocchi*,
   565 U.S. 18 (2011) (per curiam).......................................................................................... 17

*Leigh v. Blackfeet Tribe of Blackfeet Indian Reservation*,
   No. CIV. A. 89-1568-Z, 1990 WL 122398 (D. Mass. Aug. 17, 1990)................................... 8

iii

*Lewis* v. *Clarke*,
    137 S. Ct. 1285 - 92 (2017) ................................................................................ 14

*Maysonet-Robles v. Cabrero*,
    323 F.3d 43 (1st Cir. 2003) ................................................................................ 13

*Michigan v. Bay Mills Indian Cmty.*,
    134 S. Ct. 2024 (2014) ................................................................................ 7, 8, 14

*Mohamed v. Uber Techs., Inc.*,
    848 F.3d 1201 (9th Cir. 2016) ............................................................................ 19

*Momot v. Mastro*,
    652 F.3d 982 (9th Cir. 2011) .........................................................................17, 19

*Monk v. N. Coast Brewing Co. Inc.*,
    No. 17-CV-05015-HSG, 2018 WL 646679 (N.D. Cal. Jan. 31, 2018).................. 24

*Montana v. United States*,
    450 U.S. 544 (1981) ............................................................................................ 21

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1, 24 (1983) ....................................................................................17, 19

*Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*,
    498 U.S. 505 (1991) .............................................................................................. 7

*Palm Ridge, LLC v. Ahlers*,
    No. 8-CV-652, 2008 WL 11339594 (C.D. Cal. June 23, 2008).....................23, 24

*Petters Company v. BLS Sales*,
    No. 4-CV-2160, 2005 WL 2072109 (N.D. Cal. Aug. 26, 2005).......................... 23

*Pistor v. Garcia*,
    791 F.3d 1104 (9th Cir. 2015) .............................................................................. 7

*Ponomarenko v. Shapiro*,
    287 F. Supp. 3d 816, 838 (N.D. Cal. 2018).......................................................... 21

*Quileute Indian Tribe v. Babbitt*,
    18 F.3d 1456 (9th Cir. 1994) ............................................................................... 16

*Rent-A-Ctr., W., Inc. v. Jackson*,
    561 U.S. 63 (2010)............................................................................................... 19

*Sarlot-Kantarjian v. First Pennsylvania Mortg. Tr.*,
    599 F.2d 915 (9th Cir. 1979) .............................................................................. 24

iv

*Seeman v. Phila. Warehouse Co.*,
   274 U.S. 403 (1927)................................................................................................. 22

*Shannon-Vail Five Inc. v. Bunch*,
   270 F.3d 1207 (9th Cir. 2001)...............................................................................23, 24

*Smith v. Babbitt*,
   875 F. Supp. 1353 (D. Minn. 1995), *judgment aff'd, appeal dismissed in part*,
   100 F.3d 556 (8th Cir. 1996)........................................................................................ 8

*Stoner v. Santa Clara Cnty. Office of Ed.*,
   502 F.3d 1116 (9th Cir. 2007) .................................................................................. 25

*Straub v. A P Green, Inc.*,
   38 F.3d 448 (9th Cir. 1994) ...................................................................................... 14

*State ex rel. Suthers v. Cash Advance*,
   No. 05-143, 2012 WL 3113527 (D. Colo. Feb. 18, 2012) ...................................... 14

*Tassone v. Foxwoods Resort Casino*,
   No. 3:11CV1718 WWE, 2012 WL 1885586 (D. Conn. May 23, 2012), *aff'd*,
   519 F. App'x 27 (2d Cir. 2013) .................................................................................. 8

*Ury v. Jewelers Acceptance Corp.*,
   38 Cal. Rptr. 376 (Ct. App. 1964) ........................................................................... 24

*Vt. Agency of Natural Res. v. United States ex rel. Stevens*,
   529 U.S. 765 (2000)................................................................................................... 25

*White v. University of California*,
   765 F.3d 1010 (9th Cir. 2014) ....................................................................7, 8, 9, 17

*Williams v. Lee*,
   358 U.S. 217 (1959) .................................................................................................. 21

**Statutes**

18 U.S.C. 1961 ................................................................................................................21, 24

18 U.S.C. § 1962(c)–(d).................................................................................................. 6, 24

Cal. Civ. Code § 1916-2 ..................................................................................................... 21

Cal. Const. Art. XV § 1..................................................................................................... 21

Fed. R. Civ. P. 12(b)(6).................................................................................................... 21

Fed. R. Civ. P. 19.............................................................................................................. 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

**Other Authorities**

*Dep't of Interior Notices,* 83 Fed. Reg. 4235 (Jan. 30, 2018).........................................................2

*Restatement (Second) of Conflict of Laws* § 187 (1971) ...........................................................23

PLAIN GREEN'S NOTICE OF MOTION AND MOTION TO DISMISS OR COMPEL ARBITRATION
CASE NO. 3:18-CV-01200-WHO

## STATEMENT OF THE ISSUES TO BE DECIDED

This Motion raises the following issues:

1.      Whether the Chippewa Cree Tribe's sovereign immunity bars Plaintiffs' claims against Plain Green, LLC, an economic entity chartered, indirectly wholly owned, and controlled exclusively by the Tribe for the benefit of the Tribe and its members.

2.      Whether Plaintiffs can maintain a putative class-action lawsuit in federal court against Plain Green when the parties agreed that "any dispute" as to the loans challenged here would be submitted before a neutral arbitrator on an individual basis.

3.      Whether Plaintiffs have stated a claim on which relief can be granted when their federal and state-law claims rest entirely on the assumption that California usury law applies but the loan agreements' prominent choice-of-law provisions, to which Plaintiffs necessarily agreed, provide that Chippewa Cree tribal law governs.

4.      Whether Plaintiffs may pursue a RICO claim against Plain Green when RICO is inapplicable to tribal sovereigns.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Plain Green, LLC is a lending entity owned and operated by the Chippewa Cree Indians of the Rocky Boy's Reservation, a federally recognized, sovereign, self-governing Indian Tribe. Since it chartered Plain Green under tribal law, the Chippewa Cree Tribe has been the only entity entitled to receive distributions, directly or indirectly, from Plain Green, and the Tribe has directly or indirectly received 100% of Plain Green's distributions. The Tribe has used those distributions to ensure the Tribe's self-sufficiency and to provide desperately-needed services to the Tribe's members. In recognition of Plain Green's crucial role as an economic arm of the Tribe, the Tribe formally extended its sovereign immunity to Plain Green from the moment of its inception.

One of the three named plaintiffs in this suit contracted with Plain Green to borrow short-term consumer loans, and he purports to represent a class of similarly situated borrowers. Plain Green's lending contracts clearly disclose Plain Green's sovereign status as a tribal entity. They also include bold faced provisions explaining that any and all contract-related disputes, including those raised in the Complaint, must be arbitrated, and that Chippewa Cree—and not state—law governs the contracts. Nonetheless, Plaintiffs have eschewed arbitration and have instead brought suit against Plain Green and several other entities, raising California state law claims and Racketeer Influenced Corrupt Organizations Act ("RICO") claims predicated on alleged violations of California law.

Plaintiffs' claims against Plain Green must fail for multiple reasons. *First*, as an arm of the Chippewa Cree Tribe, Plain Green has sovereign immunity. Because that immunity has not been abrogated or waived, Plain Green cannot be sued in federal court, full stop. Indeed, at least *three* federal courts have recognized that the Chippewa Cree's immunity protects Plain Green from judicial process. *See Commonwealth of Pennsylvania v. Think Finance et. al.*, No. 2:18-mc-00169-JCJ (E.D. Pa. September 26, 2018); *In re Think Finance, LLC*, No. 17-33964-hdh11 (Bankr. N.D. Tex. Oct. 2, 2018), ECF Nos. 1016 at 45 & 1034 (Attached as Exhibit 1); *Howard v. Plain Green, LLC*, No. 2:17CV302, 2017 WL 3669565, at *3 (E.D. Va. Aug. 7, 2017), *report and*

- 1 -

*recommendation adopted*, No. 2:17CV302, 2017 WL 3669096, at *1 (E.D. Va. Aug. 24, 2017). Because Plain Green has sovereign immunity, the Court lacks subject-matter jurisdiction over this lawsuit. The claims against Plain Green must therefore be dismissed in their entirety.

*Second*, this suit is also barred because Plaintiffs, in entering the loan agreements they now seek to challenge, agreed that the claims they have raised should be submitted to arbitration. That arbitration agreement is valid and enforceable, and provides the exclusive means for redressing Plaintiffs' grievances. Thus, if the Court declines to dismiss Plaintiffs' claims on sovereign immunity grounds, it should instead compel arbitration.

*Third*, all of Plaintiffs' claims are predicated on the application of California state law, but the parties explicitly agreed that Chippewa Cree tribal law would govern all relevant loan terms. Once that choice of law provision is appropriately enforced, Plaintiffs are left without any valid cause of action. That too requires dismissal.

*Fourth and finally*, Plaintiffs cannot pursue their RICO claim against Plain Green because of Plain Green's status as an arm of the Tribe. The civil RICO provisions do not apply to tribal sovereigns.

Plaintiffs cannot surmount any of these four obstacles. Accordingly, Plain Green respectfully requests that this Court grant its motion to dismiss.

## BACKGROUND

### A. Plain Green

The Chippewa Cree Indians of the Rocky Boy's Reservation is a federally recognized tribe with a reservation in north-central Montana. The Tribe is an independent sovereign nation that, among other things, provides social services, jobs, education, healthcare, and infrastructure to its 6,880 members, 4,440 of whom live on the Reservation. Whitford Decl. ¶ 4. The Tribe has engaged in a government-to-government relationship with the United States for more than 150 years. Since the enactment of the Indian Reorganization Act of 1934, and its adoption by the Tribe, the Tribe has operated under a tribal Constitution and Bylaws. *See Dep't of Interior Notices,* 83 Fed. Reg. 4235, 4236 (Jan. 30, 2018) (listing the "Chippewa Cree Indians of the Rocky

Boy's Reservation" on the list of "Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs").  A critical part of the relationship between the Chippewa Cree and the United States is the Tribe's immunity from suit in federal courts.  *See, e.g.*, *Demontiney v. U.S. ex rel. Dep't of Interior, Bureau of Indian Affairs*, 255 F.3d 801, 811 (9th Cir. 2001) (affirming dismissal of contract claims brought against the Chippewa Cree Tribe and reiterating the "strong presumption against waiver of tribal sovereign immunity"(citation omitted)).

In or before 2009, the Tribe began to explore the possibility of engaging in internet lending as a way to advance the Tribe's goals of economic development and self-sufficiency.  Whitford Decl. ¶ 8.  The Tribe first entered the lending business in 2010, through its tribal entity, Plain Green, LLC (then known as First American Asset Recovery, LLC), an economic arm of the Tribe governed by tribal law.  Whitford Decl. ¶ 9 & Ex. A-3.

Plain Green was chartered pursuant to the Tribe's Constitution and under its Limited Liability Company Act.  As provided in its Articles of Organization and other governing documents, Plain Green exists "to enhance the Tribe's economic self-sufficiency and self-determination" and "to serve the social, economic, educational, and health needs of the Tribe" by enhancing the Tribe's business prospects.  Whitford Decl. ¶ 10 & Ex. A-3. The revenue and opportunity that an economic entity like Plain Green offers to the Tribe is critical.  For example, the poverty rate for those located on the Rocky Boy's Reservation was 37.9%.[1]  Indeed, the Tribe chartered Plain Green for the "sole purposes" of functioning as an economic arm of the Tribe and to benefit of the Tribe's members.  Whitford Decl. ¶ 10.  Accordingly, the Tribe conferred on Plain Green "all of the Tribe's rights, privileges and immunities concerning federal, state, and local . . . jurisdiction, to the same extent that the Tribe would have such rights, privileges, and immunities."  Ex. A-3.

Since October 2016, Plain Green has operated as a manager-managed LLC, with the wholly tribally owned and operated Atoske Holding Company ("AHC") as its sole member.

---

[1] *See generally My Tribal Area*, United States Census Bureau (last visited Oct. 10, 2018), https://bit.ly/2IIPPvR.

Whitford Decl. ¶ 14. The Tribe's Business Committee appoints the Board of Directors for AHC, and operates AHC as an arm of the tribe. *Id.* ¶ 16. Through AHC, the Tribe is able to control the appointment and removal of Plain Green's manager. *Id.* ¶ 15.[2]   The Business Committee is also authorized to sign checks on behalf of Plain Green. *Id.* ¶ 22. Further, the Business Committee has on multiple occasions amended Plain Green's Articles of Organization, most recently in October 2016, acting in its capacity as the 100% owner of AHC, the sole member of Plain Green. *See id.* ¶¶ 12–16

The Tribe further regulates Plain Green's activities under the Chippewa Cree Tribal Lending and Regulatory Code and through supervision by an independent regulatory subdivision of the Tribe's governing structure, the Tribal Consumer Protection Bureau. *Id.* ¶¶ 24-25 & Ex. A-9. That tribal oversight ensures that Plain Green complies with licensing requirements and submits to quarterly compliance audits, as well as an annual on-site review. Whitford Decl. ¶¶ 24-25.   The Commissioner of the Tribal Consumer Protection Bureau formerly served as the Banking Commissioner for the State of Colorado. *Id.* ¶ 24.

While the Tribe has always indirectly or directly owned Plain Green, in its early days, it contracted with non-tribal entities to obtain the capital, expertise, and support services necessary to run a successful business.   Parker Decl. ¶ 7.   But, importantly, as Plain Green and the Tribe built their expertise and knowledge in these areas, they brought the lending operation in house. *See* Parker Decl. ¶ 10.  Plain Green renegotiated the terms of its relationship with its primary third-party service providers, entities related to Think Finance, in 2013 and again in 2015. *See id.* ¶ 9. Each time, Plain Green internalized more and more of the services for which it previously relied on third-party service providers. *See id.* ¶¶ 9-11. In 2016, Plain Green completed its internalization of nearly all services for which it previously relied on Think Finance entities: Plain Green now markets, underwrites, funds, services, and collects on all of its loans from its location on the Rocky Boy's Reservation, with the exception of a handful of workers in Arizona. *See id.* ¶ 11.  While Plain Green continues to contract with certain third-party service providers, who

---

[2] Plain Green was placed under Atoske's control in 2016. Before that, Plain Green was owned and operated directly by the Tribe. *See* Ex. A-8.

handle collections, customer support, and call center activities to meet customer demand. This allows Plain Green's workers, who are predominantly members of the Tribe, to attend important community events including Tribal ceremonies, powwows, and Tribal funerals that are not part of their customers' calendar. *See id.* ¶¶ 12–14. Plain Green performs routine quality assurance reviews over these third party service providers. *See id.* ¶ 15.

Plain Green has admirably served the purposes for which it was chartered: It has promoted tribal self-sufficiency and spurred economic development. From its inception, the Tribe has been the only entity entitled to receive distributions, directly or indirectly, from Plain Green, and the Tribe has directly or indirectly received *all* of Plain Green's distributions. *See* Parker Decl. ¶ 17. Like many new businesses, the net income of Plain Green was relatively small in the early years. Plain Green relied on certain third-party providers, which increased operating expense, and, in turn, decreased net income. *See id.* ¶ 8. But, as Plain Green grew and prospered, it renegotiated its contracts, pared back on its reliance on such third-party service providers, and, as a result, increased the value it ultimately generated for the Chippewa Cree Tribe. *Id.* ¶¶ 10, 16–17. Plain Green's role as a revenue generator is now flourishing. *Id.* ¶ 18. Distributions from Plain Green currently represent approximately 86% of the Tribe's General Fund, and in 2017, the Tribe received over $25 million through Plain Green's sole manager, AHC. *See id.* ¶ 18; Whitford Decl. ¶ 20. Plain Green's contribution to the General Fund has provided the Tribe with the means to develop a Tribal health clinic, to fund various community and ceremonial events, to provide school supplies and medical equipment, and to ensure critical governmental services, including law enforcement, fire protection, housing, and utilities. Whitford Decl. ¶ 20. As a further benefit to the Tribe, Plain Green has accepted liability for Tribal debts to BEH Gaming Ltd. for activities unrelated to its consumer lending business. *Id.* ¶ 21.

Plain Green's benefits for the Tribe do not end there. Plain Green has served as an important generator of work for tribal members. Plain Green adheres to the Tribe's Employment Rights Ordinance, and as such "give[s] preference to qualified Indians, with the first preference to local Indians, in all hiring, promotion, training, lay-offs, and all other aspects of employment." Ex.

B-1, *see also* Ex. B-2.   As with profits, this benefit has increased over the years:   In 2017, Plain Green provided work for 62 members of the Chippewa Cree Tribe, as well as 16 members of other Indian Tribes, paying a total of $2,529,594.85 to Tribal members. *See* Parker Decl. ¶ 13.   By August 2018, that number had increased to $2,612,258.11.   *Id.* And Plain Green now offers work to 72 members of the Tribe.   *Id.*   In short, Plain Green is a tribal entity that plays a vital role in the economic life of the Chippewa Cree Tribe.

## B.  Procedural History

In February 2018, named Plaintiffs Brice, Browne, and Novort filed a putative class-action complaint against a host of entities and individuals including Plain Green.   Plaintiffs raise three interrelated claims against Plain Green.   They claim that Plain Green charged loan payments in excess of those allowed under California usury and unjust-enrichment laws, Dkt. 1 ¶¶ 197–206, 207–216, and as a result similarly violated and conspired to violate the RICO ban on the "collection of unlawful debt," *id.* ¶¶ 174–186, 187–196; 18 U.S.C. § 1962(c)–(d).   While all three plaintiffs purport to bring suit against Plain Green, only one Plaintiff—Browne—alleges that he actually has a loan agreement with Plain Green.   Dkt. 1 ¶ 139.

Anticipating that a straightforward application of settled immunity principles would bar to the claims against Plain Green, Plaintiffs specifically note on the third page of their Complaint that Plain Green is "not entitled to sovereign immunity" because Plain Green is part of a "'rent-a-tribe' lending" scheme that was "established for the sole purpose of evading state usury laws."   *See* Dkt. 1 ¶ 1 & n.5.   Plaintiffs' claims here are largely a rehash of those brought in other courts around the country, which have explicitly and implicitly recognized this immunity bar to litigating in federal court.[3]   As the Eastern District of Virginia recently confirmed, "Plain Green is an 'arm of the tribe'" and is thus "immune from suit under existing tribal immunity precedent."   *Howard v. Plain Green, LLC*, No. 2:17CV302, 2017 WL 3669565, at *3 (E.D. Va. Aug. 7, 2017), *report and*

_____

[3] *See, e.g.*, *Gingras v. Rosette*, No. 5:15-CV-101, 2016 WL 2932163, at *19–20 (D. Vt. May 18, 2016) (substantially similar RICO case brought against the officers of Plain Green under *Ex Parte Young* because the "Plain Green and the Tribe . . . would  otherwise be subject to sovereign immunity"), *consolidated appeal docketed* No. 16-2132 (2d Cir. June 22, 2016); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 332 (4th Cir. 2017) (substantially similar RICO case brought against a non-tribal service provider of a loan issued by a tribal lender).

1  *recommendation adopted*, No. 2:17CV302, 2017 WL 3669096 (E.D. Va. Aug. 24, 2017); *accord*

2  *Commonwealth of Pennsylvania v. Think Finance et. al.*, No. 2:18-mc-00169-JCJ (E.D. Pa.

3  September 26, 2018); *In re Think Finance, LLC*, No. 17-33964-hdh11 (Bankr. N.D. Tex. Oct. 2,

4  2018), ECF Nos. 1016 at 45 & 1034.  This case is no different.

5        Following a case-management conference in August, this Court ordered limited "essential"

6  discovery to be completed by October 10, 2018 in advance of the November 14, 2018 hearing set

7  for all preliminary motions.  *See* Dkt. 75.  Plain Green has now produced in discovery all

8  documents necessary to prove its immunity, and this Motion follows.

9                                        **ARGUMENT**

10  **I.   Plain Green Is Immune From Suit**

11        This Court should dismiss the Complaint with prejudice because Plaintiffs' claims are barred

12  by the "'common-law immunity from suit traditionally enjoyed by sovereign powers.'"  *Michigan*

13  *v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014) (quoting *Santa Clara Pueblo v. Martinez*,

14  436 U.S. 49, 58 (1978)).  "In the context of a Rule 12(b)(1) motion to dismiss on the basis of tribal

15  sovereign immunity, the party asserting subject matter jurisdiction has the burden of proving its

16  existence, i.e. that immunity does not bar the suit."  *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th

17  Cir. 2015)(internal quotation marks omitted).  Plaintiffs cannot come close to meeting that burden.

18        Unless clearly and unequivocally waived by the tribe or abrogated by Congress, "Indian tribes

19  generally enjoy sovereign immunity."  *See* O*kla. Tax Comm'n v. Citizen Band Potawatomi Indian*

20  *Tribe of Okla.*, 498 U.S. 505, 509 (1991).  Moreover, "the settled law of [the Ninth Circuit] is that

21  tribal corporations acting as an arm of the tribe enjoy the same sovereign immunity granted to a

22  tribe itself." *Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718, 725–726 (9th Cir. 2008).  The

23  only question, then, is whether Plain Green constitutes an arm of the Chippewa Cree Tribe.  It

24  does:  The undisputed facts demonstrate that Plain Green qualifies as an "arm of the tribe" under

25  the five factor inquiry adopted by the Ninth Circuit in *White* v. *University of California*, 765 F.3d

26  1010, 1025 (9th Cir. 2014).

27        **A.  An Arm of the Chippewa Cree Tribe Is Entitled to Immunity from Suit**

28

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

It is well-established that tribes enjoy a basic immunity from suit as a "necessary corollary to Indian sovereignty and self-governance." *Bay Mills,* 134 S. Ct. at 2030 (internal quotation marks omitted).  It is equally well-established that this immunity extends to suits "arising from a tribe's commercial activities," whether they occur on or off a reservation.  *Id.* at 2031. Accordingly, when a tribe creates an entity "pursuant to a tribal ordinance" or similar "intergovernmental agreement" and "wholly own[s] and manage[s]" it for the "economic benefits produced," that entity functions as an "arm of the tribe" and is entitled to "enjoy the same sovereign immunity granted to a tribe itself." *Cook,* 548 F.3d at 725–726.

The Ninth Circuit has specifically held that the Chippewa Cree Tribe must be afforded sovereign immunity from suit.  *Demontiney,* 255 F.3d at 811.  As Plaintiffs' apparently recognize, the Tribe has not waived its immunity with respect to the allegations at stake in this suit, nor has Congress clearly and unequivocally abrogated that immunity.[4]  *See* Dkt. ¶ 1 & n.5 (questioning only Plain Green's arm-of-the-tribe status).  Thus, any entity that qualifies as arm of the Chippewa Cree Tribe is entitled to sovereign immunity from Plaintiffs' claims.  Plain Green undoubtedly fits the bill.

### B. Plain Green is an Economic Arm of the Chippewa Cree Tribe

In *White v. University of California*, the Ninth Circuit held that courts must apply a five factor analysis borrowed from the Tenth Circuit's opinion in *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino and Resort*, 629 F.3d 1173 (10th Cir. 2010), to determine whether an

---

[4] The only federal law Plaintiffs invoke in their claims against Plain Green is RICO.  There is nothing in RICO suggesting that Congress intended to abrogate the Tribes' sovereign immunity, much less that it did so clearly and unequivocally.  Every Court to have addressed this issue has so concluded.  *See, e.g.*, *Tassone v. Foxwoods Resort Casino*, No. 3:11CV1718 WWE, 2012 WL 1885586, at *1 (D. Conn. May 23, 2012), *aff'd*, 519 F. App'x 27 (2d Cir. 2013); *Gristede's Foods, Inc. v. Unkechauge Nation*, No. 06-CV-1260 (CBA), 2006 WL 8439534, at *2 & n.2 (E.D.N.Y. Dec. 22, 2006); *Buchanan v. Sokaogon Chippewa Tribe*, 40 F. Supp. 2d 1043, 1047 (E.D. Wis. 1999); *James Joseph Morrison Consultants, Inc. v. Sault Ste. Marie Tribe of Chippewa Indians*, No. 2:97-CV-315, 1998 WL 1031492, at *2 (W.D. Mich. Aug. 6, 1998); *Smith v. Babbitt*, 875 F. Supp. 1353, 1365 (D. Minn. 1995), *judgment aff'd, appeal dismissed in part*, 100 F.3d 556 (8th Cir. 1996); *Leigh v. Blackfeet Tribe of Blackfeet Indian Reservation*, No. CIV. A. 89-1568-Z, 1990 WL 122398, at *1 (D. Mass. Aug. 17, 1990).

Hogan Lovells US LLP
Attorneys At Law

1   entity constitutes an "arm of the tribe." *White,* 765 F.3d at 1025.  The Ninth Circuit explained that

2   under *Breakthrough,* a court should look to:  (1) the "method of creation" of the economic entity;

3   (2) its "purpose"; (3) its "structure, ownership, and management, including the amount of control

4   the tribe has over the entit[y]"; (4) "the tribe's intent with respect to the sharing of its sovereign

5   immunity"; and (5) "the financial relationship between the tribe and the entit[y]."  *Id.* (quoting

6   *Breakthrough,* 629 F.3d at 1187).

7        The federal courts that have considered the question have all concluded that the

8   *Breakthrough* analysis dictates that Plain Green is an arm of the Chippewa Cree Tribe.  *In re Think*

9   *Finance, LLC,* No. 17-33964-hdh11 at ECF Nos. 1016 at 45 & 1034; *Howard,* 2017 WL 3669565;

10  *see also Gingras,* 2016 WL 2932163 (accepting the undisputed proposition that Plain Green is

11  entitled to sovereign immunity); *Think Finance,* No. 2:18-mc-00169-JCJ (same).  That is hardly

12  surprising because each and every one of the "*Breakthrough* factors" adopted by the Ninth Circuit

13  cuts in favor of extending immunity to Plain Green.[5]

14       *1. Method of Creation:*  In *Breakthrough,* the Tenth Circuit held that an entity's "method of

15  creation . . . weighs in favor" of sovereign immunity when that entity is "created . . . under tribal

16  law" and "under [the tribe's] constitution."  629 F.3d at 1191.  The *Breakthrough* Court also

17  looked to "the Tribe's own descriptions" of the entity in its resolution and ordinances, finding it

18  significant that the tribe in that case had dubbed the entity an "instrumentality" and "authorized

19  agency" of the tribe.  *Id.* at 1192.  Here, the Chippewa Cree Tribe chartered Plain Green under its

20  laws and constitution, and Plain Green operates pursuant to those laws.  Whitford Decl. ¶¶ 7, 9,

21  15–17; Ex. A-3, A-10. Moreover, when the Tribe ratified and approved Plain Green's Articles of

22

23       [5] The *Breakthrough* Court also enumerated a sixth factor: whether the policies underlying
     tribal sovereign immunity in connection with tribal economic development would be served by
24   granting immunity.  629 F.3d at 1187.  The Ninth Circuit has not explicitly adopted that factor.
     *See also Cain v. Salish Kootenai Coll.,* No. cv-12-181-M-BMM, 2018 WL 2272792, at *2–4 (D.
25   Mont. May 17, 2018) (applying only the five factors explicitly adopted in *White*).  But that
     distinction makes no difference in this case because the sixth factor also counsels strongly in favor
26   of Plain Green's status as an arm of the tribe.  Recognizing that Plain Green is an arm of the Tribe
     would serve the sovereign immunity doctrine's core purposes because Plain Green brings in
27   critical revenue for the Tribe, which has been essential to the Tribe's economic development.
     Whitford Decl. ¶ 10.

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

1   Organization, the Tribe expressly recognized Plain Green "as an economic arm of the Tribe"

2   created to serve the needs of the Tribe and its members.  Whitford Decl. ¶ 10.  In other words, the

3   evidence that the *Breakthrough* Court found persuasive with respect to the first factor is similarly

4   present in this case.

5           *2. Purpose:*  The *Breakthrough* Court explained that the purpose factor "weighs strongly in

6   favor of immunity" where an entity is "created for the financial benefit of the Tribe and to enable

7   it to engage in various governmental functions."  629 F.3d at 1192.  The *Breakthrough* Court

8   looked to the purpose of the entity as expressed in tribal resolutions and pointed approvingly at the

9   way in which the *Breakthrough* tribe had allocated revenues received from the entity towards

10  tribal government and support services.  *Id.*

11          Evidence in this case demonstrates that the Tribe created Plain Green for the purpose of

12  economic development and that Plain Green has served that goal:  Plain Green's governing

13  documents make clear that it exists "to enhance the Tribe's economic self-sufficiency and self-

14  determination" and "to serve the social, economic, educational, and health needs of the Tribe."

15  Whitford Decl. ¶ 10.   Financial records and uncontested declarations further demonstrate that

16  Plain Green has achieved that purpose by providing the Tribe with over $25 million in 2017 alone.

17  *See* Parker Decl. ¶18.   That revenue has been used for the development of a Tribal health clinic; it

18  has gone towards funding various community and ceremonial events; and it has enabled the Tribe

19  to provide school supplies and medical equipment and to ensure critical governmental services,

20  including law enforcement, fire protection, housing development, and utilities.  Whitford Decl.

21  ¶ 20.  Moreover, Plain Green has also served its economic development purposes by locating its

22  operations on the reservation and by giving work to tribal members.  *Howard*, 2017 WL 3669565,

23  at *3; Parker Decl. ¶¶ 11, 13.   In 2017, Plain Green provided work to 62 members of the

24  Chippewa Cree Tribe and 16 members of other Indian Tribes; in 2018, it has similarly given work

25  to 72 members of the Chippewa Cree Tribe as well as 15 members of other Indian Tribes. *See*

26  Parker Decl. ¶ 13. Additionally, Plain Green has also enhanced tribal self-determination and

27  served the social needs of the Tribe by adopting and exercising hiring practices and policies that

28

further the purposes of the Tribe's Indian Preference in Employment law.  *See* Parker Decl. ¶ 12.

Plain Green gives preference in recruitment, training, and promotion to enrolled members of the

Tribe and enrolled members of other federally recognized Indian tribes.  *Id.*; Exs. B-1, B-2.

   *3. Structure, Ownership, and Management.*  With respect to the third factor, the

*Breakthrough* Court evaluated the extent to which members of the Tribe were involved in

managing and operating the entity.  629 F.3d at 1193.  Yet again, analogous evidence regarding

Plain Green counsels strongly in favor of immunity.  The Chippewa Cree Tribe wholly owns and

manages Plain Green through a manager-managed limited liability company of which the

Chippewa Cree is the sole member, with the exclusive authority to appoint and remove the

manager.  *See* Whitford Decl. ¶ 9. Members of the Tribe's Business Committee have periodically

served on Plain Green's Board of Directors, and other tribal members frequently hold management

positions.  *Id.* ¶17.

   Moreover, Plain Green runs the entity's operations from the Tribe's Reservation.  *Id.* ¶ 18.

No third party or other outside individual exercises control, management, or ownership.  *Id.*  Plain

Green runs its own platforms and is responsible for its own loan products.  Plain Green markets,

underwrites, funds, processes, and collects on its loans.  *Id.*  To the extent it utilizes third-party

service providers, it conducts quality assurance review and sets Standard Operating Procedures for

these vendors.  Parker Decl. ¶¶ 14–15   And, importantly, Plain Green's use of third-party service

providers serves its mission to benefit the Tribe, allowing its tribal members to participate

meaningfully in their communities. For example, there are times when workers cannot perform

their duties due to important community events such as Tribal holidays, traditional tribal

ceremonies, powwows, and funerals. During these times, Plain Green works with third-party

service providers to handle certain call center and collection traffic and overflow demand.

   The Tribe also tightly oversees Plain Green's operations, ensuring that they occur pursuant

to tribal law. *See* Whitford Decl. ¶¶ 24–25.  Notably, Plain Green must satisfy the tribe's licensing

requirements and adhere strictly to the regulations under the Tribe's Lending and Regulatory

Code, including tribal rules on the extension of credit, the application of usury and interest rates,

and required disclosures.  Whitford Decl. ¶¶ 24–25; A-9 at Parts 1, 2, and 5; A-10.  The Tribe, through the independent regulatory Tribal Consumer Protection Bureau, conducts quarterly compliance audits of Plain Green and requires Plain Green to complete an annual on-site review. Whitford Decl. ¶ 25.  That the audits and reviews are professional and rigorous is established first by the TCPB leader, the former State Bank Commissioner of Colorado. *Id.* ¶ 24.

   *4. The Tribe's Intent as to Sharing Immunity:*  In analyzing the fourth factor, the *Breakthrough* Court held that a Tribe's explicit conferral of sovereign immunity on an entity is an important consideration in the "arm of the tribe" analysis.  629 F.3d at 1194.  In the Plain Green Articles of Organization, the Tribe explicitly and unequivocally "confer[red] on the Company sovereign immunity from suit to the same extent that the Tribe would have such sovereign immunity if it engaged in the activities undertaken by the Company."  *See* Ex. A-3. That too favors a finding of immunity.

   *5. The Financial Relationship Between the Tribe and Plain Green:*   As to the fifth factor, the *Breakthrough* Court instructed courts to examine the way in which a tribe is affected by the financial fortunes of the relevant entity.  In *Breakthrough*, the Court found that immunity was appropriate where the Tribe received "100%" of the entity's profits, and where "the Tribe depend[ed] heavily on [the entity] for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities."  629 F.3d at 1195. The *Breakthrough* Court explained that where such a relationship exists, any financial harm to the entity will "reduce the Tribe's income."  *Id.*  Precisely such a relationship exists between Plain Green and the Tribe.  From its inception to the present day, the Tribe has been the sole owner of Plain Green, or the sole owner of its sole member.  Whitford Decl. ¶¶ 7, 9.   Thus, *all* of Plain Green's profits inure to the benefit of the Tribe.  *Howard*, 2017 WL 3669565, at *4 (emphasis added).  And the Tribe depends heavily on the income it receives from Plain Green in order to fund vital government services.  *See* Whitford Decl. ¶¶ 20-21. A reduction in Plain Green's profits directly affects the welfare of the Tribe. *Ibid.*

1    In short, as multiple federal courts have confirmed, the *Breakthrough* factors overwhelmingly

2    demonstrate that Plain Green is an economic arm of the Chippewa Cree Tribe entitled to sovereign

3    immunity.  *In re Think Finance, LLC*, No. 17-33964-hdh11 at ECF Nos. 1016 at 45 & 1034;

4    *Howard*, 2017 WL 3669565; *see also Gingras*, 2016 WL 2932163; *Think Finance et. al.*, No.

5    2:18-mc-00169-JCJ.

6                         **C.  Plaintiffs' Arguments Against Immunity Fail.**

7            Despite the overwhelming evidence that Plain Green is immune from suit as an arm of the

8    Chippewa Cree Tribe, Plaintiffs assert that Plain Green is not immune because of its alleged

9    relationship with Think Finance and other non-tribal entities.  *See* Dkt. 1 ¶ 1 & n.5.   Plaintiffs are

10   doubly wrong:  *First*, for sovereign immunity purposes, courts must consider the facts as they exist

11   on the date of filing.  *Bank of Hemet v. United States*, 643 F.2d 661, 665 (9th Cir. 1981).  When

12   Plaintiffs filed their complaint in February of this year, Plain Green had *no* relationship with Think

13   Finance or its related corporations, and had been completely independent from Think since 2016.

14   Plaintiffs' allegations therefore have no bearing on the sovereign immunity analysis.  *Second*, even

15   if Plain Green's prior relationship with Think Finance is taken into consideration, Plain Green is

16   still entitled to sovereign immunity under the *Breakthrough* analysis.

17          *1. Plain Green's sovereign status must be assessed as of the time of filing.*

18          The Ninth Circuit has held that an entity's entitlement to sovereign immunity must be

19   assessed based on the facts as they existed "as of the date the complaint was filed."  *Bank of*

20   *Hemet*, 643 F.2d at 665.  Other courts of appeals have similarly concluded that the relevant time is

21   the date of the complaint, or even later. *Compare Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d

22   1225, 1236 (10th Cir. 2010) (recognizing the Second, Third, and Fifth Circuits follow the Ninth

23   Circuit's "as of the date the complaint was filed" standard); *with id.* (concluding instead that the

24   Court can take into account events after the suit commences), *and Maysonet-Robles v. Cabrero*,

25   323 F.3d 43, 49 (1st Cir. 2003) (same).

26          The consensus that sovereign immunity must be assessed based on the time of filing

27   reflects "the longstanding principle that the jurisdiction of the Court depends upon the state of

28

Hogan Lovells US
LLP
Attorneys At Law

things at the time of the action brought." *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) (quotation marks omitted).  It also reflects the fact that—as the Supreme Court has remarked in the Foreign Sovereign Immunities Act context—sovereign immunity is designed to give sovereigns "and their instrumentalities some protection from the inconvenience of suit." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003).  That purpose cannot be fully vindicated if newly sovereign entities may remain subject to suit for earlier conduct when they were not.[6]  *Id.*; *cf. Straub v. A P Green, Inc.*, 38 F.3d 448, 451 (9th Cir. 1994) (holding that immunity under the Foreign Sovereign Immunities Act for later-acquired instrumentality of the Province of Quebec turns on whether "a party is a foreign state at the time the lawsuit is filed, even if that party was not a foreign state at the time of the alleged wrongdoing").

While the Supreme Court has not applied this principle directly to tribal sovereign immunity, it has explained that tribal immunity is rooted in the basic protections "from suit traditionally enjoyed by sovereign powers." *Bay Mills*, 134 S. Ct. at 2030.  And more recently it has held that it is generally appropriate to apply "established sovereign immunity principles" to the "context of tribal sovereign immunity." *Lewis* v. *Clarke*, 137 S. Ct. 1285, 1291–92 (2017).  Thus, the *Breakthrough* Court focused its analysis on the relevant entity's *present* ownership status, structure, operation, and financial relationship with the tribe.  629 F.3d. at 1191–96.  And other courts have even more explicitly noted that the arm-of-the-tribe inquiry is "trapped in the present" and looks to "the current state of affairs" without regard to whether the entity was entitled to immunity "at some earlier time." *State ex rel. Suthers v. Cash Advance,* No. 05-143, 2012 WL 3113527 (D. Colo. Feb. 18, 2012); *accord Felts v. Paycheck Today*, No. CV 2008-13084, slip op. at 3–4 & n.3 (D. N.M. Sept. 20, 2018).

Once the lens is appropriately focused on the "current state of affairs," Plaintiffs' arguments against Plain Green's sovereign immunity all fall away.  Plaintiffs' Complaint is full of allegations about the way in which Think Finance and other non-tribal entities attempted to use Plain Green to conduct their own lending schemes. *See, e.g.*, Dkt. 1 ¶¶ 2, 3, 4, 5, 52, 63, 83, 99

---

[6] Plain Green, of course, is not itself a "newly sovereign entity" because it has been a sovereign arm of the Chippewa Cree Tribe since its inception. *See* p. 8–9, *supra*.

But those allegations revolve around asserted contractual relationships and revenue sharing agreements between those entities and Plain Green that *no longer exist*. It is undisputed that Plain Green severed all ties with Think Finance and its related entities in 2016, and it is equally undisputed that Plain Green is now controlled exclusively by the Tribe. Whitford Decl. ¶ 16. Plain Green is therefore entitled to sovereign immunity based on its current status. *See Howard*, 2017 WL 3669565 at *3–4 (analyzing *present* relationship between Plain Green and the Tribe and concluding that Plain Green is an arm of the tribe); *see also In re Think Finance,* No. 17-33964-hdh11 (Bankr. N.D. Tex. Oct. 2, 2018), ECF Nos. 1016 at 45 & 1034 (concluding that Plain Green is entitled to a protective order from discovery after argument that it is immune as an arm of the Tribe, supported by affidavit detailing Plain Green's current status);*Commonwealth of Pennsylvania v. Kenneth Rees, et al.*, No. 2:18-mc-00169-JCJ (E.D. Pa. Sept. 26, 2018) (same).

> ### 2. Sovereign immunity bars this suit even if Plain Green's past relationships are considered.

Plaintiffs are simply mistaken when they suggest that Plain Green's past relationships with non-tribal entities are relevant to the sovereign immunity analysis. But even if those past relationships are considered, Plain Green is still entitled to immunity under the *Breakthrough* analysis. Stripped of the rhetoric, Plaintiffs' allegations boil down to the assertion that—when the Tribe first created Plain Green—it relied extensively on contracts with non-tribal vendors to provide the expertise, financing, and support services necessary to participate in the lending business. Dkt. 1 ¶¶ 2–5. But it is hardly remarkable that a sovereign embarking on a new business venture would require ample assistance from outside entities with more experience. Nor is the Tribe's reliance on such entities relevant to the *Breakthrough* factors. Despite the Tribe's use of outside vendors and financers, Plain Green itself was then chartered under tribal law through governing documents that permitted Plain Green to share in the Tribe's immunity. *See* Whitford

- 15 -

Decl. ¶¶ 7, 9, 19. Plain Green was created for the purpose of tribal economic development, and even then it accomplished that goal by serving as a tribally owned and managed entity that provided the tribe with any and all profits to which Plain Green was entitled. *Id* . ¶¶ 10, 16.

To be sure, Plaintiffs may assert that at that time Plain Green made *less* of a profit than it should have because its revenue sharing arrangements with its vendors and financers required that most of the revenue be returned to those outside entities. But arguing this fact ignores that hard reality that the Tribe needed outside investment in order to start *any* business of significance. And it does not change the fact that all of the profits Plain Green earned, even under the initial financing structure, went directly to the Tribe for use in providing tribal government and support services. *See Breakthrough*, 629 F.3d at 1192–93 (finding it highly relevant that all of the revenues received from the entity were used to support the Tribe and its members). Plain Green has gradually developed its own ability to operate its own lending business, and as it has done so it decreased its reliance on non-tribal entities such that it is now almost completely self-sufficient. Parker Decl. ¶¶ 8–10. Its developmental arc is analogous to that of other entities recognized as sharing sovereign immunity with their tribal owner. *See Felts*, No. CV 2008-13084, slip op. at 3–4 & n.3.[7]

---

[7] If this Court were to decline to dismiss Plaintiffs' claims against Plain Green on sovereign-immunity grounds, this suit faces a further, independent bar: failure to join a required party under Rule 19. *See* Fed. R. Civ. P. 19 (instructing courts to assess whether, "in equity and good conscience," suit may proceed without a required party whose joinder is not feasible); *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1460 (9th Cir. 1994) ("[W]hen the necessary party is immune from suit, there may be 'very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor.'" (citation omitted)). At a bare minimum, it is indisputable that Plain Green is fully owned and managed by the Tribe. Thus, if Plain Green is not considered an arm of the Tribe, it would be necessary for the Tribe to participate in order to ensure that its significant ownership and control interests are protected. But—as all agree—the Tribe itself is entitled to immunity and therefore cannot be joined. Accordingly, it would still be necessary to dismiss the case. *See, e.g.*, *White*, 765 F.3d at 1026 (9th Cir. 2014) (affirming dismissal of Native American Graves Protection and Repatriation Act claims when the Kumeyaay Nation and its Repatriation Committee could not be joined as parties because

- 16 -

Thus, there is ample reason to conclude that—as multiple courts have already held—Plain Green is immune from judicial process because of its sovereign immunity. The claims against it should therefore be dismissed.

## II. The Parties' Agreement Requires Arbitration.

If this Court declines to dismiss Plaintiffs' claims against Plain Green outright, it should instead compel Plaintiffs to submit this dispute to arbitration on an individual basis as the parties agreed. The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, governs the parties' agreement to arbitrate, just as it does all arbitration agreements in transactions involving non-exempted commerce. *See id.* § 2; *Comanche Indian Tribe of Okla. v. 49, L.L.C.*, 391 F.3d 1129, 1132 (10th Cir. 2004) ("The requirement that the underlying transaction involve commerce 'is to be broadly construed so as to be coextensive with congressional power to regulate under the Commerce Clause." (quotation omitted)). The FAA reflects the firmly entrenched federal policy favoring arbitration and ensures that arbitration agreements are rigorously enforced. *See, e.g.*, *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (per curiam) (reiterating the "emphatic federal policy in favor of arbitral dispute resolution" (citation omitted)). "[C]ourts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citation omitted). To avoid "undermin[ing] the 'liberal federal policy favoring arbitration agreements,'" the party seeking to avoid arbitration bears the burden of establishing that the agreement in question should not be enforced. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91–92 (2000) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also Momot v. Mastro*, 652 F.3d 982, 986 (9th Cir. 2011). Because Plaintiffs cannot shoulder that burden here, this Court should dismiss the suit in favor of arbitration if it does not dismiss on sovereign immunity grounds.

### A. The Parties Entered a Valid and Enforceable Arbitration Agreement

When Plaintiffs requested their loans from Plain Green, they agreed to arbitrate "any

of their sovereign immunity).

dispute"—defined as "any claim or controversy of any kind between" the parties—with that term "given its broadest possible meaning" to encompass "all federal, state or Tribal law claims or demands (whether past, present, or future), based on any legal or equitable theory and regardless of the type of relief sought." Ex. B-3 at 7. The claims raised in the Complaint—which challenge the terms and enforcement of the loan agreements—undoubtedly qualify as "dispute[s]" under the arbitration agreement.

Plaintiffs could not have missed this agreement to arbitrate, as the relevant loan agreement contains a specially marked text box, labelled "**<u>WAIVER OF JURY TRIAL AND ARBITRATION AGREEMENT</u>**" in bolded, underlined, and all-capitals text. *Id*. Under this heading, in italicized, bolded, all-capitals text, are paragraphs beginning "***RIGHT TO OPT-OUT***" and "***PLEASE CAREFULLY READ THIS AGREEMENT  TO ARBITRATE***," advising borrowers that, if they fail to timely opt out in writing as specified by the agreement, "***ANY DISPUTE YOU HAVE RELATED TO THIS AGREEMENT WILL BE RESOLVED THROUGH BINDING ARBITRATION***." *Id.*

The features of the contract's agreement to arbitrate are equally clear and unmistakable.  If one of the parties to the loan has a dispute with the other, that party may initiate arbitration.  *Id.* That party may then select an arbitrator from either the American Arbitration Association or JAMS, the Resolution Experts, and the selected group's policies and procedures for consumer disputes will then govern unless contradicted by the loan agreement or tribal law.  *Id.*  At the initiating party's choice, the arbitration may be held within thirty miles of the party's residence or on tribal land.  *Id.* at 7–8. Plain Green will pay the filing fees and other arbitration-related costs, except for attorneys' fees, regardless of who initiates arbitration.  *Id.* at 7.

By filing this lawsuit, Plaintiffs have failed to submit their claims to the proper dispute-resolution forum as the parties originally intended.  Accordingly, this Court should exercise its authority under the FAA to "'rigorously enforce' arbitration agreements according to their terms"

- 18 -

1   by dismissing the claims against Plain Green.  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S.

2   228, 233 (2013) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

### B.   There Is No Valid Reason to Decline to Enforce the Arbitration Agreement.

Plaintiffs' Complaint does not offer any reason why their agreement to arbitrate is

unenforceable.  Any belated argument to this effect is doomed to fail.  Plaintiffs may not, for

example, avoid the agreement's effect by attacking the validity of the arbitration provisions

themselves.  The arbitration agreement contains an explicit "delegation clause," which specifies

that an arbitrator—not this Court—must resolve "any issue concerning the validity, enforceability,

or scope of this Agreement *or this Agreement to Arbitrate*."  Ex. B-3 at 7 (emphasis added).  When

there is such "clear and unmistakable evidence" that the parties agreed to have an arbitrator decide

threshold issues of arbitrability, courts must respect that agreement.  *See First Options of Chic.,

Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.*,

475 U.S. 643, 649 (1986)); *see also Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) ("An

agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party

seeking arbitration asks the federal court to enforce, and the FAA operates on this additional

arbitration agreement just as it does on any other.").  The Ninth Circuit routinely enforces

agreements to arbitrate any disputes about the enforceability and scope of an arbitration

agreement. *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016); *Brennan

v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *Momot*, 652 F.3d at 988.  The parties'

delegation clause here is no exception.

Nor may the Plaintiffs argue that the contents of the arbitration agreement render it wholly

unenforceable.  While in some cases involving tribal loan agreements, courts have refused to

enforce arbitration clauses (as well as their delegation clause components), that is invariably due to

a particular feature of the lending agreements that is absent here:  their inclusion of a prospective

- 19 -

waiver of all federal law.   In *Hayes v. Delbert Services. Corp.*, 811 F.3d 666 (4th Cir. 2016), for

instance, the arbitration agreement stated:  "[T]his Agreement shall be subject to and construed in

accordance with only the provisions of the laws of the Cheyenne River Sioux Tribe, and [] *no*

*United States* state or *federal law applies* to this Agreement." *Id.* at 670 (emphasis added).  The

Fourth Circuit found such an "arbitration agreement fails for the fundamental reason that it

purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims."

*Id.* at 673; *see also Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017) (holding a

similar arbitration agreement invalid where several of its "terms . . . evince an explicit attempt to

disavow the application of federal law" "to any part of the contract or its parties").  There is no such

prospective waiver in the contracts at issue here.  To the contrary, Plaintiffs' loan agreements in

general, as well as their arbitration clauses in particular, *embrace*—rather than prospectively

waive—the application of specific federal law.  *See* Ex. B-3 at 6  ("Th[is] Agreement to Arbitrate

also comprehends the application of the Federal Arbitration Act."); *id.* (recognizing that "any

federal law . . . expressly applicable to the operations of the Chippewa Cree Tribe" would still

apply to the arbitration agreement); *id.* at 8 ("**THE PARTIES ADDITIONALLY AGREE TO**

**LOOK TO THE FEDERAL ARBITRATION ACT AND JUDICIAL INTERPRETATIONS**

**THEREOF FOR GUIDANCE IN ANY ARBITRATION THAT MAY BE CONDUCTED**

**HEREUNDER**."); *id.* at 5 (the loan is a "'registered form' within the meaning of [specified] U.S.

Treasury Regulations"); *id.* at 1 (disclosing that "THIS LOAN IS MADE WITHIN THE TRIBE'S

JURISDICTION AND IS SUBJECT TO AND GOVERNED BY TRIBAL LAW AND *NOT THE*

*LAW OF THE BORROWER'S RESIDENT STATE*," but saying nothing about the inapplicability of

federal law (emphasis added)).  The prospective waiver doctrine is wholly inapplicable; the loan

agreements' arbitration clauses are enforceable; and the Complaint should be dismissed. [8]

---

[8] This Court should dismiss Plaintiffs' claims for another reason:  the Parties agreed to a forum-

Hogan Lovells US LLP
Attorneys At Law

### III.    Plaintiffs' Claims Ignore the Governing Law

Even if Plaintiffs can overcome the sovereign immunity bar, and even if they can persuade this Court to ignore the binding agreement to arbitrate, they still cannot prevail because their complaint suffers from yet another fatal defect:  All of Plaintiffs' claims flow from the mistaken assumption that *California* law provides the relevant cap on Plain Green's loans.  *See* Cal. Const. Art. XV § 1; Cal. Civ. Code § 1916-2; *see also* 18 U.S.C. 1961(6) (defining "unlawful debt" for RICO purposes as a debt unenforceable "under State or Federal law" because of "the laws relating to usury" when "the usurious rate is at least twice the enforceable rate").  But, as evidenced by the clear and conspicuous choice-of-law clause on the very first page of the relevant loan documents, the parties have agreed that Chippewa Cree *Tribal* law governs.  The law of California is therefore irrelevant, and Plaintiffs' Compliant cannot state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).

That the law of the Chippewa Cree governs cannot come as a surprise to Plaintiffs.  On the very first page of the Browne loan agreement, there appears the following choice-of-law clause, in bolded all-capitals text:

**THE BORROWER EXPRESSLY CONSENTS AND AGREE THAT THIS LOAN IS MADE WITHIN THE TRIBE'S JURISDICTION AND IS SUBJECT TO AND GOVERNED BY TRIBAL LAW AND NOT THE LAW OF BORROWER'S RESIDENT STATE.**

selection clause electing as the proper judicial tribunal the Chippewa Cree Tribal Court.  *See* Ex. B-3 at 7.  If this Court declines to enforce the parties' agreement to arbitrate, that clause would nevertheless remain valid and preclude Plaintiffs from pursuing their claims here.  As such, this Court should alternatively dismiss this case on *forum non conveniens* grounds.  There are no exceptional circumstances that suggest deviating from the strong federal policy favoring enforcing valid forum-selection clauses.  *See, e.g., See Ponomarenko v. Shapiro*, 287 F. Supp. 3d 816, 838 (N.D. Cal. 2018) ("a valid forum selection clause should be given controlling weight in all but the most exceptional cases" (quoting *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013))).  And the Tribe has a long-recognized right to adjudicate civil disputes that arise under its laws when non-members enter such agreements.  *See, e.g., Montana v. United States*, 450 U.S. 544 (1981); *Williams v. Lee*, 358 U.S. 217 (1959).

- 21 -

1   Ex. B-3 at 1. To remove any doubt as to what this would mean for the applicable interest-rate

2   limit, the agreement provides the further cautionary disclaimer, highlighting for the borrowers the

3   relative trade-offs for entering into a loan governed by Tribal law:

4       **THE BORROWER'S RESIDENT STATE'S LAW MAY HAVE INTEREST
        RATE LIMITS AND OTHER CONSUMER PROTECTION PROVISIONS**

5       **THAT ARE MORE FAVORABLE TO THE BORROWER. IF THE
        BORROWER WISHES TO HAVE THE BORROWER'S RESIDENT**

6       **STATE'S LAW APPLY TO ANY LOAN THAT THE BORROWER
        OBTAINS, THE BORROWER SHOULD CONSIDER OBTAINING A LOAN**

7       **FROM A LICENSED LENDER IN THE BORROWER'S STATE.**

8

9   *Id.* at 1–2.  As with the arbitration agreement described above, Plaintiffs were required to manifest

10  their assent to this choice-of-law clause by affirmatively checking a box acknowledging that they

11  "**agree that this Loan is governed by the laws of the Chippewa Cree Tribe and is not subject**

12  **to the provisions or protections of the laws of your home state or any other state**." *Id.* at 8.

13  No one was hiding the ball.  Plaintiffs cannot plausibly suggest otherwise.

14      Plaintiffs are also precluded from asserting that they have stated a claim for relief under

15  Chippewa Cree law.  The relevant provision of the Chippewa Cree Trial Lending and Regulatory

16  Code do not provide the relief Plaintiffs seek.  To the contrary, Chippewa Cree law expressly

17  provides that there shall be "no maximum Interest rate or charge, or usury rate restriction between

18  or among Persons if they establish the Interest rate or charge by written agreement." Ex. A-9 at 7.

19  Chippewa Cree Tribal Code § 10-3-201.

20      Plaintiffs seem to believe that this distinction between the tribal and state law permits them

21  to ignore their choice of law agreement.  It does not.  In fact, it is by now unremarkable that two

22  sovereigns may take different approaches to regulating interest rates and that private parties whose

23  economic transactions cross jurisdictional boundaries will be bound by a choice-of-law provision

24  specifying which sovereign's law should govern.  *See, e.g.*, *Seeman v. Phila. Warehouse Co.*, 274

25  U.S. 403, 407 (1927) ("The general principle in relation to contracts made in one place, to be

26  executed in another, is well settled.  They are to be governed by the law of the place of

27  performance, and if the interest allowed by the laws of the place of performance is higher than that

28

                                        - 22 -

1   permitted at the place of the contract, the parties may stipulate for the higher interest, without

2   incurring the penalties of usury." (quoting *Miller v. Tiffany*, 68 U.S. 298, 307 (1863)).

3           Moreover, the Ninth Circuit has made crystal clear that a sovereign's lack of usury laws

4   does not preclude the application of that sovereign's laws to a particular case.  *See Shannon-Vail*

5   *Five Inc. v. Bunch*, 270 F.3d 1207, 1213 (9th Cir. 2001).  In *Shannon-Vail*, after concluding that

6   the parties' choice-of-law clause selecting Nevada law in a separate guarantee could not be

7   imputed to the promissory notes in dispute, the Court nevertheless held that, under California

8   choice-of-law principles, Nevada's "ample connections" to the loans demanded the application  of

9   Nevada law *even though Nevada had repealed its usury law.*    The Court reasoned that "the lack

10  of a usury law does not mean that Nevada has a less substantial concern than California about

11  interest rates; rather, it appears to reflect a choice to favor individual contract decisions and the

12  free flow of capital."  *Id.*; *see also Palm Ridge, LLC v. Ahlers*, No. 8-CV-652, 2008 WL

13  11339594, at *2 (C.D. Cal. June 23, 2008) (giving force to a choice-of-law provision selecting

14  Nevada law over California law); *Petters Company v. BLS Sales*, No. 4-CV-2160, 2005 WL

15  2072109, at *4-5 (N.D. Cal. Aug. 26, 2005) (same, for a provision selecting Minnesota law over

16  California law).  That principle applies with full force to Plaintiffs' agreement to be bound by the

17  law of the Chippewa Cree.

18          Indeed, under any conceivable choice-of-law standard,[9] tribal law governs Plaintiffs' loans.

19  When, as here, the parties have a valid and enforceable choice-of-law provision an elaborate

20  analysis is not required.  Instead, the agreement simply controls.  *See Restatement (Second) of*

21  *Conflict of Laws* § 187 (1971).  While there are two minor exceptions to this rule, neither is

22  applicable here.  The first exception occurs when "the chosen state has no substantial relationship

23  to the parties or the transaction and there is no other reasonable basis for the parties' choice."  *Id.*

24  § 187(2)(a).  The second comes into play when "application of the law of the chosen state would

25  ─────────────────

26          [9]  Tribal law should likewise govern the choice-of-law question, given the parties'
    agreement and the location of contracting.  Even if California law or federal common law applies,
    the result remains the same.  Both look to the *Restatement (Second) of Conflict of Laws*, which
27  strongly favors the parties' agreement for forum selection.  *See, e.g.*, *Henderson v. Super. Ct.*, 142
    Cal. Rptr. 478, 483 (Ct. App. 1978); *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No.
28  CV157522JFWRAOX, 2016 WL 4820635, at *5 (C.D. Cal. Aug. 31, 2016).

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW                                                    - 23 -
─────────────────────────────────────────────────────────
PLAIN GREEN'S NOTICE OF MOTION AND MOTION TO DISMISS OR COMPEL ARBITRATION
CASE NO. 3:18-CV-01200-WHO

be contrary to a fundamental policy of a state which has a materially greater interest" and which "would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id.* § 187(2)(b).

In this case, it is the Tribe, not California, that has the more substantial relationship to Plaintiffs' claims: Plain Green is incorporated and conducts its business from the Tribe's Reservation, the contracts were issued from the Reservation, and the loans were primarily administered from and collected upon from the Reservation. *E.g.*, *Sarlot-Kantarjian v. First Pennsylvania Mortg. Tr.*, 599 F.2d 915, 917 (9th Cir. 1979) (giving force to choice-of-law provision in an loan agreement involving a California borrower where the "making of the contract and its performance, i.e. repayment of the loan, both took place in Massachusetts," "the funds were disbursed in Massachusetts," and the lender's "location [was] in Massachusetts"); *Palm Ridge*, 2008 WL 11339594, at *2 (court should not "override [the] negotiated contractual choice of law provision" selecting Nevada where the "lender [was] based in Nevada," "the loan was negotiated" in Nevada, and Nevada thus had "a substantial relationship with the loan at issue"). Meanwhile, California has no great interest in enforcing its usury laws against loans with only a tangential connection to the State when the parties to a transaction have agreed otherwise. *See Shannon-Vail Five*, 270 F.3d at 1213; *see also Ury v. Jewelers Acceptance Corp.*, 38 Cal. Rptr. 376, 382 (Ct. App. 1964) ("California does not have such a strong public policy against any and all contracts which would be usurious if they were made and to be performed here").

Plaintiffs' Complaint does not acknowledge this governing tribal law. Their state-law claims, and the RICO counts stacked upon them, all depend instead on California usury law. Because California usury law is irrelevant, those claims should be dismissed.[10]

## IV.   Plaintiffs Cannot Plead a RICO Claim

---

[10] Plaintiffs have also tried to plead a standalone unjust-enrichment claim under California law. *See* Dkt. 1 ¶¶ 207–216. There is no such thing. Even if this Court were willing to construe that claim as one in quasi-contract, the express contract between Plain Green and Plaintiffs addresses the relevant subject matter and therefore bars that theory here, because Plaintiffs do not allege that they had any relationship with Plain Green beyond their loans. *Cf. Monk v. N. Coast Brewing Co. Inc.*, No. 17-CV-05015-HSG, 2018 WL 646679, at *5 (N.D. Cal. Jan. 31, 2018) (citing *Rutherford Holdings, LLC v. Plaza Del Rey*, 166 Cal. Rptr. 3d 864, 872 (Ct. App. 2014)).

- 24 -

Plaintiffs' RICO claim also fails for another, independent reason:  As discussed above, *supra* Section I, Plain Green is an arm of the Chippewa Cree Tribe entitled to sovereign immunity. Plain Green's sovereign status also means that it is not governed by the civil RICO provisions. Those provisions apply only to "person[s]."  18 U.S.C. § 1962(c), (d).  A "person," in turn, is defined as "any individual or entity capable of holding a legal or beneficial interest in property." *Id.* § 1961(3). There is a "longstanding interpretive presumption that 'person' does not include the sovereign." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000) (finding that the term "person" in the False Claims Act does not include states); *cf. Inyo Cty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 708 (2003) (assuming that a tribe, like a state, is not a "person" that could be sued under 42 U.S.C. § 1983). Plain Green—a sovereign arm of the Tribe—similarly is beyond the statute's reach. *See Stoner v. Santa Clara Cnty. Office of Ed.*, 502 F.3d 1116, 1122 (9th Cir. 2007) (construing "person" under the False Claims Act in a way that "avoids suits against 'state instrumentalities' that are effectively arms of the state immune from suit"); *see also Howard ex rel. U.S. v. Shoshone-Paiute Tribes of the Duck Valley Indian Reservation*, 608 F. App'x 468, 468 (9th Cir. 2015) ("The district court correctly concluded that the Tribe, like a state, is a sovereign that does not fall within the definition of a 'person' under the FCA").  Thus, RICO does not apply to Plain Green, and Plaintiffs' claims asserting otherwise should be dismissed.

## **CONCLUSION**

For these reasons, this Court should dismiss Plaintiffs Brice, Browne, and Novort's claims against Plain Green.  In the alternative, this Court should compel arbitration and stay this action as to Plain Green pending the conclusion of such proceedings.

1

Dated: October 10, 2018                    **HOGAN LOVELLS US LLP**

2

By:  */s/ Michael. J. Shepard*

3

4                                            Michael J. Shepard
                                             **HOGAN LOVELLS US LLP**
5                                            3 Embarcadero
                                             San Francisco, CA 94111
6                                            Tel: (415) 374-2300
                                             Fax: (415) 374-2499
7                                            michael.shepard@hoganlovells.com

8                                            *Attorneys for Plain Green, LLC*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW