# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KIMETRA BRICE, et al.,

        Plaintiffs,

   v.

PLAIN GREEN, LLC., et al.,

        Defendants.

Case No. 18-cv-01200-WHO

**ORDER DENYING PENDING MOTIONS**

Re: Dkt. Nos. 84, 85, 86, 111

      Plaintiffs seek to hold defendants L. Stephen Haynes ("Haynes") and Haynes Investments, LLC. (collectively, "Haynes defendants") liable for their direct involvement in internet loan businesses that allegedly used Native American tribes to avoid state usury laws. Currently before me are three motions brought by the Haynes defendants: to compel arbitration of the named plaintiffs' claims; to stay in light of a case with some overlap pending in the District Court of Vermont; and to dismiss for lack of personal jurisdiction over the Haynes defendants and for failure to state a claim. I DENY each motion. The Plain Green and GPL arbitration agreements are unenforceable because they are prospective waivers of plaintiffs' rights and remedies. A stay is not warranted because there is not significant overlap between this case and the *Gingras* case and equity does not support it. There is an adequate basis to assert personal jurisdiction over the Haynes defendants and plaintiffs have sufficiently stated their claims. Consistent with the analyses of numerous courts who have addressed similar arguments, I will allow plaintiffs' claims to proceed in this court.

## BACKGROUND

      Haynes Investments is a private equity firm, owned and managed by Haynes. Complaint ("Compl.") ¶ 5 [Dkt. No. 1]. Plaintiffs allege that the Haynes defendants participated in a "rent-a-tribe" loan scheme involving Plain Green Lending, LLC, owned by the Chippewa Cree Tribe of

the Rocky Boy's Indian Reservation ("Chippewa Cree Tribe") in Montana, and Great Plains Lending, LLC ("GPL"), a tribal entity owned by the Otoe-Missouria tribe (collectively the "Tribes").  *Id.* ¶¶ 16, 17.  The Haynes defendants, along with other parties, allegedly helped design, fund, and run this "rent-a-tribe" scheme using the two "Native American tribal entities as the conduit to ostensibly cloak the loans in tribal sovereign immunity . . . established with the intent of evading state usury laws."  *Id.* ¶¶ 1, 2.  Under the scheme, the Tribal Entities – Plain Green and GPL – marketed, offered, issued, and then collected on high-interest loans over the internet, and thereby avoided interest-rate caps imposed under California law.

The inception of the scheme started in early 2011, when Haynes signed an agreement between Haynes Investments, the Chippewa Cree Tribe in Montana, Think Finance[1] ("Think"), and Victory Park Capital Advisors, LLC for the creation of a lending institution wholly owned by the Chippewa Cree Tribe, Plain Green, LLC.  Term Sheet for Think Finance-Chippewa Cree Transaction ("Term Sheet") [Dkt. No. 1-2].  Haynes Investments agreed to provide the initial funds for the creation of Plain Green and to fund loans issued by Plain Green.[2]  *Id.* at 2.  Haynes Investment provided ongoing funding for Plain Green loans via Think.  Compl.  ¶¶ 49, 51. Plaintiffs specifically allege that "Haynes Investment increased its investment in Plain Green on multiple occasions from April 2011 through February 2015."  *Id.* ¶¶ 85, 86.  The Haynes defendants are not alleged to have funded loans for GPL – which is alleged to have had the same

---

[1] Think is owned and operated by Kenneth Rees, a former defendant in this matter.  Think was not named as a defendant, presumably because it had filed for bankruptcy.  Compl. ¶ 2, n.2. Think provided the basic infrastructure to both Tribal Entities to process the loans, "including software, risk management, application processing, underwriting assistance, collections, and customer service for the loans."  *Id.* ¶ 3.

[2] On June 7, 2018, I granted GPL's motion to transfer claims against defendants Kenneth Rees, GPL Servicing, Ltd. (GPLS), Victory Park Capital Advisors, LLC, Victory Park Management, LLC, Scott Zemnick, Jeffrey Schneider, and Thomas Welch.  Order Granting Motion to Transfer [Dkt. No. 66].  I declined to transfer claims against Plain Green, GPL, Sovereign Business Solutions, LLC, and the Haynes defendants.  *Id.*  On August 15, 2018, plaintiffs voluntarily dismissed defendant GPL.  Notice of Voluntary Dismissal [Dkt. No. 71].  On January 29, 2019, I granted a stipulation staying claims against Plain Green in light of the parties' settlement.  Order Granting Stipulation [Dkt. No. 120].  Therefore, the only remaining active defendants in this action are the Haynes defendants and Sovereign Business Solutions, LLC; the remaining named plaintiffs with claims against these defendants are Brice, Browne, and Novorot.

*United States District Court*
*Northern District of California*

essential structure and purpose as Plain Green – but instead are alleged to have provided consulting services, including as mentioned above, securing necessary ACH processors and other services. *Id*. ¶¶ 62, 96.

With respect to both Plain Green and GPL, Haynes "played an integral role in helping the [scheme] obtain a bank willing to process payments through the Automated Clearing House Network . . . an electronic payment processing system regulated by the National Automated Clearing House Association." *Id*. ¶ 88. In addition, Haynes "played a critical role in finding a new bank to partner with Plain Green and [GPL]" once the original partnering banks were targeted by state and federal regulators and ceased processing the debits and credits on Plain Green's and GPL's loans. *Id*. ¶¶ 95, 96. Finally, Haynes "acted as the liaison between Think Finance and the Tribes." *Id*. ¶¶ 88, 97.

Two days after the loans were originated by Plain Green or GPL, GPL Servicing, Ltd. ("GPLS")[3] purchased 99% of them. *Id*. ¶¶ 52, 100. GPLS also refunded Haynes Investments 99% of the funds it invested in Plain Green, plus five percent interest on loans issued and a referral fee. *Id*. ¶ 53. By comparison, GPLS paid the Chippewa Cree tribe only 4.5% of revenue from the loans, as well as reimbursement for costs and expenses. *Id*. ¶ 54.[4]

On February 23, 2018, Kimetra Brice, Earle Browne, and Jill Novorot, on behalf of themselves and a class of California consumers, filed this putative class action against the Haynes defendants and others for allegedly violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, by: (i) collecting unlawful debt; (ii) using and reinvesting this income into the "rent-a-tribe" enterprise; (iii) acquiring and maintaining an interest in the "rent-a-tribe" enterprises; and (iv) conspiring with co-defendants "to repeatedly violate state

---

[3] GPLS is a foreign corporation incorporated under the laws of the Cayman Islands and created to allow investors to purchase interests in the consumer loans originated by the Tribal Entities. *Id*. ¶¶ 4, 15. Former co-defendants Scott Zemnick, Jeffrey Schneider, and Thomas Welch were partners at Victory Park Capital Advisors, LLC, a private equity firm that was the majority shareholder in GPLS. *Id*. ¶¶ 20–24.

[4] The agreement with the Otoe-Missouria tribe was substantially similar, except that GPL received 6% of revenues. Compl. ¶ 62.

United States District Court
Northern District of California

United States District Court
Northern District of California

lending statutes resulting in the collection of an unlawful debt."[5]  *Id.* ¶ 7.  Plaintiffs also assert claims for unjust enrichment and violation of California's usury laws.  *Id.* ¶ 8.[6]

On October 10, 2018, the Haynes defendants filed motions to: (i) compel arbitration under the Federal Arbitration Act; (ii) stay this proceeding under the first-to-file rule pending a decision on class certification in *Gingras et al. v. Victory Park Capital Advisors, LLC, et al.*, No. 5:17-cv-233 (D. Vt.); and (iii) dismiss the complaint for lack of personal jurisdiction and for failure to state a claim.  Motion to Compel Arbitration ("MTC") [Dkt. No. 85]; Motion to Stay ("MTS") [Dkt. No. 84]; Motion to Dismiss ("MTD") [Dkt. No. 86].  I consider each motion below.

## DISCUSSION

## I.     MOTION TO COMPEL ARBITRATION

The Haynes defendants move to compel arbitration, arguing that I should enforce arbitration agreements that each of the named plaintiffs signed as part of their loan agreements.  In addition, to the extent plaintiffs challenge the enforceability of their arbitration agreements, the Haynes defendants argue those challenges should be decided by the arbitrator because the arbitration agreements clearly delegate all disputes concerning the loan agreements to the arbitrator and plaintiffs fail to challenge the delegation provision.  Plaintiffs oppose, arguing that the arbitration agreements are not enforceable because they are impermissible prospective waivers of statutory rights and remedies and are unconscionable under California law.

### A.     Legal Standard

The Federal Arbitration Act ("FAA") governs the motion to compel arbitration.  9 U.S.C. §§ 1 *et seq.*  Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue.  *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  "To evaluate the validity of

---

[5] This action is one of a number of cases challenging similar tribal loan schemes.  *See MacDonald v. CashCall*, Civil Action No. 16–2781, 2017 WL 1536427, at *3 (D.N.J. Apr. 28, 2017), aff'd 883 F.3d 220 (3d Cir. 2018) (collecting cases).

[6] Brice is alleged to have secured a loan through GPL in 2016.  Compl. ¶ 138.  Browne is alleged to have secured loans through both Plain Green and Great Plains, but the complaint does not state when Browne secured these loans.  *Id.* ¶ 139.  Novorot is alleged to have secured loans through GPL in 2016.  *Id.* ¶ 140.

an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted). If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

The question of whether the arbitration agreement is valid is itself arbitrable. *Rent-a-Center, West Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). Where a party seeks to challenge arbitrability in court, the party must specifically challenge the validity of the delegation provision, rather than "the validity of the contract as a whole." *Id.* at 72. Although arbitration agreements are generally enforceable under the FAA, they must not contravene public policy. *M/S Bremen v. Zapata Offshore Co.*, 407 U.S. 1, 15 (1972). Two grounds for unenforceability are when (i) the arbitration agreement acts as a prospective waiver of statutory rights and remedies and (ii) the arbitration agreement is unconscionable under state contract law principles. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 666 n.19 (1985); *Armendariz v. Found. Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 113 (2000).

### 1. Prospective Waiver

An arbitration agreement that is a "prospective waiver of a party's right to pursue statutory remedies" is unenforceable as it is against public policy. *Mitsubishi*, 473 U.S. at 666 n.19. Put another way, an arbitration agreement must not prevent a party from effectively vindicating their statutory rights and remedies. *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013). Provisions that limit but do not foreclose a plaintiff's right to pursue statutory remedies do not constitute a substantive waiver of their statutory rights. *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013) (class-action waiver did not eliminate plaintiffs' right to pursue statutory remedy in arbitration).

United States District Court
Northern District of California

### 2. Unconscionability

Whether a contract is unconscionable is a question of law. *Patterson v. ITT Consumer Fin. Corp.*, 14 Cal. App. 4th 1659, 1663 (Cal. Ct. App. 1993). In California, unconscionability includes an "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 821 (Cal. Ct. App. 2010) (citation omitted). Accordingly, unconscionability has both a "procedural" and a "substantive" element. *Id.* (citation omitted).

Procedural unconscionability occurs where a contract or clause involves oppression, consisting of a lack of negotiation and meaningful choice, or surprise, such as where the term at issue is hidden within a wordy document. *Id.* "California law treats contracts of adhesion, or at least terms over which a party of lesser bargaining power had no opportunity to negotiate, as procedurally unconscionable to at least some degree." *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010) (superseded by statute on other grounds).

Substantive unconscionability occurs where the provision at issue "reallocates risks in an objectively unreasonable or unexpected manner." *Lhotka*, 181 Cal. App. 4th at 821 (citation omitted). "Substantive unconscionability focuses on the one-sidedness or overly harsh effect of the contract term or clause." *Id.* 824–825.

Both the procedural and substantive elements must be met before a provision will be deemed unconscionable, but both need not be present to the same degree. Rather, "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 114 (Cal. 2000).

### B. Loan Agreements at Issue

The loan agreements between Brice and Novorot and GPL required borrowers to resolve all disputes by arbitration, which itself would be governed by tribal law. Compl., Ex. 12 [Dkt. No. 1-12]("Brice Agreement" or "GPL Agreement"); Compl., Ex. 13 [Dkt. No. 1-13] ("Novorot Agreement" or "GPL Agreement"). Neither plaintiffs nor the Haynes defendants produced the loan agreement between Browne and Plain Green. However, the defendants produced an

agreement between Darlene Gibbs, a plaintiff in a different suit, and Plain Green; both sides
assume that agreement would be similar to the one Browne signed.  MTC, Ex. A at ECF pg. 17
[Dkt. No. 85-1] ("Gibbs Agreement" or "Plain Green Agreement").

### 1.    "Governing Law" Sections

In its "Governing Law" section, which appears before the Arbitration Agreements in the
document, the GPL Agreement states:

> **GOVERNING LAW; NON-APPLICABILITY OF STATE
> LAW; INTERSTATE COMMERCE:** This Agreement and the
> Agreement to Arbitrate are governed by Tribal Law and such federal
> law as is applicable under the Indian Commerce Clause of the
> Constitution of the United States of America.  We do not have a
> presence in Oklahoma or any other state of the United States of
> America.  Neither this Agreement nor the Lender is subject to the
> laws of any state of the United States.  The Lender may choose to
> voluntarily use certain federal laws as guidelines for the provision of
> services. Such voluntary use does not represent acquiescence of the
> Otoe-Missouria Tribe to any federal law unless found expressly
> applicable to the operations of the Otoe-Missouria Tribe.  You and
> we agree that the transaction represented by this Agreement involves
> interstate commerce for all purposes.

GPL Agreement 6 (emphasis in original).

The Agreement with Plain Green contains similar terms, but omits reference to the Indian
Commerce Clause.  The Plain Green Agreement also provides that: "This Agreement and the
Agreement to Arbitrate are governed by Tribal Law.  The Agreement to Arbitrate also
comprehends the application of the Federal Arbitration Act as provided below."  Plain Green
Agreement 15.  The Plain Green Agreement also discloses: "Plain Green does not have a presence
in Montana or any other state of the United States of America."  *Id.*

### 2.    Arbitration Agreements

The GPL Arbitration Agreement states that "IF YOU DO NOT AGREE TO ARBITRATE
ALL DISPUTES (DEFINED BELOW) IN ACCORDANCE WITH THE TERMS AND
CONDITIONS OF THE AGREEMENT TO ARBITRATE YOU MUST ADVISE US IN
WRITING" either by mail or by email.  GPL Agreement 6.  The GPL Arbitration Agreement also
states: "IN THE EVENT YOU OPT OUT OF THE AGREEMENT TO ARBITRATE, ANY
DISPUTES SHALL NONETHELESS BE GOVERNED UNDER TRIBAL LAW AND MUST

United States District Court
Northern District of California

1  BE BROUGHT WITHIN THE COURT SYSTEM OF THE OTOE-MISSOURIA TRIBE." *Id.*

2  The Plain Green Agreement contains nearly identical terms, with nominal differences in

3  language: "IF YOU DO NOT AGREE TO ARBITRATE ALL DISPUTES (DEFINED BELOW)

4  IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE AGREEMENT TO

5  ARBITRATE YOU MUST ADVISE PLAIN GREEN IN WRITING," and "ANY DISPUTES

6  SHALL BE GOVERNED UNDER TRIBAL LAW AND MUST BE BROUGHT WITHIN THE

7  CHIPPEWA CREE TRIBAL COURT." Plain Green Agreement 16.

8  The GPL Arbitration Agreement defines "Arbitration" and addresses the breadth of

9  disputes to be resolved in arbitration:

> **WHAT ARBITRATION IS:** Arbitration is having an independent third–party resolve a Dispute. A "Dispute" is any claim or controversy of any kind between you and [the lender] or otherwise involving this Agreement or the Loan. The term Dispute is to be given its broadest possible meaning and includes, without limitation, all federal, state or Tribal Law claims or demands (whether past, present, or future), based on any legal or equitable theory and regardless of the type of relief sought (i.e., money, injunctive relief, or declaratory relief). A Dispute includes any issue concerning the validity, enforceability, or scope of this Agreement or this Agreement to Arbitrate.

16  GPL Agreement 6 (emphasis in original). The Plain Green Arbitration Agreement is essentially

17  identical aside from defining "Arbitration" as "a form of alternative dispute resolution where

18  Disputes are presented to an independent third party for resolution." Plain Green Agreement 16.

19  Although the GPL agreement allow parties to use independent arbitration firms CPR or JAMS and

20  the Plain Green agreement allows for parties to use JAMS or AAA, both loan agreements provide:

> The policies and procedures of the selected arbitration firm will apply provided such policies and procedures do not contradict this Agreement to Arbitrate or Tribal Law. To the extent the arbitration firm's rules or procedures are different than the terms of this Agreement to Arbitrate, the terms of this Agreement to Arbitrate will apply.

24  GPL Agreement 6; Plain Green Agreement 16.

25  The Arbitration Agreements also make clear that arbitrators are to apply tribal law. Both

26  Arbitration Agreements state that "[t]he arbitrator has the ability to award all remedies available

27  under Tribal Law, whether at law or in equity, to the prevailing party, except that you and we

28

8

agree that the arbitrator has no authority to conduct class-wide proceedings and will be restricted to resolving individual disputes." GPL Agreement 7; Plain Green Agreement 17. The GPL Agreement states: "**APPLICABLE LAW AND JUDICIAL REVIEW OF ARBITRATOR'S AWARD. THIS AGREEMENT TO ARBITRATE SHALL BE GOVERNED BY TRIBAL LAW.** The arbitrator shall apply Tribal Law and the terms of this Agreement, including this Agreement to Arbitrate and the waivers included herein." GPL Agreement 7 (emphasis in original). The Plain Green Agreement similarly provides:

> **APPLICABLE LAW AND JUDICIAL REVIEW OF ARBITRATOR'S AWARD: THIS AGREEMENT TO ARBITRATE IS MADE PURSUANT TO A TRANSACTION INVOLVING INTERSTATE COMMERCE AND SHALL BE GOVERNED BY TRIBAL LAW. THE PARTIES ADDITIONALLY AGREE TO LOOK TO THE FEDERAL ARBITRATION ACT AND THE JUDICIAL INTERPRETATIONS THEREOF FOR GUIDANCE IN ANY ARBITRATION THAT MAY BE CONDUCTED HEREUNDER.** The arbitrator shall apply Tribal Law and the terms of this Agreement, including the Agreement to Arbitrate and the waivers included herein.

Plain Green Agreement 17 (emphasis in original). Finally, both Agreements provide that parties have the right to judicial review of arbitration award in Tribal court and in accordance with Tribal law. GPL Agreement 7; Plain Green Agreement 17.

### C. The Arbitration Agreements are Unenforceable

In two recent decisions, the Fourth Circuit concluded that arbitration agreements similar to those challenged by plaintiffs were prospective waivers of federal statutory rights and, as a result, unenforceable. In *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016) ("*Hayes*"), borrowers brought a putative class action against Western Sky, a payday lender located on the Cheyenne River Indian Reservation. The arbitration agreement stated that (i) Western Sky was subject solely to tribal law, (ii) "no other state or federal law or regulation shall apply to this Loan Agreement," and (iii) "[n]either this Agreement nor Lender is subject to the laws of any state of the United States of America." *Id.* 669–70. The court concluded that the agreement "fail[ed] for the fundamental reason that it purport[ed] to renounce wholesale the application of any federal law to the plaintiffs' federal claims." *Id.* 673. The court also found that the choice-of-law provisions

9

United States District Court
Northern District of California

could not be severed from the rest of the arbitration agreement because they went "to the core of the arbitration agreement." *Id.* 675–76.

In *Dillon v. BMO Harris, N.A.*, 856 F.3d 330 (4th Cir. 2017) ("*Dillon*"), borrowers brought claims arising from loans issued by GPL, one of the lenders at issue in this action. *Id.* 332. As an initial matter, the defendants argued that the court should not consider the prospective waiver issue until after the arbitrator had decided whether any federal remedies remained available to the borrower. *Id.* 335. The court disagreed, concluding that because the "agreement [was] an unambiguous attempt to apply tribal law to the exclusion of federal and state law," it was unenforceable as a matter of law. *Id.* at 336. The court based its decision on the fact that the terms of the arbitration agreements at issue were "identical to the terms" the Fourth Circuit reviewed in *Hayes*. *Id.* at 335. Numerous district courts have also found that arbitration provisions in similar loan agreements were unenforceable as prospective waivers.[7]

Defendants argue that the analysis and result here should be different from that in the *Dillon* and *Hayes* cases. First, the Haynes defendants assert there is a clear and unmistakable delegation provision that plaintiffs fail to challenge, so the question of enforceability must be decided by the arbitrator in the first instance. Defendants also assert that the arbitration agreements here are not prospective waivers for three reasons: (i) unlike the agreements in *Dillon* and *Hayes*, the arbitration agreements signed by plaintiffs expressly "invoke" federal law; (ii) plaintiffs have not carried their burden of showing more than a mere risk that the agreements will prospectively waive plaintiffs' statutory rights and remedies; and (iii) tribal law of both the

---

[7] *See Titus v. ZestFinance, Inc.*, 18-5373 RJB, 2018 WL 5084844, at *5 (W.D. Wash. Oct. 18, 2018) ("the arbitration agreement here uses a choice of law provision, which, when construed with the other provisions in the Loan Agreement, prospectively waives most federal statutory remedies. Although the language in this case is not as specific as it was in *Hayes*, it implicitly achieves the same results."); *Rideout v. CashCall, Inc.*, Case No. 2:16–cv–02817–RFB–VCF, 2018 WL 1220565, at *6 (D. Nev. Mar. 8, 2018) ("Plaintiff cannot, based upon the facts of this case, waive substantive federal rights through a choice of law or forum selection clause."); *Ryan v. Delbert Servs.*, No. 5:15-cv-05044, 2016 WL 4702352, *4 (E.D. Pa. Sept. 8, 2016) (the "inescapable conclusion is that this arbitration clause was not intended to be 'a just and efficient means of dispute resolution' but rather a means 'to avoid state and federal law and to game the entire system.'"); *Smith v. Western Sky Financial, LLC*, 168 F.Supp.3d 778, 785 (E.D. Pa. Mar. 4, 2016) ("The purpose of the arbitration agreement at issue here is not to create a fair and efficient means of adjudicating Plaintiff's claims, but to manufacture a parallel universe in which state and federal law claims are avoided entirely.").

Chippewa Cree and the Otoe-Missouria tribes provide remedies.

### 1.    The Delegation Provisions

The issue of whether there are clear and unmistakable delegation provisions in the Agreements is secondary to the determination of whether the agreements are unenforceable prospective waivers.[8]  Regardless of whether a delegation provision is clear and unmistakable on its own terms, it will not be enforced if it results in enforcing an arbitration agreement that prospectively waives plaintiffs' statutory rights and remedies.  The district court in *Smith v. Western Sky Financial, LLC* considered a similar loan agreement that required the arbitrator to exclusively apply tribal law.  168 F.Supp.3d 778, 784 (E.D. Pa. 2016).  There, the court concluded that "enforcing the delegation provision would place an arbitrator in the impossible position of deciding the enforceability of the agreement without authority to apply any applicable federal or state law."  Other courts have concluded similarly.  *Ryan v. Delbert*, No. 5:15-cv-05044, 2016 WL 4702352, at *5 (E.D. Pa. Sept. 8, 2016) (delegation clause was "doomed" under the prospective waiver doctrine because it would prevent the borrower from effectively vindicating her federal statutory rights under the Fair Debt Collections Act); *see also MacDonald v. CashCall*, Civil Action No. 16–2781, 2017 WL 1536427, at *4 (D.N.J. Apr. 28, 2017) (same).

Further, although the Court in *Rent-A-Center* held that challenges to an arbitration agreement generally do not suffice to supersede a valid delegation provision, it recognized that the plaintiff may challenge the general arbitration procedures "*as applied* to the delegation clause" to show that they rendered the delegation clause unenforceable.  561 U.S. 63, 74 (emphasis in original).  Therefore, before I analyze whether there is a clear and unmistakable delegation provision, I analyze whether the agreements prospectively waive plaintiffs' statutory rights and remedies.

---

[8] Defendants' contention in their MTC that because plaintiffs had not directly or specifically challenged the delegation provision in the Complaint, the motion must be granted and the matter submitted to the arbitrator, is incorrect.  MTC 13.  Generally, as long as the plaintiff's challenge to the validity of an arbitration clause is a distinct question from the validity of the contract as a whole, the question of arbitrability is for the court to decide regardless of whether the specific challenge to the arbitration clause is raised as a distinct claim in the complaint.  *See, e.g.*, *Smith v. Jem Grp.*, 737 F.3d 636, 639 (9th Cir. 2013) (relying on *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 998 (9th Cir.2010)).

United States District Court
Northern District of California

2.      **The Agreements Do Not Expressly Invoke Federal Law and, Instead, Disclaim It**

The Haynes defendants argue that the arbitration agreements do not constitute prospective waivers because, unlike the agreements considered in *Dillon* and *Hayes*, the agreements "expressly invoke the application of federal law." MTC 20. In *Hayes v. Delbert Servs. Corp*, the terms of the loan agreements stated that the agreements were "subject solely to the exclusive laws and jurisdiction of the [tribe]" and that "no other state or federal law or regulation shall apply to this loan or Agreement." 811 F.3d 666, 669 (4th Cir. 2016). The agreement in *Dillon v. BMO Harris, N.A.* contained similar language, asserting sole and exclusive tribal jurisdiction and that "no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation." 856 F.3d 330, 333 (4th Cir. 2017).

The choice-of-law provisions of the loan agreements at issue here contain some different language from that in *Hayes* and *Dillon*. Defendants point to the following difference. First, neither choice-of-law provision contains language that the tribe or the agreements are subject to the sole jurisdiction of tribal law or that no federal law applies. Instead, the GPL loan agreement "is governed by Tribal Law and such federal law as is applicable under the Indian Commerce Clause" and the Plain Green loan agreement states that the "Agreement to Arbitrate also comprehends the application of the Federal Arbitration Act . . . ." GPL Agreement 6; Plain Green Agreement 15.

Second, both loan agreements state that "[the lender] may choose to voluntarily use certain federal laws as guidelines for the provisions of services." GPL Agreement 6; Plain Green Agreement 15. Regarding the GPL loan agreement, the defendants point to an Otoe-Missouria ordinance that ostensibly requires licensed consumer financial services entities to abide by "all applicable federal and Tribal consumer protection law . . . ."[9] As to the Plain Green loan

---

[9] The ordinance referenced claims that licensees must comply with "all applicable federal and Tribal consumer protection law," thereafter listing numerous federal consumer protection acts and providing a URL link to the ordinance. Mot. 20, n.7. But, this ordinance was passed on May 3, 2018, months after this suit was filed and years after the relevant agreements were entered. Otoe Missouria Tribal Consumer Financial Services Ordinance, § 5.2(a), available online at http://www.omtribe.org/useruploads/files/approved_ordinance_2018_pdf.pdf (last accessed Feb. 13, 2019). In addition, the next subsection of the Ordinance states that "[t]his Ordinance does not waive any Licensee defenses, legal position, or serve as consent by any Licensee related to the

United States District Court
Northern District of California

1  agreement, defendants reply on an excerpt of the Chippewa Cree code posted on the Plain Green

2  website providing that licensed financial services may not violate "any applicable Federal

3  Consumer Protection Laws . . . ."  Chippewa Code § 10–4–108(c).[10]  Because these provisions

4  provide a possibility that federal law will be applied to the Agreements, defendants argue that they

5  do not prospectively waive plaintiffs' statutory rights and remedies.

6         Those differences in language do not alter the ultimate effect of the choice-of-law

7  provisions.  Under the choice-of-law provision for both the GPL and Plain Green loan agreements,

8  the lender "may choose to voluntarily use certain federal laws as guidelines," but "such voluntary

9  does not represent acquiescence of the [tribe] to any federal law unless found expressly applicable

10  to the operations of the [tribe]."  GPL Agreement 6; Plain Green Agreement 15.  The defendants

11  do not identify what federal law would be applicable.  Nor do they explain how the arbitrator

12  would apply that law, given that the other more express terms of the agreements that prohibit them

13  from doing so.

14         Defendants also argue that the reference to the Indian Commerce Clause in the GPL loan

15  agreement clearly invokes federal law.  MTC 20.  The actual language states that the Loan

16  Agreement is governed by "such federal law as is applicable under the Indian Commerce Clause."

17  GPL Agreement 6.  Inclusion of the Indian Commerce Clause amounts to "invocation of an

18  irrelevant constitutional provision."  *Jackson v. Payday Fin., LLC*, 764 F. 3d 765, 778 (7th Cir.

19  2014).  A district court considering a similar loan that invoked the Indian Commerce Clause also

20  concluded that it "does not provide a basis for tribal jurisdiction over non-Indians.  *F.T.C. v.*

21  *Payday Fin., LLC*, 935 F.Supp.2d 926, 932 n.4 (D.S.D. 2013).[11]  Defendants do not address these

22

23  applicability of federal laws to the Tribe, the Commission[,] any Licensee, or any Consumer
   Financial Services."  *Id.* at § 5.2(b).

24  [10] Available online at http://www.plaingreenloans.com/content/assets/Uploads/title10.pdf (last
25  visited Feb. 13, 2019).

26  [11] The Haynes defendants further attempt to distinguish this case from *Dillon* and *Hayes* because
   those cases referenced *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346 (11th Cir.).  MTC 22–23.
27  Defendants note that in *Inetianbor*, the court concluded that the arbitration agreements were
   unenforceable in part because they referenced a nonexistent arbitral forum, and assert that is
   clearly not the case here where JAMS, AAA, and CPR are offered as forums.  However, neither
28  *Dillon* nor *Hayes* relied on the unavailability of an arbitral forum in their decisions.

adverse cases, nor do they specify what federal law *would* be applicable under the Indian Commerce Clause.

Finally, defendants argue that the arbitration agreements do not call for the exclusion of federal law because they are separate from the choice-of-law provisions. Defendants cite *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 53 (1995) for the proposition that "the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration; neither provision intrudes upon the other." MTC 19. Therefore, the defendants assert, the choice-of-law provisions cannot be applied to the arbitration clause to show that the arbitration agreement is a prospective waiver. However, the holding in *Mastrobuono* was specific to the case at hand, in which there was an issue of harmonizing the choice-of-law provision with the arbitration agreement. *Id.* 1214–15. There, the parties chose New York law, which prevented arbitrators from awarding punitive damages, but the arbitration agreement contained implied expectations that the arbitrator would be able to award punitive damages. *Id.* 1214–15, 1218. Here, there is no tension to harmonize between the choice-of-law provision and the arbitration agreement because they seek the same thing—exclusive application of tribal law.

### 3.   The Choice-of-Law Provisions Unambiguously Waive Statutory Rights and Remedies

Next, the Haynes defendants characterize the choice-of-law provisions as presumptively valid under federal precedent because plaintiffs have not shown that there is more than a "mere risk" that these provisions will prospectively waive plaintiffs' statutory rights and remedies. MTC 5–6; Reply MTC 8; relying on *Green Tree Fin. Corporation-Alabama v. Randolph*, 531 U.S. 79, 91 (2000). In *Green Tree*, the plaintiff argued only that an arbitration agreement that was silent as to attorney fees introduced a risk that a party would be unable to recover those fees and that this could prospectively waive their ability effectively vindicate their claims. *Id.* The Court determined that this was too speculative. *Id.* Defendants also cite the Fourth Circuit's decision in *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274 (4th Cir. 2007). There, plaintiffs argued that a clause preventing joinder of defendants prospectively waived their statutory rights but failed to produce any evidence showing the cost of proceeding individually against defendants or

14

1    demonstrating how that cost would prevent them from pursuing their claims. *Id.* 285.

2         The loan agreements at issue are readily distinguishable because they present more than

3    mere risk that the plaintiffs may be unable to effectively vindicate their statutory rights. As

4    repeatedly noted by courts in analogous cases, the arbitration agreements at hand "purport[] to

5    renounce wholesale the application of any federal law to the plaintiffs' federal claims." *Hayes*,

6    811 F.3d at 673; *see also Dillon*, 856 F.3d at 336 ("Great Plains purposefully drafted the choice of

7    law provisions in the arbitration agreement to avoid the application of state and federal consumer

8    protection laws."); *Rideout v. CashCall, Inc.*, Case No. 2:16–cv–02817–RFB–VCF, 2018 WL

9    1220565, at *7 (D. Nev. Mar. 8, 2018) ("[T]he arbitration clause [is] unenforceable because it

10   seeks to effect a prospective waiver of federal statutory rights."). The harm to plaintiffs, who seek

11   to bring state and federal statutory claims against the Haynes defendants, is more than speculative.

12   It is practically guaranteed by the terms of the agreements.

13        According to the Haynes defendants, risk of waiver should not make the agreements

14   unenforceable because if this issue is submitted to an arbitrator, the arbitrator may decide not to

15   enforce the tribal choice-of-law provision. Reply MTC 8. According to defendants, the arbitrator

16   will be free to "conduct a choice-of-law analysis identical to the one this Court would be called

17   upon to perform." But this strains credulity. The very terms of the arbitration agreements state

18   that the arbitrator "shall apply Tribal Law and the terms of this Agreement, including this

19   Agreement to Arbitrate and the waivers included herein." GPL Agreement 7; Plain Green

20   Agreement 17. The defendants do not explain how an arbitrator might conduct a choice-of-law

21   analysis that would result in a decision not to apply tribal law or what source of law would then be

22   applied.

23        Relatedly, defendants argue that while the Court recognized the prospective waiver

24   doctrine, it has "always declined" to apply it to invalidate the arbitration agreement at issue. MTC

25   5. As noted, numerous circuit courts and district court have persuasively applied the doctrine with

26   respect to materially similar tribal loan agreements. Defendants note that choice-of-law provisions

27   have been upheld, even where provisions mandated the application of foreign law to the exclusion

28   of domestic law. MTC 7; *see Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2nd Cir. 1993) ("It

United States District Court
Northern District of California

defies reason to suggest that a plaintiff may circumvent forum selection and arbitration clauses merely by stating claims under laws not recognized by the forum selected in the agreement."). That said, "[w]ere there no subsequent opportunity for review and were we persuaded that 'the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies . . . we would have little hesitation in condemning the agreement as against public policy.'" *Vimar Seguros y Reaseguros v. M/V Sky Reefer*, 515 U.S. 528, 540 (1995) (quoting *Mitsubishi Motors*, 473 U.S. 614 at 637 n.19).

Finally, defendants allege that the arbitration agreements cannot be a prospective waiver because "this court will retain jurisdiction over this case and will be the ultimate arbiter of whether the arbitration complies with the [FAA]." Reply MTC 9. But 9 U.S.C. § § 9 and 10, which defendants explicitly cite, state that the court specified by the parties in an arbitration agreement to confirm an award shall maintain jurisdiction over the matter. Here, under the terms of the agreements, the Tribal courts are to confirm arbitration awards. GPL Agreement 7; Plain Green Agreement 17. There is no basis for the defendants to say that under the FAA, this court retains jurisdiction based on the terms of the agreements. Further, the agreements specify that "[a]s an integral component of accepting this Agreement, you irrevocably consent to the exclusive jurisdiction of the Tribal courts for purposes of this Agreement" and "[t]he parties will have the right to judicial review in a Tribal court." GPL Agreement 7; Plain Green Agreement 17. Defendants' argument regarding the ongoing jurisdiction of this court undermines the terms they are ultimately trying to enforce.

In short, defendants have not distinguished the materially similar language in the GPL and Plain Green choice-of-law and arbitration agreements from the language addressed by the numerous courts identified above that have struck down the arbitration agreements as unenforceable prospective waivers. I will follow them and refuse to enforce the accompanying delegation clauses.

**4.    Tribal Laws Do Not Provide Remedies for Plaintiffs' Statutory Claims**

Finally, defendants maintain that the Chippewa Cree[12] and the Otoe-Missouria[13] tribes provide a remedy to plaintiffs.  Reply MTC 7.  The defendants contend that "[p]laintiffs do not identify any claims for which they would not be able to obtain at least some *relief* in arbitration." *Id.* (emphasis in original).  But in the choice-of-law cases the defendants cite, the disputes were to be arbitrated under the laws of countries with demonstrably robust legal and court systems.  *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 8 (1972) (British choice-of-law provision enforced despite British law as applied being less favorable to domestic plaintiff); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2nd Cir. 1993) (British choice-of-law provision enforced).[14]

In *Rideout v. CashCall, Inc.*, the defendant acknowledged that the federal statutory rights that plaintiff sought to enforce did not exist under Cheyenne Sioux tribal law and "it could not identify analogous rights that would exist."  2018 WL 1220565, Case No. 2:16–cv–02817–RFB– VCF, at *6 (D. Nev. Mar. 8, 2018).  Here, similarly, the Haynes defendants have not identified any provision of the allegedly applicable tribal laws that would enforce the state and federal statutory rights of plaintiffs or analogous rights arising under tribal law.

In conclusion, the choice-of-law provisions regarding the lenders and the loan agreements, in conjunction with arbitration agreement provisions restricting the law the arbitrator may apply, create an unambiguous waiver of rights and the agreements and are therefore unenforceable.  I do not reach whether there is a clear and unmistakable delegation clause because that would not change the fact that the arbitration agreement is unenforceable as an unambiguous prospective

---

[12] The Chippewa provide remedies for violations by consumer financial services licensees of the Chippewa lending code.  As noted earlier, the code requires licensees to abide by all "applicable" federal consumer protection laws but also states that the code does not serve as consent by any licensee to the application of federal law.  Chippewa Cree Tribal Lending and Regulatory Code §§ 10–5.2–(a)—(b); 10–6–201(a)(1)—(2), available online at http://www.plaingreenloans.com/content/assets/Uploads/title10.pdf.

[13] The Otoe-Missouria provide a "Consumer Complaint Procedure" but no remedies.  Tribal Consumer Financial Services Ordinance § 8.2, available online at http://www.omtribe.org/useruploads/files/approved_ordinance_2018.pdf.

[14] Defendants also cite *Ceramic Corp. of America v. Inka Maritime Corp., Inc.*, 1 F.3d 947 (9th Cir. 1993), which is inapplicable because it deals with the standard for dismissal under *forum non conveniens*, a distinct question from the issue of prospective waiver.

1  waiver.

2         Accordingly, the motion to compel arbitration is DENIED. The arbitration agreements are

3  unenforceable prospective waivers.[15]

4  ## II.     MOTION TO STAY

5         The Haynes defendants move to stay in light of a first-filed case, *Gingras v. Victory Park*

6  *Capital Advisors, LLC, et al.*, No. 5:17-cv-233 (D. Vt.) ("*Gingras*"), arguing that the parties and

7  claims at issue in the two actions are substantially the same and that equitable considerations

8  support a stay, at least until the issue of class certification is decided in *Gingras*. MTS 1; Reply

9  MTS 6. Plaintiffs respond that the cases are not sufficiently similar and that even if they were,

10  equitable considerations militate against granting a stay because *Gingras* has been repeatedly and

11  is presently stayed and there is no current schedule to determine class certification. Oppo. MTS 1.

12       ### A.     Legal Standard

13         The first-to-file rule promotes judicial efficiency by allowing a district court to transfer,

14  stay, or dismiss a case when a complaint involving the same parties and the same issues has

15  already been filed in another district. *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 628

16  (9th Cir. 1991). The elements of the rule are: (i) chronology of the lawsuits; (ii) similarity of the

17  parties; and (3) similarity of the issues. *Kohn Law Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*,

18  787 F.3d 1237, 1240 (9th Cir. 2015). "The most basic aspect of the first-to-file rule is that it is

19  discretionary," and a court may decide not to apply it based on "reasons of equity." *Alltrade*, 946

20  F.2d at 628. Those equitable exceptions include "bad faith, anticipatory suit, and forum

21  shopping." *Id.* (citations omitted).

22       ### B.     Chronology

23         *Gingras, et al. v. Victory Park Capital Advisors, et al.*, No. 5-17-cv-233 (D. Vt.), is a

24  putative class action on behalf of consumers who took out loans through Plain Green. Oppo.

25  MTS, Exh. A ("*Gingras* Compl.") at ¶ 2 [Docket 101-1]. The *Gingras* Complaint names Haynes

26  Investments, but not Haynes personally, as a defendant. *Id.* at ¶ 13. The loan agreements at issue

27

28    [15] As such, I do not need to reach plaintiffs' other arguments, including unconscionability.

United States District Court
Northern District of California

contain arbitration agreements with the same terms as those at issue here. *Id.* at ¶¶ 173–190. Plaintiffs in *Gingras* allege violations of (1) Electronic Funds Transfer Act, 15 U.S.C. § 1693k; (2) Vermont Consumer Fraud Act, 8 V.S.A. § 2201; (3) RICO; and (4) unjust enrichment. *Id.* ¶¶ 214–267.

The parties do not dispute that *Gingras v. Victory Park Capital Advisors, LLC, et al.*, No. 5:17-cv-233 (D. Vt.) ("*Gingras*") was filed on November 21, 2017, approximately three months before this action was filed. The chronology requirement of the first-to-file rule is met.

### C. Similarity of Parties

Only "substantial similarity"—not "exact identity of the parties"—is needed to apply the first-to-file rule. *Kohn Law Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1240 (9th Cir. 2015). In analyzing class actions, most courts approach this factor by comparing the classes, not their representatives, even when certification has not yet taken place. *See Adoma v. Univ. of Phoenix, Inc.*, 711 F. Supp. 2d 1142, 1147 (E.D. Cal. 2010); *Hill v. Robert's Am. Gourmet Food, LLC*, No. 13-CV-00696-YGR, 2013 WL 3476801, at *3 (N.D. Cal. July 10, 2013) (citing this approach as "the more widely accepted rule").

There is some overlap in the putative classes because prospective plaintiffs in *Gingras* include California consumers who obtained loans from Plain Green, like Browne here. But the class of California consumers who obtained loans from GPL, like Brice and Novorot, are not included in and would not be represented in the putative class of national consumers in *Gingras* because *Gingras* concerns only loans made by Plain Green. Oppo. MTS, Ex. A ("*Gingras* Compl.") at ¶ 191.

The majority of cases on which defendants rely are inapposite because they concern situations where "the proposed class and claims [were] essentially identical to those in the [first-filed complaint]." *Ortiz v. Panera Bread Co.*, Civil Action No. 1:10CV1424, 2011 WL 3353432, at *2 (E.D. Va. Aug. 2, 2011). In *Panera*, two cases were filed against Panera alleging that a class of managers was misclassified and denied proper compensation and the two classes were practically identical. *See also Peak v. Green Tree Fin. Serv. Corp.*, No. 00-0953 SC, 2000 WL 973685, at *1 (N.D. Cal. Jul. 7, 2000) (SC) ("Plaintiff's allegations defining the proposed class are

19

United States District Court
Northern District of California

1  identical to [the first-filed suit]."); *Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 791

2  (6th Cir. 2016) ("The [plaintiffs] undoubtedly would be members of the [first-filed suit] class if it

3  were certified."); *Intersearch Worldwide Ltd. v. Intersearch Group, Inc.*, 544 F. Supp. 2d 949, 952

4  (N.D. Cal. 2008) (SBA) (parties in first and second suits were identical).  While there is partial

5  overlap here, there is not substantial overlap between the putative classes.

6       As to the defendants, while Haynes Investments is a defendant in this suit as well as in

7  *Gingras*, Haynes as an individual is not.  *Gingras* Compl. ¶¶ 20–33.  This is significant because

8  here plaintiffs advance two theories of Haynes' involvement with the rent-a-tribe scheme: (i) that

9  "Haynes played a critical role in finding a new bank to partner with Plain Green and Great Plains,"

10  and (ii) that Haynes "also acted as the liaison between Think Finance and the Tribes."  Compl. ¶¶

11  96–97.  These allegations, implicating Haynes personally, are missing from *Gingras*.

12       Relatedly, *Gingras* concerns only loans received through Plain Green, whereas this suit

13  concerns loans received through Plain Green and GPL.  The Haynes defendants highlight that

14  plaintiffs voluntarily dismissed GPL from this suit to show that this suit, like *Gingras*, chiefly

15  concerns loans made by Plain Green.  Reply MTS 4.  According to them, "[t]he idea that Plaintiffs

16  can still prosecute claims pertaining to Great Plains is without merit and thus is not a valid basis to

17  distinguish this case from Gingras."  *Id.*  But the Haynes defendants do not move to dismiss the

18  claims of Brice or Novorot on these grounds or otherwise challenge the inclusion of plaintiffs with

19  GPL loans in this action.  Indeed, they expressly rely on the GPL Agreement language in support

20  of their motion to compel arbitration.

21       Finally, defendants imply that plaintiffs are attempting to game the system by "selectively

22  add[ing] or subtract[ing] defendants from second-filed actions so as to avoid the first-to-file

23  doctrine."  Reply MTS 4.  They rely on *Kohn Law Group, Inc. v. Auto Parts Mfg. Mississippi,*

24  *Inc.*, 787 F.3d 1237 (9th Cir. 2015).  However, in *Kohn*, a law firm brought an action against a

25  property owner on behalf of a client whom the owner was suing in a first-filed interpleader action,

26  but left out the other party sued in the interpleader action.  *Id.* 1238.  This is distinguishable at

27  least insofar as there, the second-filed suit omitted a party that was present in the first suit,

28  whereas here the plaintiffs add Haynes individually in order to pursue a theory that he was

personally involved and personally liable for his conduct with respect to services provided to both Plain Green and GPL. The *Kohn* court's conclusion that a plaintiff could not "skirt the first-to-file rule merely by omitting one party from a second lawsuit" is not applicable here.

There is undoubtedly some overlap between the parties in the two cases, but that overlap is not so significant as to mandate a stay here.

### D. Similarity of Issues

Under this prong, "[t]he issues in both cases also need not be identical." *Kohn Law Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1240 (9th Cir. 2015). Rather, this factor requires a "similarity in allegations [that] would require the court to make similar determinations" for the first-to-file rule to apply. *Adoma*, 711 F. Supp. 2d at 1148. The plaintiffs in *Gingras* allege claims under (1) the Electronic Funds Transfer Act, 15 U.S.C. § 1693k; (2) Vermont Consumer Fraud Act; 8 V.S.A. § 2201; (3) RICO; and (4) unjust enrichment. Plaintiffs in this case allege claims under: (1) RICO; (2) California state usury laws; and (3) unjust enrichment.

The most significant potential for overlap between the claims is the RICO claim alleged in both cases. The RICO claims require determining whether the defendants collected unlawful debt, which RICO defines as debt "which is unenforceable under state or federal law . . . because of the laws relating to usury . . . [and] which is incurred in connection with" usurious lending. 18 U.S.C. § 1961(6). Whether or not the Vermont case will, as part of the RICO claim, have to analyze California's usury law is not certain and depends on whether a class covering California consumers will be certified in *Gingras*.

In sum, as to similarity of parties and issues, there is some overlap between the putative classes and defendants, and there may be some overlap (class certification dependent) on at least the RICO claim based on California law. However, this similarity is not so significant that a stay in this action is warranted, especially considering the equitable considerations discussed below.

### E. Equitable Exceptions

"The most basic aspect of the first-to-file rule is that it is discretionary," and a court may decide not to apply it based on "reasons of equity." *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 628 (9th Cir. 1991). While bad faith, anticipatory suit, and forum shopping are common

United States District Court
Northern District of California

United States District Court
Northern District of California

equitable considerations, "[t]here are a variety of equitable circumstances under which courts have declined to apply the first-to-file rule." *Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*, 179 F.R.D. 264, 270 (C.D. Cal. 1998); *see, e.g., Church of Scientology of Cal. v. U.S. Dept. of Army*, 611 F.2d 738, 750 (9th Cir. 1979) (overruled on other grounds by *Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016)) (declining to apply rule where second-filed action had progressed to judgment, appeal, and remand); *Ward v. Follett Corp.*, 158 F.R.D. 645, 648 (N.D. Cal. 1994) (court may relax rule if balance of convenience weighs in favor of second-filed action); *Sorenson v. Big Lots Stores, Inc.*, 638 F.Supp.2d 1219, 1221 (S.D. Cal. 2009) (declining to apply rule because of untimely service in first-filed action).

The most significant consideration weighing against a stay in this case is that the *Gingras* case has itself been stayed, without a concrete timeframe for that case resuming and with no class certification schedule. Given the differences between these cases and that there is no concrete timeframe (much less a reliable estimate) for how long defendants' requested stay will last, equitable considerations merit proceeding with this case.

The Haynes defendants' Motion to Stay is DENIED.

## III.  MOTION TO DISMISS

The Haynes defendants also move to dismiss. They argue that the allegations in the Complaint do not establish this court's personal jurisdiction over them. They also contend that plaintiffs have not or cannot state their claims and those claims must be dismissed.

### A.  Legal Standard

#### 1.  Personal Jurisdiction

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move to dismiss for lack of personal jurisdiction. The plaintiff then bears the burden of demonstrating that jurisdiction exists. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). The plaintiff "need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995); *Fields v. Sedgwick Assoc. Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986). "Although the plaintiff cannot simply rest on the bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as

true." *Schwarzenegger*, 374 F.3d at 800 (citations omitted). Conflicts in the evidence must be resolved in the plaintiff's favor. *Id.* "Where, as here, the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. In such cases, we only inquire into whether [the plaintiff's] pleadings and affidavits make a prima facie showing of personal jurisdiction." *Caruth v. International Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995) (internal punctuation and citation omitted).

There are two types of personal jurisdiction, general and specific. *Fields*, 796 F.2d at 301. General jurisdiction exists where a nonresident defendant's activities within a state are "substantial" or "continuous and systematic." *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1977). In the absence of general jurisdiction, a nonresident defendant may be sued in the forum if specific jurisdiction exists. *Id.* Specific jurisdiction arises when a defendant's specific contacts with the forum give rise to the claim in question. *Helicopteros Nacionales de Columbia S.A. v. Hall*, 466 U.S. 408, 414–16 (1984). "A court exercises specific jurisdiction where the cause of action arises out of or has a substantial connection to the defendant's contacts with the forum."[16] *Glencore Grain Rotterdam BV v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002). The Ninth Circuit employs a three part test to determine whether there is specific jurisdiction over a defendant:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.

---

[16] "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger*, 374 F.3d at 800–01.

United States District Court
Northern District of California

United States District Court
Northern District of California

The first prong may be satisfied by "purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). In tort cases, courts typically inquire whether a defendant "purposefully directs his activities at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Id.*[17] In contrast, in contract cases, courts typically inquire whether a defendant "purposefully avails itself of the privilege of conducting activities or consummates a transaction in the forum, focusing on activities such as delivering goods or executing a contract." *Id.* (citation and internal punctuation omitted). However, either test can be applied to either tort or contract cases. *See, e.g., Language Line Servs., Inc. v. Language Servs. Ass'n, Inc.*, No. 10–cv–02605 JW, 2010 WL 5115671, at *3 (N.D. Cal. Dec. 9, 2010) (applying "effects" test to contract claims because the focus of the plaintiff's complaint was on the defendant's tortious conduct); *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990) (applying purposeful availment test to tort claims that arose out of parties' contractual relationship).

The plaintiff bears the burden of satisfying the first two prongs of the test. *Schwarzenegger*, 374 F.3d at 802. If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. *Id.*[18]

## 2.   Failure to State a Claim

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

---

[17] However, as the Supreme Court reemphasized in *Walden v. Fiore*, 571 U.S. 277, 285 (2014) the "effects" "analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."

[18] The factors to be considered in determining reasonableness include: "(1) the extent of the defendant's purposeful interjection into the forum state, (2) the burden on the defendant in defending in the forum, (3) the extent of the conflict with the sovereignty of the defendant's state, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 745 (9th Cir. 2013) (citing *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir.2000)).

if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008).

## B.  Personal Jurisdiction

The Haynes defendants argue that the allegations in the Complaint do not support a "prima facie showing" of personal jurisdiction over Haynes (a resident of Texas) individually and over Haynes Investments (a Texas limited liability company).  While contending that their allegations alone were sufficient, plaintiffs also sought and I granted their request for access to discovery from other related proceedings regarding the Haynes defendants' activities.  Dkt. No. 104.  Plaintiffs argue that their allegations supplemented by this new evidence demonstrate that specific jurisdiction exists over both Haynes and Haynes Investments.  Dkt. No. 107.[19]

The essence of the Haynes defendants' jurisdiction challenge – made solely in the motion to dismiss and not supported by any declaration – is that plaintiffs have not alleged facts sufficient

---

[19] I note plaintiffs' subsequent communication to this Court (Dkt. No. 113, January 11, 2019 letter), explaining that they believed they would be able to use a discovery response that non-party Think Finance issued in related litigation in support of their assertion of jurisdiction, but that Think Finance reversed course at the last minute and now asserts that plaintiffs cannot use the response given a protective order in the related litigation.  *Id*.

United States District Court
Northern District of California

to convey specific jurisdiction in California over both Haynes individually as well as Haynes' investments. MTD (Dkt. No. 86) at 4-8. The Haynes defendants argue generally that the only acts complained of are acts by others; namely the acts taken by the Native American lenders (Plain Green and GPL) who made and collected on the loans and service providers, such as Think Finance, who were controlling the lenders.

To the contrary, the Complaint makes numerous allegations – which are uncontested – about the Haynes defendants being responsible for the inception, direction, initial funding, operations (at least with respect to arranging for critical components of the loan process), and ongoing consulting necessary to the continued operation of the loan process. Those allegations include, with respect to the company: (1) Haynes Investments provided the initial capital to fund the operations of Plain Green-- it has claimed its "Native American investments have successfully monetized the tribal advantages of sovereignty to enhance yield while substantially reducing risk," Compl. ¶ 18; (2) Haynes Investments "provided substantial capital used to make high interest loans to consumers and participated in the affairs of the enterprise," *id*. ¶ 5; (3) Haynes Investments agreed to "provide funding to the Tribe to enable it to make each of the Loans" and to fund Plain Green's bank account with "sufficient monies to fund one business day of Loans based upon the average Loan volumes for the preceding month," *id*. ¶ 50; (4) Haynes Investments provided funds to Think Finance which could only be used to fund loans originated in the name of Plain Green, *id*. ¶ 51;[20] (5) Haynes Investments then received back 99% of the funds they provided but also 5% interest on the money loaned to the Tribe, and 1% of the revenue collected on the loans as a "referral" fee, *id*. ¶ 53; and, (6) due to the lucrative returns, Haynes Investments "increased its investment in Plain Green on multiple occasions from April 2011 through February 2015, resulting in substantial returns to Haynes Investments and Mr. Haynes." *Id*. ¶ 86.

---

[20] Defendants dispute many of these assertions in their reply to the MTD, contending that the interest they received was only on their unsecured line of credit to Plain Green and the 1% referral fee was a "finder's fee" paid by Think Finance. MTD Reply at 1-2. Those assertions are not supported by any declaration or other evidence. Moreover, the relationship between what and how much the Haynes defendants received directly from Plain Green or through Think Finance and the interest and fees collected by the Tribes from consumers is better explored on a full evidentiary record.

United States District Court
Northern District of California

As to Haynes personally, plaintiffs plead that: (1) he participated in the loan enterprise and signed each of the agreements used to fund the illegal loans, *id*. ¶ 19; (2) he personally made "the decision to invest and reinvest in the enterprise" and "actively participated in the affairs of the enterprise and helped design the financial and operational structure of the rent-a-tribe scheme," *id*. ¶ 5; (3) "Haynes used his connections to assist the enterprise's efforts to collect unlawful debt," by helping the enterprise obtain a bank willing to process payments through the Automated Clearing House Network (the "ACH Network"), an electronic payment processing system regulated by the National Automated Clearing House Association ("NACHA"), *id*. ¶ 88; (4) after Plain Green and GPL were targeted by state and federal regulators (and banks ceased processing the debits and credits on their loans), "Haynes played a critical role in finding a new bank to partner with Plain Green and Great Plains," *id*. ¶¶ 96-97; and, (5) "based on his rapport with the Tribes through prior transactions, Mr. Haynes also acted as the liaison between Think Finance and the Tribes." *Id*. ¶ 98.

The discovery plaintiffs have confirms that: (1) Haynes took credit for connecting Think Finance to the Chippewa Cree; (2) that the Haynes defendants agreed to provide "ongoing consulting services" defined as services "in connection with implementing and operating the" loan processes; (3) Haynes reviewed a recommended tribal code forwarded by Think Finance; (4) the Haynes defendants assisted the Chippewa Cree tribe with the purchase of the Plain Green website; (5) Haynes Investments funded 100% of all Plain Green loans; (6) Haynes actively helped secure ACH processors for the lending process in 2013 and 2014, as well as debit/credit card processors; (7) and Haynes was intimately involved with creating the "complete business ready package" to enable tribes to carry out the scheme. *See* MTD Oppo. (Dkt. No. 111-4) at 4-6.

As to loans allegedly "funded" (or more perhaps more aptly, "enabled") by the Haynes defendants in California, plaintiffs do not rely on any hard figures showing how many California loans were funded by Plain Green and GPL during the relevant time period. That is presumably because that information has been marked confidential by non-party Think Finance. Instead, using figures from a similar lawsuit, plaintiffs assert that the Haynes defendants can be assumed to have funded or enabled the funding of loans in California far in excess of the $22 million dollars

27

of loans they funded in the much-less populous state of Virginia.  MTD Oppo. 4, n.2.

These allegations, as supplemented by the evidence, are adequate to make a prima facie case for exercising personal jurisdiction over the Haynes defendants, who are alleged to be responsible for the creation and implementation of the allegedly fraudulent and illegal scheme as well as funders of millions of dollars in loans in California.  These allegations suffice to make a prima facie showing of "intentional acts" "expressly aimed" at California sufficient to establish both the "purposeful direction" and "purposeful availment" tests for specific jurisdiction.

Given the size and commercial value of the California market, plaintiffs assert that defendants cannot claim ignorance that their loans would be secured by California consumers. The exercise of jurisdiction over the Haynes defendants is reasonable in light of the Haynes' defendants' alleged immense profit from loans secured by California consumers, California's significant interest in having its usury rates applied to California consumers, the miniscule burden to defendants of litigating here, and that the only other law defendants contend applies to this dispute (tribal law) is a sham attempt to avoid state usury laws.

Absent *evidence* to the contrary produced by Haynes defendants, I find plaintiffs' allegations sufficient to establish personal jurisdiction in California over the Haynes defendants. The personal role of Haynes and the corporate role of Haynes Investments in the scheme are alleged in detail.  While the specific connection of those intentional acts to California is weaker, given that defendants have come forward with no evidence regarding the actual number of loans generated by Plain Green or GPL in California, and the apparently reliable source (discovery in another case regarding loans in Virginia) for plaintiffs' unrebutted estimate (far in excess of $22 million in loans), there is a basis to find that the Haynes defendants both directed their activities to California and purposefully availed themselves of the large market for loans in California.  The purpose of the loan schemes allegedly orchestrated by the Haynes defendants and others was to avoid usury laws, like California's, in order to make more money off of consumer loans, like the ones secured by Brice, Browne, and Novorot.

As to the third prong of the specific jurisdiction test, the Haynes defendants argue it would be unreasonable to exercise jurisdiction over them in California because the making and direct

United States District Court
Northern District of California

1   funding of the loans in California were not undertaken by the Haynes defendants and Texas, where

2   the Haynes defendants are located, is more convenient for them and not inconvenient to plaintiffs,

3   as plaintiff Browne instituted an adversary proceeding against Think Finance in Texas mere

4   months before filing this suit. However, the interests of California in protecting low income

5   consumers (as plaintiffs assert they are) and in applying its usury laws far outweigh the interests of

6   Texas as the residence of the defendants. It is not unreasonable to require defendants to litigate

7   this case here.[21]

8       For the forgoing reasons, I DENY the Haynes defendants' motion to dismiss for lack of

9   personal jurisdiction.

10      **C.**    **Failure to State a Claim**

11       The Haynes defendants also move to dismiss for failure to state a claim. They assert that

12   tribal law applies (undermining both the asserted state law claims as well as the RICO claim) and

13   that plaintiffs have failed to state their RICO, usury, and unjust enrichment claims.

14       **1.**    **Choice of Law**

15       The Haynes defendants argue that the choice-of-law provisions in the Plain Green and

16   GPL loan contacts govern, meaning that tribal law must be applied to plaintiffs' claims. Under

17   that theory, the Haynes defendants contend that the California usury and unjust enrichment claims

18   cannot be stated and the RICO claim fails because the interest rate charged by the tribes was not

19   "at least twice the enforceable rate" permitted under the laws of the tribes. *See* 18 U.S.C. §

20   1961(6) (defining an "unlawful debt" under RICO).

21       Plaintiffs raise several good reasons why the tribal choice-of-law provisions should not be

22   enforced. First, similar to the arguments made in opposing the motion to compel arbitration,

23   plaintiffs assert that the choice-of-law provisions mandating tribal law effectively deprive

24   plaintiffs of their statutory rights and remedies and are therefore unenforceable. In support,

25   plaintiffs rely on numerous decisions from other circuits and district courts interpreting internet

26

27

28

---

[21] Because I find that the allegations of the Complaint, supplemented by the discovery evidence, satisfy the *prima facie* case for specific personal jurisdiction, I need not reach the alternative ground for jurisdiction under RICO, 18 U.S.C. § 1965(b) or §1965(d).

United States District Court
Northern District of California

loan agreements with materially similar language requiring application of tribal law and concluding – mostly in the context of holding the arbitration agreements unenforceable *because* the choice-of-law provisions were unacceptable prospective waivers – that the tribal choice-of-law provisions are an impermissible prospective waiver.[22]  *See, e.g., Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017) (rejecting defendant's attempt "to rewrite the unenforceable foreign choice of law provision in order to save the remainder of the arbitration agreement"); *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 675 (4th Cir. 2016) (in the context of finding arbitration agreement unenforceable, noting that "[i]nstead of selecting the law of a certain jurisdiction to govern the agreement, as is normally done with a choice of law clause, this arbitration agreement uses its 'choice of law' provision to waive all of a potential claimant's federal rights."); *Rideout v. CashCall, Inc.*, 16-02817, 2018 WL 1220565, at *6 (D. Nev. Mar. 8, 2018) (in finding arbitration agreement unenforceable, holding that, "Plaintiff cannot, based upon the facts of this case, waive substantive federal rights through a choice of law or forum selection clause."); *see also Titus v. ZestFinance, Inc.*, 18-5373 RJB, 2018 WL 5084844, at *5 (W.D. Wash. Oct. 18, 2018) ("the arbitration agreement here uses a choice of law provision, which, when construed with the other provisions in the Loan Agreement, prospectively waives most federal statutory remedies. Although the language in this case is not as specific as it was in *Hayes*, it implicitly achieves the same results.").

Defendants do not address or distinguish those opinions or otherwise argue why the tribal choice-of-law provisions are enforceable despite their attempt to effect a waiver of statutory rights and remedies in their motion to dismiss.  Instead, they argue only that plaintiffs have failed to identify any "specific" federal right or remedy that they are precluded from pursuing.  That alleged failure does not save an otherwise wholly unenforceable choice-of-law provision.  I see no reason to depart from the cases discussed above.

The choice-of-law provisions in the agreements at issue are unenforceable prospective waivers.  Therefore, the Haynes defendants' motion to dismiss based on choice-of-law is

---

[22] Here, the choice-of-law provisions seek to impose Chippewa Cree tribal law on the Plain Green loans and Otoe-Missouria tribal law on the GPL loans.

United States District Court
Northern District of California

DENIED.[23]

## 2. RICO

The Haynes defendants next move to dismiss plaintiffs' RICO claim. They argue that plaintiffs fail to plead proximate causation between the Haynes defendants' conduct and plaintiffs' damages and fail to allege a substantive violation under RICO, resulting in plaintiffs' inability to allege conspiracy under RICO.

### a. Standing

The Haynes defendants argue that plaintiffs' RICO claim fails because plaintiffs have not alleged that the Haynes defendants, as opposed to the RICO enterprise, has proximately caused them harm. Essentially, the Haynes defendants contend that because their conduct was several steps removed from the conduct that caused the actual harm – the allegedly usurious rates and fees charged under the loans and received first by the Tribes (Plain Green and GPL) and then processed by Think Finance – plaintiffs cannot plead proximate causation under RICO as to them.

As explained by the Supreme Court in *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010), "[p]roximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations; proximate cause thus requires 'some direct relation between the injury asserted and the injurious conduct alleged,'" and links that are "too remote," "purely contingent," or "indirec[t]" are insufficient. *Id*. at 9. This is not a case where the injury alleged was caused by intervening acts of third parties or where the injuries were unexpected or speculative. Instead, the injury here was expressly contemplated, and allegedly designed and specifically intended by the Haynes defendants. These allegations suffice for proximate cause. *See, e.g., Bridge v. Phoenix*

---

[23] Because I conclude the choice of law provisions are unenforceable prospective waivers, I need not reach plaintiffs' alternate arguments that the choice of law provisions must be set aside because of the lack of a substantial relationship between the Tribes and the end-consumers and that application of the Tribal choice of law violates California's strong public policy protecting consumers against usury. However, I note the persuasive analysis of district courts who have refused to enforce materially similar choice of law provisions. *See CashCall, Inc*., CV-157522-JFWRAOX, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) ("Application of CRST law would be contrary to a fundamental public policy of sixteen states, and those states have a materially greater interest than CRST in the application of their laws."); *see also MacDonald v. CashCall, Inc*, CV 16-2781, 2017 WL 1536427, at *8 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018) ("application of CRST law would be contrary to New Jersey's fundamental public policy of protecting its citizens from usurious loans and unlicensed lenders.").

United States District Court
Northern District of California

*Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) (proximate cause satisfied where injury was "direct result of petitioners' fraud," a "foreseeable and natural consequence of petitioners' scheme," and where there were "no independent factors that account for" the claimed injury, and "no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue.").[24]

In Reply, the Haynes defendants make a more nuanced argument, complaining that there is no proximate cause between the Haynes defendants' actions allegedly taken in 2011-2015 and the harms suffered by plaintiffs in 2016-2018. MTD Reply at 11. However, at the motion to dismiss stage, plaintiffs have sufficiently alleged how the Haynes defendants helped create, fund, and run the loan scheme that directly caused plaintiffs' injuries. The outer boundaries of proximately caused damages is better determined on a full evidentiary record.

The motion to dismiss the RICO claim for failure to plead proximate causation is DENIED.

### b.      Violation of Section 1962

Plaintiffs allege that the Haynes defendants violated three separate RICO provisions. I will discuss each below.

### i.      Section 1962(a)

Section 1962(a) prohibits a person who receives income derived from a pattern of racketeering activity from using or investing such income in an enterprise engaged in interstate commerce. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1149 (9th Cir. 2008). A plaintiff asserting a section 1962(a) violation must allege facts showing he was injured by the use of racketeering income. *Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.*, 981 F.2d 429, 437 (9th Cir.1992). This "investment injury" must be "separate and distinct from the injury flowing from the predicate act...." *Sybersound Records,* 517 F.3d at 1149. Finally, "[r]einvestment of proceeds from alleged racketeering activity back into the enterprise to continue its racketeering

---

[24] The fact that consumers (represented by plaintiffs' counsel here) have sued other parties to recover for their injuries, including ACH providers (MTD Reply 13), does not mean plaintiffs injuries were not also proximately caused by the Haynes' defendants' role in the scheme.

United States District Court
Northern District of California

1   activity is insufficient to show proximate causation." *Id*.

2       The activity alleged by plaintiffs here is the collection of unlawful debt, not racketeering.

3   While defendants argue that plaintiffs have failed to allege a "connection" between the funds the

4   Haynes defendants received from the scheme (the enterprise) to the funds that the Haynes

5   defendants invested in the enterprise, this hinges in large part on the Haynes defendants'

6   contention that they were not the ones that collected the unlawful debts. However, plaintiffs'

7   allegations regarding the structure of profits from the scheme paid to the Hayes defendants, plus

8   allegations that the Haynes defendants reinvested in the scheme as late as 2013, is sufficient at this

9   juncture.

10                          ii.      **Section 1962(b)**

11      Section 1962(b) prohibits "any person through a pattern of racketeering activity ... to

12  acquire ... control of any enterprise" engaged in or affecting interstate or foreign commerce. The

13  "control" required is "is best determined by the circumstances of each case and does not require

14  formal control such as the holding of majority stock or actual designation as an officer or

15  director." *Ikuno v. Yip*, 912 F.2d 306, 310 (9th Cir. 1990). The Haynes defendants argue that

16  because there are no allegations that the Haynes defendants, personally, collected the illegal debts

17  or otherwise engaged in racketeering activity, the RICO claims fail.

18      The Complaint repeatedly alleges that the Haynes defendants' role went beyond mere

19  investing and included helping create the scheme, setting up the entities involved, and providing

20  consulting services and key components (ACH transfer houses) that were needed to run the

21  enterprise.[25] The Complaint also explains in detail how the Haynes defendants were compensated,

22  directly from the allegedly usurious rates and fees charged on the loans, over and above the

23  amounts of their "investments." Those allegations are sufficient at this juncture.

24                          iii.     **Section 1962(c)**

25      Section 1962(c) prohibits a person employed by or associated with any enterprise engaged

26

27  ───────────────────────
    [25] *See, e.g., Constellation Bank, N.A. v. C.L.A. Mgt. Co.*, 94 CIV. 0989 (RPP), 1995 WL 42285, at
28  *4 (S.D.N.Y. Feb. 1, 1995) ("[a]llegations that the acquisition or maintenance of an interest in an
    enterprise was obtained by arranging financing satisfies the requirements of section 1962(b).").

                                           33

United States District Court
Northern District of California

in interstate commerce to conduct or participate in the conduct of the enterprise through a pattern of racketeering activity. Similar to their challenges to (a) and (b), the Haynes defendants argue that the failure to allege that they personally collected an illegal debt means that this claim cannot be asserted against them. Plaintiffs do not plead that the Haynes defendants were mere "passive lenders" whose investments were used by others to perpetuate a racketeering enterprise. Instead, they contend that the Haynes defendants were instrumental in setting up, and knowingly set up, an enterprise whose sole purpose was to collect illegal debts, thereby causing those acts to occur and reaping the benefits therefrom. Those allegations are sufficient to establish the participation and direction elements. *See, e.g., Bunnett & Co., Inc. v. Gearheart*, 17-CV-01475-RS, 2018 WL 1070298, at *7 (N.D. Cal. Feb. 27, 2018) (where defendants "are alleged to have been instrumental in setting up the" scheme and "convincing [others] to engage with it," the averments "in combination with Plaintiffs' allegations regarding their roles in the enterprise described above, are sufficient at this stage to plead that each defendant participated in the operation of the enterprise such that they played some part in directing its affairs.").

### c. Conspiracy

Finally, the Haynes defendants assert that because plaintiffs cannot allege a substantive RICO claim (as the loans are neither illegal nor usurious under tribal law and there is no proximate causation alleged between the Haynes defendants and plaintiffs' injuries), no conspiracy claim can be alleged under Section 1962(d). However, as plaintiffs have adequately alleged substantive violations of RICO, their conspiracy claim also survives.

### 3. Usury

The Haynes defendants argue that the usury claim under California law fails for two reasons. First, the statute only holds liable a defendant who received the usurious interest; here it is undisputed that the tribes received the loan payments. Second, the statute of limitations is two years; because the complaint was filed on February 23, 2018 and there are no allegations that the Haynes defendants had any involvement with either Plain Green or GPL since February 2015, this claim is barred. Neither argument has merit.

To the first one, plaintiffs respond that because the defendants indirectly received part of

the usurious interest payments made by plaintiffs and other loan holders, defendants can be liable under California's usury laws even if they were not the direct payor.  Plaintiffs rely on *Creative Ventures, LLC v. Jim Ward & Associates*, 195 Cal. App. 4th 1430, 1449 (Cal. App. 6th Dist. 2011), which held that an investor who allegedly owned a "fractional interest" in usurious loans and who did not directly receive the principal and interest payments from the debtors but received payments from the loan holders (who maintained physical possession of the notes, collected the loan payments from plaintiffs, and disbursed the principal and interest to investors), were liable under California's usury laws.  *Id.* at 1437, 1449.

The Haynes defendants counter that because they never held a "fractional" interest in the loans and never received interest payments *directly* from plaintiffs, *Creative Ventures* is inapposite and they cannot be held liable.  But as alleged, the Haynes defendants received "interest" on the loans they made to Plain Green as well as a 1% referral fee that was based on the amount of money collected from the debtors.  Compl. ¶ 53.  These allegations support plaintiffs' assertions that the Haynes defendants actually *received* some of the usurious interest payments, albeit indirectly.  That is sufficient to state the usury claim against the Haynes defendants.[26]

As to the statute of limitations, plaintiffs do not dispute the two-year statute applies but argue that because class members paid interest that flowed to Haynes defendants within the two

---

[26] The Haynes defendants' cases are inapposite.  In *Liebelt v. Carney*, 213 Cal. 250, 253 (1931) the claim failed because the defendant did not receive any of the usurious interest, even indirectly, and "there was no showing of collusion or relation of any other kind between defendant and either of the assignees," which plaintiffs have adequately alleged here.  Similarly, the claim failed in *Clarke v. Horany*, 212 Cal. App. 2d 307, 310 (Cal. App. 2d Dist. 1963) because there was no allegation of "any joint venture or partnership with the [lenders] in lending money or extending credit (as distinguished from concerted action to exact usurious interest)."  That has been alleged here.  Finally, in *Penziner v. W. Am. Fin. Co.*, 133 Cal. App. 578, 588 (Cal. App. 1st Dist. 1933), the "interest was paid to and received by the finance company alone" and there was no evidence, unlike here, that any of the interest was passed on to the loan company.  *See also Ubaldi v. SLM Corp.*, 11-CV-01320-EDL, 2014 WL 12639953, at *4 (N.D. Cal. Dec. 19, 2014) (concluding plaintiffs did not have standing to certify a class to proceed against a corporate parent defendant where there were no facts supporting allegation that the corporate parent indirect received "residual profits" from the usurious scheme).  Finally, this is not an attempt to hold the Haynes defendants liable for "aiding and abetting" usury – *Bisno v. Kahn*, 225 Cal. App. 4th 1087, 1098 (Cal. App. 1st Dist. 2014), as modified (May 23, 2014) ("agents and abettors could not be held liable under the usury law") – but for their role in creating and directing the scheme and, ultimately, for their indirect receipt of the usurious interest.

United States District Court
Northern District of California

years prior to filing the suit, plaintiffs are entitled to recover that from the Haynes defendants. Specifically, plaintiffs pleaded that they each made payments on their loans within the year prior to suit, the majority of which were credited towards interest and fees. Compl. ¶¶ 138-140. Those allegations, plus recently secured evidence showing that the Haynes defendants continued to receive payments for their funding of Plain Green and involvement in the loan scheme through at least June 2018, suffice at this juncture. MTD Oppo. 34.

The California usury claims are adequately alleged and will not be dismissed. The motion to dismiss this cause of action is DENIED.

### 4. Unjust Enrichment

Finally, the Haynes defendants argue that the unjust enrichment claim must be dismissed, if not under the choice-of-law analysis then because unjust enrichment cannot be stated on the facts here as an independent claim. As with usury, this claim will not be dismissed at this juncture. The choice-of-law arguments have been rejected, unjust enrichment can be an independent claim under California law,[27] and while the Haynes defendants argue that plaintiffs' loan agreements had an "adequate basis at law" to be enforceable and are not unjust, that is the essence of plaintiffs' challenge and will be determined on its merits. The motion to dismiss this cause of action is DENIED.

## IV. MOTIONS TO SEAL

In support of their Opposition to the Motion to Dismiss, plaintiffs submit and rely on various documents produced by the Haynes defendants that were marked as confidential under the Protective Order by defendants. As a result, plaintiffs filed an administrative motion to seal [Dkt. No. 111], conditionally filed those exhibits under seal, and filed a redacted version of their Opposition brief.

In support of the administrative motion to file under seal, the Haynes defendants rely on the declaration of L. Stephen Haynes. Dkt. No. 121.[28] Haynes does not address each type of

---

[27] *See Bruton v. Gerber Products Co.*, 703 Fed. Appx. 468, 470 (9th Cir. 2017) (unpublished).

[28] That declaration was not timely filed, Dkt. No. 122, but will be fully considered.

information defendants seek to file under seal, but broadly requests sealing of whole exhibits and references to the information in those exhibits in the Opposition brief.  He declares generally that: (i) these documents contain "commercially sensitive" information (again without identifying them on a document by document or category by category basis); (ii) that he takes "great efforts" to protect the secrecy of that information; and (iii) "if this information became generally known, then there is a risk of competitive harm to Haynes."  Haynes Decl. ¶ 5.

Because the motion to dismiss is more than tangentially related to the merits – both as to the disputes over the role the Haynes defendants played and the viability of plaintiffs' claims – defendants must show compelling justification overcoming the public's right of access.  *Ctr. for Auto Safety v. Chrysler Group*, LLC, 809 F.3d 1092, 1101 (9th Cir. 2016).

The administrative motion to seal is DENIED.  In his declaration, Haynes fails to provide facts showing the existence of a compelling justification to seal this information.  As an initial matter, Haynes fails to even describe or identify the categories of information at issue and link those categories to specific harms that would likely result from its public disclosure.[29]  *See, e.g., Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1184 (9th Cir. 2006)  ("Simply mentioning a general category of privilege, without any further elaboration or any specific linkage with the documents, does not satisfy the burden.").  Nor does he show that *any*, much less all, of this information (mostly communications and agreements between the parties involved in the lending scheme and presentations) has not become otherwise publicly known given disclosures made in the pending lawsuits and other proceedings regarding the loan scheme at issue.  Finally, there is no justification for sealing all of the information in each of the exhibits in full.  The sealing request is, on its face, impermissibly overbroad.[30]

---

[29] For example, Haynes does not explain that disclosure of the referral agreement between the Haynes defendants and Think Finance [Ex. 2] or the Promissory Note between Plain Green LLC and Haynes Investments [Ex. 34] would likely cause any specifically identified competitive harms to Haynes because specific terms in either document are relevant to Haynes' current or future business plans.

[30] As explained in this Court's Civil Local Rule 79-5, simply because the information is considered confidential or is marked confidential under a Protective Order, does not mean that information should be sealed.  Civ. L.R. 79-5(d)(1)(A).  I note that the Haynes defendants have also failed to comply with my Standing Order on Administrative Motions to Seal.

United States District Court
Northern District of California

The administration motion to file under seal is DENIED and these exhibits will be unsealed.

## CONCLUSION

Accordingly, the Haynes defendants' Motion to Compel Arbitration, Motion to Stay, and Motion to Dismiss are DENIED.  They shall answer the Complaint in ten days.

**IT IS SO ORDERED.**

Dated: March 12, 2019



William H. Orrick
United States District Judge