UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KIMETRA BRICE, *et al*.,

        Plaintiffs,

    v.

HAYNES INVESTMENTS, LLC., *et al*.,

        Defendants.

Case No. 18-cv-01200-WHO

**ORDER ON PENDING MOTIONS**

KIMETRA BRICE, *et al*.,

        Plaintiffs,

    v.

MIKE STINSON, *et al*.,

        Defendants.

Case No. 19-cv-01481-WHO

Dkt. Nos. 178, 179, 181, 182, 183

Defendants move for summary judgment and plaintiffs move for partial summary judgment and to exclude two of defendants' experts in this class action case involving defendants' alleged scheme to charge illegally high rates of interest to consumers. The defendants' motion is DENIED. Material disputes of facts exist concerning each defendant's role in and benefit from plaintiffs' loans secured through the Tribal Lending Scheme that preclude summary judgment. Plaintiffs' motion for partial summary judgment is GRANTED in part. California law applies to plaintiffs' claims. The defendants are not shielded by tribal immunity and the remaining claims do not impact any Tribe's immunity. Plaintiffs' motions to exclude are GRANTED. The level of financial benefit to the Tribe is not disputed. While the issue of control over and direction of the

Tribal Lending Scheme is disputed, that issue will be determined by the jury based on the documentary and percipient witness evidence. The proposed expert testimony is not directly relevant to the remaining legal and factual issues and its admission will unnecessarily risk jury confusion and inefficiencies in trial such that exclusion under Rule 403 is appropriate.

## BACKGROUND

The facts underlying these consolidated actions have been thoroughly identified in my prior Orders and I will not repeat them here.[1] Plaintiffs and named class representatives Kimetra Brice, Earl Browne, and Jill Novorot are (or for part of the class period were) California residents who took out short term loans ("Loan Agreements") with allegedly illegally high rates of interest from entities run through Native American Tribes; Great Plains Lending, LLC and/or Plain Green, LLC.[2] The remaining defendants in these cases are alleged to be founders, funders, or owners of now-defunct Think Finance, LLC, the entity through which the allegedly illegal "Tribal Lending Scheme" was organized, financed, and run.[3]

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify

---

[1] Disputed material facts are identified below.

[2] The loans were run through the Chippewa Cree Tribe, the Otoe-Missouria Tribe, and Tunica-Biloxi Tribe (collectively, the "Tribes").

[3] The remaining defendants in Case No. 19-cv-01481 are Michael Stinson, Linda Stinson, 7HBF No. 2, Ltd., and Stephen J. Shaper (the "Shareholder Defendants"). The remaining defendants in Case No. 18-cv-01200 are Haynes Investments, LLC, and L. Stephen Haynes (the "Haynes Defendants"). One defense motion for summary judgment was filed collectively by 7HBF No. 2, Ltd., Stephen J. Shaper, Linda Stinson, Michael Stinson, Haynes Investment, LLC, And L. Stephen Haynes. Dkt. No. 183. Former defendant SCV separately moved for summary judgment but subsequently settled with plaintiffs. Dkt. Nos. 180, 235.

"specific facts showing there is a genuine issue for trial." *Id*. The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id*. at 255. In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

## I.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants make a number of arguments in support of summary judgment, Dkt. No. 183, but those arguments implicate numerous disputed and material questions of fact to be resolved by the trier of fact.

### A.    Individual Person/Entity Liability[4]

#### 1.    Released-Directors

Defendants argue, as they did on their motion to dismiss, that Linda Stinson and Shaper cannot be liable for their conduct as *directors* of Think Finance, because those claims were released as part of the Think Finance bankruptcy. As I noted in ruling on the Motion to Dismiss:

> The terms of the Final Order confirming the Chapter 11 Plan for Think Finance defined "Non-Released Parties" to include "Linda Stinson (except to the extent released in her capacity as a former director or officer)" and "Stephen J. Shaper (except to the extent released in his capacity as a former director or officer)." December 5, 2019 Final Order at § 1.1.113 [Dkt. No. 84-1]. The release for former officers and director specifies that they "shall not be released for purposes of imposing any liability on any shareholder/member solely in their capacity as a shareholder/member or former shareholder/member." *Id*. § 1.1.144.

---

[4] This portion of defendants' motion seeks judgment in favor of only defendants Linda Stinson, Shaper, and 7HBF. There are no arguments raised regarding the individual or entity liability specifically of Michael Stinson, L. Stephen Haynes, or Haynes Investments, LLC in the "Corporate/Shareholder Law" section of their motion.

There is no dispute, therefore, that to the extent plaintiffs' claims are based on Linda Stinson and Shaper's acts as directors of Think Finance, those have been released and cannot be asserted here. Indeed, in their opposition plaintiffs "withdraw" their limited allegations relating to the action of these defendants in their "capacity as members of Think Finance's Board of Directors." Oppo. to Stinson and Shaper MTD at 3 [Dkt. No. 98].

Plaintiffs, however, continue to assert claims against Linda Stinson and Shaper in "their capacity as owners" of Think Finance, as those types of claims were carved out from the Final Order's release. See Complaint ¶14 (alleging Linda Stinson "operated and participated in the affairs of the rent-a-tribe lending scheme as a board of director of Think Finance and she received proceeds from the usurious loans through her joint ownership of Think Finance with her husband" (emphasis added)); ¶ 26 (alleging Shaper through his "ownership of Think Finance, [] operated and participated in the affairs of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise. He received a large distribution of his profits in Think Finance in the form of shares in Elevate, a publicly traded company that Think Finance spun-off to try to launder the profits of its unlawful enterprise.").

August 2020 Order, at Dkt. No. 110 (quoting "Bankruptcy Release").

There is no dispute, therefore, that liability cannot attach to Linda Stinson and Shaper as members of the Think Finance Board of Directors. The separate question, however, is what liability can attach to these two as shareholder/owners or through their other roles in support of Think Finance and the larger alleged RICO Enterprise. Defendants argue that plaintiffs fail to identify any acts that were performed by these two in their roles as shareholder/owners (as opposed to released-Directors) and contend they cannot be liable based merely on their receipt of dividends from Think Finance (where Shaper owned only 0.26% of Think Finance and Linda Stinson owned 20%).[5]

---

[5] In Reply, defendants argue for a broader interpretation of the release language, contending that the Release is not limited to "actions taken as an officer or director" because to do so would render § 1.1.144, defining the scope of release for officers and directors more generally, a nullity. Dkt. No. 217 at 6-8. They assert that when § 1.1.113 and § 1.1.144 are read together, there is only one result: "Ms. Stinson and Shaper have been completely released except to the extent Plaintiffs could show they took some action '**solely** in their capacity as a shareholder/member or former shareholder/member,' of Think Finance. Acts taken in multiple capacities do not suffice. Acts taken as an employee or consultant to Think Finance do not suffice. And acts taken as the wife of a person providing advice to individuals at Think Finance do not suffice." *Id.* at 8 (emphasis in original). However, as plaintiffs point out, Linda Stinson and Shaper are specifically identified as "non-released" parties in § 1.1.113. That more specific section of the Release provides that "no Non-Released Party shall be a Released Party at any time or for any reason." At least with respect to Linda Stinson and Shaper, the Release is limited only to acts they took as an officer or director and no more.

4

Neither side provides authority on how I should draw lines in recognition of that distinction. The question may, for example, turn on whether Shaper and Linda Stinson were acting more in their capacity as Board members – and fulfilling their required duty of loyalty to Think Finance – or were acting more in their capacity as shareholder/owners with the goal of advancing their own or their family's self-interest.

At this juncture, plaintiffs have identified evidence from which reasonable jurors could find that the Think Finance shareholders/owners directed to some extent the conduct of the Board and management of Think Finance. That evidence, combined with evidence suggesting that both Linda Stinson and Shafer were "key holders" with significant input in Think Finance's operation and that these shareholders invested in Think Finance for the express purpose of profiting from the allegedly illegal loans, precludes summary judgment on this ground.[6]

In addition, there is evidence that Linda Stinson was only a board member of Think Finance *before* it entered into the Tribal Lending Scheme, and therefore she could not be released under the Bankruptcy Release for her conduct that occurred after she stepped down from the Board in January 2011. As to Shaper, while he did serve on the Board during the Tribal Lending Scheme and actions taken in that capacity would be released, Shaper was also a minority but "Key Holder" and was *separately* retained as a consultant to Think Finance. Whether defendants are correct that Shaper's "consultancy" was tied exclusively to his position as a Board member (and arguably released) or whether plaintiffs are correct that Shaper's consultancy was separate from his position as Board member (as evidenced in part by the separate services agreement and

---

[6] The parties spend much time pointing to evidence regarding what specific acts Linda Stinson took to support their competing narratives: that Linda Stinson was an active participant in coordination with her husband in the Tribal Lending Scheme through Think Finance (plaintiffs' version) or that Linda Stinson as a mere passive shareholder with no real responsibility (defendants' version). This debate simply highlights the material disputes of fact and credibility issues that need to be weighed and resolved by the jury. Similarly, the factual or legal significance of any distinctions between the acts that Linda Stinson took with respect to her roles as Director or major shareholder of Think Finance versus the acts that her husband Mike Stinson took as a founder and advisor who may have had significant input, if not control, over the operations of Think Finance despite the lack of a formal title or role, are matters to be weighed and determined by the jury and, as necessary, reviewed post-trial.

separate compensation for that work), are disputes of material fact.[7]

### 2. Shareholder Liability

Defendants also argue that Shaper and Linda Stinson cannot be individually liable as they were merely operating as directors or shareholders of Think Finance and, therefore, are shielded from liability by the corporate form. However, there is sufficient but disputed evidence regarding Shaper and Linda Stinson's central roles in the conduct of these entities such that a jury should decide whether each of these defendants either directed the tortious conduct or otherwise exercised "close personal control" over the entities' tortious activity. *See, e.g., Steinberg Moorad & Dunn, Inc. v. Dunn*, CV 01-07009 RSWL(RZX, 2002 WL 31968234, at *26 (C.D. Cal. Dec. 26, 2002). Within the context of an entity whose primary if not sole purpose was to facilitate allegedly usurious and tortious loans, there are reasonable inferences the jury could draw concerning each of these defendant's roles in enabling and benefitting from those loans.[8]

### 3. 7HBF

Defendants contend that plaintiffs have failed to adduce facts showing that defendant company 7HBF No. 2 Ltd., which simply held Think Finance shares, could be liable to plaintiffs. Defendants contend that evidence regarding the actions of various individuals associated with 7HBF – John Harvison, Johnny Harvison, and Jason Harvison – is insufficient because plaintiffs adduce no facts or basis to hold the company responsible for those individuals' acts under vicarious liability principles. However, the evidence supports that Jason Harvison was at some points an employee of Think Finance and also shows that Jason and his father Johnny Harvison were at some points on the Think Finance's Board of Directors. Plaintiffs have offered sufficient

---

[7] Similarly, whether Shaper's conduct as relevant to this case was released with respect to his equity ownership in GPL Service, Ltd – an issue only raised in defendants' opposition to plaintiffs' motion for partial summary judgment, Dkt. No. 197 – if not waived, appears to rely on disputes of fact concerning how and in what roles Shaper was operating at different points in time.

[8] The posture of this case is unlike situations where a corporation engages in a range of non-tortious business activities and the question is whether shareholders can be individually liable for a discrete act of the corporation that was tortious. This is more like cases where officers or shareholders may be liable for their conduct where the central purpose of the corporation they controlled was based on illegal conduct. *See, e.g., PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368 (Cal. App. 2d Dist. 2000), *as modified on denial of reh'g* (Apr. 7, 2000).

but disputed evidence from which a reasonable jury could find – considering the complex financial arrangements these entities entered into and the closely-held nature of these entities – that despite the positions on the Think Finance Board the two family members held at various times, the identified Harvison family members took acts *on behalf* of 7HBF to fund, advise, and control Think Finance's operations in the interest of 7HBF.[9]

Defendants then argue that any claims against 7HBF are released to the extent they are based on the actions Jason Harvison and Johnny Harvison took while serving on the Think Finance Board of Directors. Defendants contend that common law agency principles recognize that where a litigant releases her claims against an agent (here, the two Harvison Think Finance Board Members) the principal's vicarious liability (here, allegedly 7HBF) is likewise released despite the fact that the Bankruptcy Release expressly excluded 7HBF as a released party.

Defendants read too much into their multistep argument. To the extent the allegations are that the various Harvison individuals were acting on behalf of and for the benefit of 7HBF, the fact that some individual liability may be released for acts committed as Board members of Think Finance (*e.g.*, acts taken pursuant to their fiduciary duties running to Think Finance) does not automatically preclude 7HBF's potential liability. Sufficient but disputed evidence has been offered to allow the jury to determine in whose interest these individuals were acting at various times.[10] Moreover, under California law – which applies to the claims at issue here as explained

---

[9] Plaintiffs point to evidence, disputed by defendants, that 7HBF was "represented" on Think Finance's Board of Directors by Jason Harvison and then by Jason's father Johnny Harvison, and that John Harvison (the father to Johnny and grandfather to Jason) frequently attended and thereby also "represented" 7HBF each time he attended a Think Finance board meeting. Plaintiffs also identify evidence that John Harvison was the person who "runs 7HBF" and would share his opinions with the Board regarding the operation and fundraising for Think Finance and that he helped secure a bank to process the ACH loan transactions for part of the Tribal Lending Scheme. It is unclear when Jason and Johnny served on the Board (for example, plaintiffs contend that Johnny was not a Board member until September 2015, after some of the significant conduct occurred). At base, some portion of the conduct by Jason and Johnny as Board members of Think Finance could potentially release some portion of their potential *personal* liability. However, the defendant here is 7HBF. What acts these individuals took on behalf of 7HBF is disputed.

[10] As plaintiffs note, even if the jury determines that the acts of Jason Harvison or Johnny Harvison were taken on behalf of Think Finance when they were on the Board of Directors, that would not absolve 7HBF for its own conduct in furthering the alleged conspiracy and illegal conduct; it could also be subject to potential vicarious liability for the acts of John Harvison, who never served on the Board of Directors.

in more detail below – "the release of an agent does not absolve the principal of vicarious liability." *See Mesler v. Bragg Mgmt. Co*., 39 Cal.3d 290, 303 (1985) ("[T]he liability of a principal for the tortious acts of his agent, even though wholly vicarious, survives the release of the agent") (*quoting Ritter v. Technicolor Corp*., 27 Cal.App.3d 152, 154 (1972)).[11]

In sum, defendants' arguments regarding Linda Stinson and Shaper's protections under Think Finance's corporate form, the scope of the Bankruptcy Release, and the potential liability of 7HBF may *limit* some of these defendants' potential liability, but disputes of material fact preclude summary judgment at this juncture to Linda Stinson, Shaper, or 7HBF.

## B. RICO

Defendants move for summary judgment on each of plaintiffs' four causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a) – (d). Specifically, defendants contend plaintiffs have failed: (i) to demonstrate proximate cause and therefore standing to bring the RICO claims against these defendants; (ii) to show these defendants have "collected" unlawful debts as required under sections 1962(a) through (c); (iii) lack evidence to support violations of Section 1962(a), (b) and (c); and (iv) the conspiracy claim fails because at most the evidence shows a conspiracy to collect unlawful debts but not a conspiracy to violate RICO.

### 1. Proximate Cause

Proximate cause for RICO purposes "should be evaluated in light of its common-law foundations; proximate cause thus requires 'some direct relation between the injury asserted and the injurious conduct alleged,'" and links that are "too remote," "purely contingent," or "indirec[t]" are insufficient. *Hemi Group, LLC v. City of New York, N.Y*., 559 U.S. 1, 9 (2010); *see also Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 658 (2008) (proximate cause satisfied where injury was "direct result of petitioners' fraud," a "foreseeable and natural consequence of petitioners' scheme," and where there were "no independent factors that account

---

[11] Defendants are correct that Texas law governs the interpretation of and the arguable scope of the Bankruptcy Release. Dkt. No. 217 at 10. But how that release impacts the claims asserted here, including the application of agency principles and vicarious liability, is determined under California law.

for" the claimed injury, and "no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue.").

The "proper referent of the proximate-cause analysis" is the predicate acts alleged. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id.* at 461.

The predicate acts are the provision and the collection of the illegal loans. On this record, plaintiffs have offered sufficient but disputed evidence such that a reasonable juror could find that the acts of *each* defendant – with respect to their separate roles to help create the Tribal Lending Scheme, fund the loans, and direct and operate Think Finance and/or the broader RICO Enterprise, and each defendant's collection of dividends, receipt of repayment of loans, and receipt of other compensation flowing to them from the loan payments made by plaintiffs and other members of the class – had a sufficiently direct connection to the plaintiffs' and class members' injuries to survive summary judgment. Plaintiffs need not show that any particular defendant here approved a particular loan to a particular plaintiff or class member. Given the fact that the predicate acts stem from the illegal loans themselves, the evidence supports that each of these defendants had requisite knowledge of, agreement to, involvement with, and direction of the operation of Think Finance and the RICO Enterprise that directly resulted in the usurious loans being provided to each plaintiff/class member and that directly injured each plaintiff/class member. Of course, that evidence may not be persuasive at trial; defendants may succeed in convincing the trier of fact or on a post-trial motion that the connection between each defendant and the Tribal Lending Scheme and the usurious loans is too weak to sustain the RICO claims or that some of all of the class members' injuries are too indirect to some of the defendant's conduct. At this stage, the evidence is sufficient.

At base, defendants' proximate cause arguments rest on many layers of disputed facts. For example, the jury may believe that Linda Stinson's sole input and influence on Think Finance's operation was her ability to appoint a director as a major shareholder. The jury, however, may believe that together Linda and Mike Stinson had a much more in-depth and joint role in creating,

funding, and continually operating Think Finance and the broader Tribal Lending Scheme.  It may be, based on the evidence at trial, the determinations of disputed facts by the jury, or on post-trial motion that each defendant may only be liable (if at all) for a *subset* of the damages incurred by plaintiffs and the other members of the class.  But there is sufficient albeit disputed evidence at this juncture to satisfy proximate causation.

## 2.    Collection of Unlawful Debts

Defendants argue plaintiffs must show that each defendant "personally" collected an unlawful debt or engaged in a pattern of racketeering activity (the collection of unlawful debts), which plaintiffs have not done.  Dkt. No. 217 at15.  Defendants do not cite cases in support of this proposition, but instead rely on generic jury instructions that simply outline the accepted showing that "defendants" acted "through a pattern of racketeering activity or through collection of an unlawful debt."[12]  Along with other courts, I have already considered and rejected this argument and I will not consider it again.  *See* March 2019 Order in Case No. 18-1200; *see also Gibbs v. Haynes Investments, LLC*, 368 F. Supp. 3d 901, 930 n.53 (E.D. Va. 2019), *aff'd*, 967 F.3d 332 (4th Cir. 2020) ("A plaintiff suing under RICO need not argue that each defendant individually collected the debt.").

Instead, under the law in this Circuit, plaintiffs need only prove each defendant's role in "conducting" an enterprise "through" the "collection" of illegal debts.  As to "conduct," the Supreme Court explained the "conduct or participate" element requires a defendant to "have some part in directing those affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  More precisely, "one is not liable under [§ 1962(c) ] unless one has participated in the operation or management of the enterprise itself."  *Id*. at 183.  Plaintiffs have offered sufficient but disputed

---

[12] Defendants' unsupported interpretation could exclude from culpability individuals in charge of RICO Enterprises.  *Compare* Dkt. No. 183 at 38 ("There are no allegations, documents, or testimony showing any defendant interacted with any consumer in such a way as to have induced repayment on a consumer's loan.  Indeed, when asked, Plaintiffs denied ever having met, had any interactions with, or possessing first-hand knowledge about, any of the Defendants.") *with Tatung Co., Ltd. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1153 (C.D. Cal. 2016) ("RICO's purpose is to reach all involved in the scheme of organized crime, whether they are generals or foot soldiers.") (internal quotation marks and citation omitted).

evidence of these defendants' significant direction of or control over the affairs of Think Finance and associated entities in the Tribal Lending Scheme.[13]

As to the "collection" of debts, defendants argue that "a defendant can only be said to have engaged in the collection of an unlawful debt by evidence showing that a defendant engaged in an action that induced a debtor to repay their debt" and because plaintiffs do not identify what each defendant did to "induce" any consumer to take any action, the RICO claims fail. Dkt. No. 217 at 16; *see also Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148 (3d Cir. 2016) ("the prohibition on the 'collection of unlawful debt' under the statute encompasses efforts to collect on a usurious loan" where defendants' actions "effect the collection of the unlawful debt"); *U.S. v. Pepe*, 747 F.2d 632, 674 (11th Cir. 1984) ("Congress defined 'to collect' in the Extortionate Credit Transactions Statute as 'induce[ing] in any way any person to make repayment.' 18 U.S.C. § 891(5) (1982). We think this is a proper definition of the term 'collection' in RICO as well."). However, the very nature of the Tribal Lending Scheme allegedly created, set up, funded, directed, and run by the defendants can be said to have "induced" repayment by the contractual terms of the loans themselves. The loans, presumably as contemplated and known by each of the defendants, set an allegedly usurious interest rate and required repayment on a set schedule to avoid penalties and fees. It may be that at trial defendants are able to show and the trier of fact may accept that these defendants had slim to no knowledge of the purpose of Think Finance and the Tribal Lending Scheme or knowledge of the terms on which the loans would be provided and repayment required, or otherwise that each defendant's conduct was too far removed or not direct enough to establish the required elements of the RICO claims. But, at this juncture, the disputed evidence suffices.

---

[13] There is some dispute concerning the contours of the RICO Enterprise alleged by plaintiffs. Defendants argue that plaintiffs admit the Enterprise is Think Finance. Dkt. No. 217 at 18-19. Plaintiffs' opposition characterizes the Enterprise as an associated-in-fact Enterprise comprising Think Finance as well as Plain Green, Great Plains, and perhaps other entities. Dkt. No. 202 at 43. The distinctions between these dueling positions do not impact the resolution of the pending motions, other than weighing against granting plaintiffs' motion for partial summary judgment on the existence of a RICO Enterprise.

### 3. Section 1962(a)

Defendants also argue that plaintiffs have failed to submit evidence in support of their Section 1962(a) claim that makes it unlawful for "a person who receives income derived from a pattern of racketeering activity from *using or investing* such income in an enterprise engaged in interstate commerce." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1147 (9th Cir. 2008) (emphasis added). But plaintiffs have offered evidence to support they have suffered an "investment injury separate and distinct from the injury flowing from the predicate act," sufficient to demonstrate standing under Section 1962(a). *Sybersound*, 517 F.3d at 1147.

In the Ninth Circuit, "a plaintiff may have standing under § 1962(a) in one of two ways. A plaintiff can allege that a defendant either: (1) used or invested its ill-gotten racketeering income in a separate enterprise that injured the plaintiff; or (2) used for itself or invested in itself ill-gotten racketeering income from prior separate racketeering activity, thus allowing it to injure the plaintiff." *In re Nat'l Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 772–73 (N.D. Ohio 2020). Plaintiffs have at least two theories they may present to the jury to satisfy the "injury investment rule": the monies gained by Think Finance from its "rent-a-bank" arrangement with the First Bank of Delaware that were used to provide funding for the Tribal Lending Scheme, and that monies earned through the Tribal Lending Scheme were reinvested in Think Finance and injured class members (like named plaintiffs Browne and Novorot) who received multiple loans.[14]

### 4. Section 1962(b)

Section 1962(b) prohibits the use of improper means to acquire or maintain control over an interest in an enterprise engaged in interstate commerce. 18 U.S.C. § 1962(b). "In order to state a claim under § 1962(b), a plaintiff must allege that '1) the defendant's activity led to its control or acquisition over a RICO enterprise, and 2) an injury to plaintiff resulting from defendant's control

---

[14] I note defendants' argument that "reinvestment" by Think Finance back into Think Finance is not adequate. *See, e.g.*, *Sybersound*, 517 F.3d at 1149 (noting that "[r]einvestment of proceeds from alleged racketeering activity back into the enterprise to continue its racketeering activity is insufficient to show proximate causation."). However, given the multiple entities involved (*i.e.*, this is not a situation where the Enterprise simply reinvests the racketeering income back into itself), as well as the separate allegations regarding the Elevate Credit spin off and the multiple injuries related to multiple loans, summary judgment on this issue is not appropriate. This argument may be raised again with fuller briefing *in limine* or post-trial.

United States District Court
Northern District of California

or acquisition of a RICO enterprise.'" *Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 830 (9th Cir. 2003 (quoting *Sebastian Int'l, Inc. v. Russolillo*, 186 F.Supp.2d 1055, 1068 (C.D. Cal. 2000)). In order to state a claim under this subsection, plaintiffs must demonstrate that "Defendants' control of the enterprise is the result of the alleged racketeering activity, as opposed, for example, to an interest derived from their legitimate business activities." *Mahai Dutciuc v. Meritage Homes of Arizona, Inc.*, CV-09-866-PHX-MHM, 2010 WL 11515527, at *5 (D. Ariz. Sept. 16, 2010), *aff'd sub nom. Dutciuc v. Meritage Homes of Arizona, Inc.*, 462 Fed. Appx. 658 (9th Cir. 2011) (unpublished).[15]

In their opposition, plaintiffs focus on evidence regarding the control element of 1962(b). That evidence is sufficient at this juncture. However, as defendants point out in reply, 1962(b) arguably requires evidence of use of racketeering activity or the collection of unlawful debts *to* "acquire or maintain the interest in the enterprise." Dkt. No. 217 at 20 (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1190 (3d Cir. 1993)). In other words, plaintiffs must offer evidence that defendants acquired or maintained their control of the Enterprise *through* the debt collection itself. But considering the evidence on this record, plaintiffs may be able to convince a reasonable juror that the collection of unlawful debts by these defendants allowed these defendants to acquire or maintain their control of Think Finance and the larger Enterprise, and that these defendants' interests in Think Finance and the larger Enterprise were not otherwise "legitimate" for other legal purposes.

### 5. Section 1962(c)

Defendants contend that the subsection (c) claim fails because plaintiffs' evidence is merely that the defendants played some role with Think Finance, but there is no evidence of these defendants' operation or management with respect to any larger association-in-fact enterprise. As

---

[15] In Reply, defendants argue that the RICO claims must be dismissed because Think Finance cannot be both the Enterprise as well as a RICO defendant. Dkt. No. 217 at 18-19. However, even assuming Think Finance is the sole RICO Enterprise (although plaintiffs plead that Think Finance and other entities including Great Plains and Plain Green formed an associated-in-fact Enterprise) Think Finance is *not* a defendant in either of the pending actions. Defendants cite no authority prohibiting plaintiffs from pursuing different theories in different cases. The fact that Think Finance is not a named RICO defendant in this case also obviates' defendants' distinctiveness arguments.

noted above, there is some ambiguity concerning the nature and scope of the Enterprise that plaintiffs seek to prove. Assuming it is limited to Think Finance, there is sufficient evidence of these defendants' significant direction of or control over the affairs of Think Finance.[16] If broadened to include other entities identified by plaintiffs (namely Plain Green and Great Plains) in an associated-in-fact enterprise, there is still adequate evidence that each of these defendants played a role in operating or controlling the larger Enterprise *through* their conduct with Think Finance and in some instances (*e.g.*, with the Haynes defendants) also through direct acts with the Tribal Entities. There is sufficient, albeit disputed, evidence that each defendant understood, intended, and directed the Enterprise's running of loans through the Tribal Entities.

This is not a situation under plaintiffs' theory of the case where an Enterprise conducts both "legitimate" and "illegitimate" business. In that situation, defendants' argument that the shareholders were operating in simply a "normal commercial/shareholder relationship" would be stronger and could weigh in favor of summary judgment. Dkt. No. 183 at 47. Because there is evidence from which a reasonable juror could determine that the whole purpose of the Enterprise (and the primary if not sole purpose of Think Finance) was to create, fund, run, and profit from the making of the usurious loans through the Tribal Lending Scheme, summary judgment is not appropriate on the control or direction element of Section 1962(c).

That plaintiffs' evidence does not assign specific, identified roles or responsibilities to each defendant in the Enterprise does not undermine this claim. *See, e.g., Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) ("an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise"). It may be that at trial the jury rejects plaintiffs' evidence regarding the "control and direction" of the Enterprise by some or all of the defendants, believing instead that one of more of them did not have or exercise the requisite control or direction over the conduct of the Enterprise. But that is in dispute and should be

---

[16] In *Reves v. Ernst & Young*, 507 U.S. 170 (1993), the Supreme Court determined, "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Id.* at 179. The Court noted that this test does not limit liability to "those with primary responsibility for the enterprise's affairs" or even "those with a formal position in the enterprise." *Id.*

resolved by the jury.

### 6.    Conspiracy

A defendant may be guilty of a conspiracy to violate the substantive provisions of RICO if the evidence showed that they "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." *U.S. v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005). As noted above, there is sufficient but disputed evidence that each defendant not only knowingly agreed to facilitate the Tribal Lending Scheme through the RICO Enterprise *but also* allegedly directed and controlled the RICO Enterprise, whose sole existence (as well as the primary if not sole purpose of Think Finance) was to generate usurious loans through those schemes. That suffices for Section 1962(d).

Defendants' motion for summary judgment on the RICO claims is DENIED.

### C.    State Law Claims

The defendants also move for summary judgment on plaintiffs' California law claims, arguing they are barred by the statute of limitations and that the claims otherwise fail.

### 1.    Statute of Limitations

Defendants contend that no class member can assert a viable usury or unjust enrichment claim against the Stinsons, Shaper, and 7HBF under the limitations period – which at most is two years under California law, *see* Cal. Code Civ. Proc. § 339 – because usury and unjust enrichment claims accrue only *after* a debtor pays excess interest and that excess interest is received by the defendant. Defendants note the undisputed evidence that the last date on which "any defendant" received a payment from Think Finance in the form of dividends was in February 2016, but this case was not filed until March 2019.

Plaintiffs agree that February 2016 was the last dividend payment date relevant to the shareholder defendants. However, they argue that the jury should be allowed to determine whether these claims have been equitably tolled.[17] Addressing similar claims challenging the

_____

[17] In California equitable tolling can apply where: "(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his

same Tribal Lending Scheme, a district court in Virginia concluded that equity warranted tolling

of at least the RICO claims (until the date a similar suit was filed in that District) based on the

terms of the loan agreements. Those agreements – as here – "purported to waive [plaintiff's]

federal rights and force him to litigate any remaining rights in an ill-defined "Tribal Forum" with

no apparent existence. . . . Thus, the Court will not fault [plaintiff] for failing to bring any RICO

claim until after June 2017, because the plain terms of his loan agreement purported to waive such

a claim and provided an ambiguous forum for the presentation of any claims, even those arising

under tribal law." *Hengle v. Asne*r, 433 F. Supp. 3d 825, 892 (E.D. Va. 2020), *motion to certify*

*appeal granted*, 3:19CV250 (DJN), 2020 WL 855970 (E.D. Va. Feb. 20, 2020).

As noted in my prior orders in these related cases, the contracts here have very similar

waivers and provisions that could have lulled plaintiffs into not attempting to file suit to remedy

both their federal and state law claims. Equitable tolling appears to apply. Any final

determination will be based on a review of the evidence at trial regarding not only the defendants'

conduct, expectations, and knowledge of or direction over the terms of the loan agreements used

in the Tribal Lending Scheme, but also the conduct and testimony of the plaintiffs.[18]

_____

injury." *Hopkins v. Kedzierski*, 225 Cal. App. 4th 736, 756 (Cal. App. 4th Dist. 2014) (internal quotations and citations omitted). The "determination of whether a defendant's conduct is sufficient to invoke the doctrine is a factual question entrusted to the trial court's discretion." *Id.* (quotation omitted).

[18] Plaintiffs also contend that if defendants are found to be jointly and severally liable for tortious conduct, they could be responsible for equitable restitution despite not having received distributions past February 2016, as the evidence will show they were "partners engaged in concerted wrongdoing." *SEC v. Curative Biosciences, Inc*., 8:18-CV-00925-SVW, 2020 WL 7345681, at *6 (C.D. Cal. Oct. 22, 2020 (citing *Liu v. SEC*, 140 S. Ct. 1936, 1949 (2020)). The question of what, if any, equitable relief should be awarded to plaintiffs will be determined only after considering the jury verdict and the evidence at trial regarding each of these defendants' knowledge of, participation in, and benefit from the Tribal Lending Scheme.

Plaintiffs' joint and several and co-conspirator theories of theory of liability are not, as alleged by defendants (Dkt. No. 217 at 22), new theories of liability that cause them prejudice. Given the discovery to date and the breadth of the RICO claims – that implicate all of these defendants' conduct as well as joint and several damage – there is no prejudice to plaintiffs' reliance on these theories at this juncture.

Nor is the joint and several liability concept – at least as proposed by plaintiffs here – necessarily impermissible under *Clarke v. Horany*, 212 Cal. App. 2d 307, 310 (Cal. App. 2d Dist. 1963) and its progeny. Those cases reject "aiding and abetting" theories attempting to state usury claims against agents or employees of lenders who received servicing or administration fees or other

### 2. Usury

Defendants more broadly attack the usury claim because any monies received by defendants through Think Finance – the dividends to the shareholder defendants and the finder's fee to the Haynes defendants –were not "direct" payments of usurious interest from the consumers to these defendants. Dkt. No. 183 at 51-53 (relying on *Creative Ventures, LLC v. Jim Ward & Associates*, 195 Cal. App. 4th 1430, 1449 (2011); *Clarke v. Horany*, 212 Cal. App. 2d 307, 311 (1963); *Liebelt v. Carney*, 213 Cal. 250, 253 (1931)). In essence, defendants argue that only the Tribal Entities could be liable for usury because only they received the usurious payments directly from the consumers.

I have already rejected this argument in connection with the Haynes defendants and addressed the cases defendants rely on, finding:

> [A]s alleged, the Haynes defendants received "interest" on the loans they made to Plain Green as well as a 1% referral fee that was based on the amount of money collected from the debtors. Compl. ¶ 53. These allegations support plaintiffs' assertions that the Haynes defendants actually received some of the usurious interest payments, albeit indirectly. That is sufficient to state the usury claim against the Haynes defendants.

*Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 985–86 & n. 26 (N.D. Cal. 2019). Defendants point to no evidence or unconsidered caselaw that would result in a different conclusion at this juncture as to Haynes or any other defendant.[19]

### 3. Unjust Enrichment & Unfair Competition Law Claim

Defendants argue the unjust enrichment and Unfair Competition Law claims (UCL, Cal. Bus. & Prof. Code § 17200 *et seq.*) likewise fail as they are both fully derivative of the failed usury claim. The usury claim, as noted, will proceed to trial. Moreover, even if the UCL claim was tethered strictly to the usury claim under the illegality prong of the UCL and the usury claim

---

compensation for "their services". Joint liability here is based on allegations of "concerted action to exact usurious interest." *Id*. at 310.

[19] It may be that the way compensation to the defendants was structured – whether through dividends, consulting fees, finders fees, or otherwise – was unrelated to the numbers of loans made/usurious interest collected, or was more akin to fees for services as in *Clarke*, *supra*, and *Ubaldi v. SLM Corp*., 11-CV-01320-EDL, 2014 WL 12639953, at *5 (N.D. Cal. Dec. 19, 2014). If so, the usury claim may fail. This argument may be re-raised during or post-trial depending on what the evidence at trial shows.

failed at trial or post-trial, plaintiffs have preserved their right to argue that defendants' conduct was fraudulent or unfair under the UCL. Plaintiffs' discovery responses indicating their UCL claim was "based on" the charging of usurious interest does not preclude, for example, unfair claims tethered to the policy behind the usury laws. *See, e.g., Lozano v. AT & T Wireless Services, Inc.*, 504 F.3d 718, 736 (9th Cir. 2007). Even if it was ambiguous, there is also no harm at this juncture to allowing plaintiffs to proceed under all three UCL prongs as the discovery and defenses to claims under each of the prongs are identical.

Defendants separately argue that no unjust enrichment claim can be litigated against the shareholders based on their mere receipt of dividends because that would be duplicative of the fraudulent transfer claim being litigated in the Think Finance bankruptcy proceedings and plaintiffs here should not be able to "jump the line" of creditors there. I will not grant summary judgment on the unjust enrichment claim based on this argument. It is not clear that the basis of the fraudulent transfer claim or the relief being sought under that claim are coextensive with the unjust enrichment claim asserted here. After viewing the evidence at trial, and upon further submission from defendants in support of this argument, I will address this argument post-trial.

For the foregoing reasons, defendants' 7HBF No. 2, Ltd., Stephen J. Shaper, Linda Stinson, Michael Stinson, Haynes Investment, LLC, and L. Stephen Hayne's Motion For Summary Judgment is DENIED.

## II. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs move for partial summary judgment on the following issues: (i) the choice-of-law provisions in the loan contracts are unenforceable; (ii) California law applies to the loans; (iii) tribal immunity does not apply to defendants/the loans (Third Affirmative Defense); (iv) the RICO conspiracy claim has been established, 18 U.S.C. §1962(d); and (v) the substantive RICO violation under 18 U.S.C. § 1962(c) has been established. Dkt. No. 182.

### A. Choice of Law

Plaintiffs argue that the loan contracts' choice of law provisions selecting tribal law are uniformly unenforceable. They contend that this conclusion is mandated by my prior determination invalidating the forum selection clauses in these same contracts. In my prior order,

18

considering *both* the provisions of tribal law identified by defendants that would cover plaintiffs' claims and the provisions mandating the tribal forum, I concluded that given defendants' failure to identify "any provision of the allegedly applicable tribal laws that would enforce the state and federal statutory rights of plaintiffs or analogous rights arising under tribal law," the "the choice-of-law provisions regarding the lenders and the loan agreements, in conjunction with arbitration agreement provisions restricting the law the arbitrator may apply, create an unambiguous waiver of rights and the agreements and are therefore unenforceable." *Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 973 (N.D. Cal. 2019); *see also Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 345 (4th Cir. 2020 (reviewing the Otoe-Missouria and Chippewa Code provisions and concluding that those laws did not allow "the effective vindication of federal statutory protections and remedies").

In their opposition, defendants do not attempt to address their prior failure to demonstrate that adequate remedies exist under tribal law or otherwise explain why I should depart from my prior analysis. They simply rehash their arguments, relying on the same cases I already addressed or considered in connection with their motions to compel, to dismiss, or to stay pending appeal in these consolidated cases.[20] I need not revisit the issue. The choice of law provision mandating tribal law is unenforceable and plaintiffs' motion for partial summary judgment on this ground is GRANTED.

### B. California Law Applies

Absent the contractual provision, there is only one choice of law to apply, California. Contrary to defendants' arguments, there are no material questions of fact that preclude my determination that California law applies.[21] California law is the only law left that could apply to the plaintiffs' and class members' claims. *See also Gingras v. Rosette*, 5:15-CV-101, 2016 WL

---

[20] For example, defendants relied on *Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir. 1998) in seeking to stay proceedings pending defendants' appeal. Case No. 18-cv-01200, Dkt. No. 139.

[21] Even if there were disputes of material fact, the record is sufficient for me to resolve them now as this is not one of those "rare cases" where the choice-of-law determination "is so bound up in the substantive claims that the court cannot decide it without compromising the constitutional guarantee of a jury resolution." *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1161–62 (N.D. Cal. 2016).

2932163, at *15 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc*., 922 F.3d 112 (2d Cir. 2019) ("the only remaining choice for substantive rules of decision about unconscionability and the enforcement of the arbitration clause is Vermont law. There is no viable alternative.").

If there were another choice, the choice of law factors applied as a matter of federal common law from the Restatement (Second) of Conflict of Laws § 187 (1971) support application of California law to the plaintiffs and class members who took out their loans in California.[22] California, with its strong history of prohibiting usury, has the materially greater interest in enforcing its usury laws and protecting its consumers from usurious conduct than either of the relevant Tribal Entities whose connection to the loans – while not insignificant – was temporal and whose aims were to avoid state usury laws.

Plaintiffs' motion for partial summary judgment as to the applicability of California law is GRANTED.[23]

---

[22] *See Flores v. Am. Seafoods Co*., 335 F.3d 904, 916–17 (9th Cir. 2003):

The principles governing analysis of choice-of-law provisions appear in Restatement (Second) of Conflict of Laws § 187 (1971), titled 'Law Of The State Chosen By The Parties,' which provides as follows:
(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either:
(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

[23] Defendants place great weight on an unpublished order from the Texas Bankruptcy Court that denied cross-motions for summary judgment on the choice of law issue raised by Think Finance and the Gibbs plaintiffs. Dkt. No. at 197 at 16-18 (discussing oral ruling from September 26, 2018, Ex. 18 to Boughrum Decl.). However, that court had not yet determined whether the tribal law and tribal forum provisions were unenforceable prospective waivers. My prior decision and the Fourth Circuit's decision in *Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 345 (4th Cir. 2020) directly considered those issues and determined the provisions were impermissible prospective waivers.

### C.     Tribal Immunity Does Not Apply

Plaintiffs seek summary judgment on defendants' third affirmative defense; that some defendants are protected by or some claims extinguished by tribal immunity.  In their opposition, defendants admit they personally "are not entitled to assert or invoke sovereign immunity as a defense to these claims" but nonetheless argue plaintiffs' litigation "of these claims against shareholders of entities providing contractual services to those lenders is a significant infringement on the sovereignty of the tribes. . . . ."  Dkt. No. 197 at 22.  Defendants miss the point.  The claims here hinge on the personal conduct of the defendants.  While that conduct is based in significant part on the services defendants personally engaged in or approved to be provided to the Tribes, the claims do not impede on the sovereignty of the Tribes where the Tribes are not defendants in this case and no Tribal Entities remain.  Absent apposite caselaw[24] or facts showing how this action "interferes with the purpose or operation of a federal policy regarding tribal interests,"[25] tribal immunity is irrelevant to this action.

Plaintiffs' motion is GRANTED on the inapplicability of tribal immunity.

### D.     RICO Conspiracy

Plaintiffs' motion for partial summary judgment under 18 U.S.C. § 1962(d) is DENIED. Disputed facts regarding the role of each defendant alleged to be involved in the Tribal Lending Scheme regarding their individual knowledge of the purpose of the Tribal Lending Scheme, disputed facts regarding the benefits they received from the Tribal Lending Scheme, as well as disputed facts regarding their knowledge of the extent of the Enterprise's activities preclude

---

[24] Defendants do not cite any apposite case law in support, and their argument has been rejected in similar cases challenging tribal lending schemes.  *See, e.g., Smith v. Martorello*, 3:18-CV-1651-AC, 2021 WL 981491, at *4 (D. Or. Mar. 16, 2021) (where alleged "purpose in creating the tribal entities was to unlawfully avoid state usury laws. . . [t]he Court does not offend tribal sovereignty by treating as RICO predicates intentional efforts to violate the law.").  It is also questionable whether the immunity would protect the tribes or tribal officials if they were present in this case (and they are not).  *See, e.g., Gingras v. Think Fin., Inc.*, 922 F.3d 112, 120 (2d Cir. 2019), *cert. denied sub nom. Sequoia Capital Operations, LLC v. Gingras*, 140 S. Ct. 856 (2020) ("tribal sovereign immunity does not bar state and substantive federal law claims for prospective, injunctive relief against tribal officials in their official capacities for conduct occurring off the reservation"); *Otoe-Missouria Tribe of Indians v. New York State Dept. of Fin. Services*, 769 F.3d 105, 114 (2d Cir. 2014 ("a tribe has no legitimate interest in selling an opportunity to evade state law").

[25] *Hoopa Valley Tribe v. Nevins*, 881 F.2d 657, 659 (9th Cir. 1989).

summary judgment on the RICO conspiracy claim.

**E.     RICO Enterprise**

Plaintiffs' motion for partial summary judgment under 18 U.S.C. § 1962(c) is DENIED. Material disputes of fact exist regarding the scope of the Enterprise and the relationships between the various entities. Plaintiffs' version of the facts (that the Tribal Lending Scheme was manufactured, packaged, and provided to the Tribal Entities by defendants and their co-conspirators and the Enterprise's sole purpose was providing and then collecting on usurious loans in violation of RICO and state law) and defendants' version (the participants in the alleged RICO Enterprise were no more than investors, consultants, and shareholders entering into routine commercial contracts and corporate arrangements) rest on disputes of material fact for the jury to determine. The same is true regarding the relationship between the various defendants alleged to be "persons" within the Enterprise and their responsibility for managing, controlling, or directing the Enterprise.

With respect to the unlawful debt issue, while I have found that California law applies to the state law claims, more foundation needs to be laid at trial regarding the RSM data and what it supports concerning the rate and amount of interest actually paid by class members. While it appears from plaintiffs' explanation of the source of that data, its contents, and plaintiffs' analyses of it, that the RSM data provides a fair and defensible method by which to determine these issues, *see* April 2021 Order Granting Motion for Class Certification (Dkt. No. 164), I have also noted that the *reliability* and completeness of that data could be tested and challenged by defendants on summary judgment or at trial. *Id.* at 7. At trial, plaintiffs will need to authenticate and prove up the contents of the RSM data through RSM, an expert, or another source with sufficient knowledge in order to show how much usurious interest class members actually paid.

**III.     PLAINTIFFS' MOTIONS TO EXCLUDE**

Plaintiffs move to exclude the testimony of Lance G. Morgan, who opines generally on the comparison of the agreements the Tribal Lending Entities entered into with various defendants to "other tribal corporate structures, strategies, and operational and financial partnering relationships," whether it was "rational" for the Tribal Entities to "outsource several elements of

their respective business operations" to defendants and others and how that outsourcing compares to "other emerging tribal industries," and whether it was "rational" for the Tribes to enter into their respective agreements with some of the defendants. Dkt. No. 198-1 at ECF No. 426-478 (Morgan Report). Plaintiffs argue that Morgan is not qualified to opine on issues relevant to this case and should be excluded under Rules 403 and 702 in light of the danger of misleading the jury, and that his testimony is largely irrelevant, unreliable, or inadmissible legal argument and opinion and therefore it should be likewise excluded under Rules 403 and 702 as well as under *Daubert v. Merell Dow Pharms., Inc*., 509 U.S. 579 (1993). Dkt. No. 178 (Mot. to Exclude Morgan).

Plaintiffs also move to exclude the testimony of Eric C. Henson who opines generally on federal policy encouraging American Indian economic development and self-sufficiency, that the tribal governments at issue entered into "mutually beneficial business arrangements with outside parties that facilitated tribal efforts to engage in online lending," that "revenues raised by the Tribes were directed to essential governmental services," that plaintiffs' allegations "are dismissive of the role played by the governments of the Tribes," and plaintiffs' "efforts to prohibit the Tribes' lending activities directly impair the ability of the Tribes to generate revenues." Dkt. No. 198-1 at ECF No. 480-562 (Henson Report). Plaintiffs argue that Henson is not an expert on any issue relevant to this case, he impermissibly bases his testimony here on other matters, his testimony is unreliable, and he offers excludable legal opinions and argument all of which must be excluded under Rules 403, 702 and *Daubert*.

Plaintiffs' motions to exclude are GRANTED under Rule 403. Both of these experts opine on issues that are not directly relevant to the resolution of the claims against the defendants remaining in these consolidated cases. Whether the structure of the arrangements between the Tribes and some of the defendants here are similar to other prior or subsequent arrangements is not relevant to the potential RICO liability or liability under California law. Similarly, how the Tribes spent the money they received from these arrangements and the social utility of that income to the Tribes is similarly irrelevant to the claims at issue, except to the scope of the financial benefit vis-à-vis non-Tribal entities. However, that issue can be established through documentary and percipient witness testimony.

23

The issues that are relevant – *e.g.*, the scope of the contacts and terms of the contractual arrangements between the Tribes and defendants, how the Tribes and defendants were compensated with respect to the loans and business operations, how much control or responsibility the Tribes had over the loan operations versus the control or operation of the defendants – are all matters that can be offered at trial through documentary evidence and percipient witness testimony. Expert testimony on these issues is not appropriate or necessary.

Finally, the expert testimony proposed by defendants raises a significant chance of misleading the jury and using up valuable trial time on issues that have no relevance to the legal and factual matters to be resolved by the jury. At most, as defendants admit, the testimony of these experts would provide background and context, illuminating the difficulties tribes may face in achieving economic self-sufficiency and the benefit provided to the Tribes by the arrangements with the defendants and others in the alleged RICO Enterprise. But that context may be readily be provided by percipient witnesses.[26] The dangers of admitting this expert testimony in terms of misleading the jury, confusing the issues, and using up trial time outweigh any of its potentially minimal probative value.

As noted in my tentative, I will not allow the use of pejorative terms at trial to describe the nature of the Tribal Entities' operations (*e.g.*, "rent-a-tribe") or the relationships between the Tribes and the defendants or others in the alleged RICO Enterprise. What terms should or should not be used at trial should be addressed through the parties' motions *in limine*.

## IV.      ADMINISTRATIVE MOTION TO SEAL

Plaintiffs filed conditionally under seal documents and information marked as confidential by third-parties in related proceedings. *See* Dkt. No. 181-2. Neither the defendants nor the third-parties have submitted a declaration in support of continued sealing under the compelling justifications standard. *See* Civ. L.R. 79-5(e). I recognize that some of all of these third-parties

---

[26] To the extent either expert's opinions might be relevant to the determination of equitable issues that will be tried to me – for example whether the UCL was violated, whether the benefits to the Tribes from these arrangements outweighed the potential harm to California consumers, and so forth – defendants may seek to introduce these Reports for purposes of my post-jury trial determinations and plaintiffs may object again at that juncture on grounds that do not rest on Rule 403's concerns for jury confusion and trial efficiency.

may be defunct and that the documents or information may have been designated for confidential treatment in other matters and produced for use in this litigation under protective orders issued in other jurisdictions. However, these consolidated actions are on the verge of trial. The fact that these documents may have been produced under protective orders issued in other jurisdictions will no longer suffice to keep the information under seal for purposes of summary judgment or trial here. Representatives of the third-parties or others whose interests align with them must submit a declaration demonstrating existing, compelling justifications for the continued sealing this information. Any such declaration shall be submitted by August 2, 2021. If no such declarations are filed, the Court will unseal the information at issue.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is DENIED. Plaintiffs' motion for partial summary judgment is GRANTED in part and DENIED in part. Plaintiffs' motions to exclude are GRANTED.

**IT IS SO ORDERED.**

Dated: July 13, 2021

_____
William H. Orrick
United States District Judge